**No. 13-56445**
_____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

**VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE DOE a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce,**
*Plaintiffs-Appellants,*
v.
**JONATHAN FIELDING, Director of Los Angeles County Department of Public Health; JACKIE LACEY, Los Angeles County District Attorney; and COUNTY OF LOS ANGELES,**
*Defendants-Appellees.*
_____

**On Appeal from the United States
District Court for the Central District of California
Hon. Dean D. Pregerson, Case No. CV13-00190 DDP (AGRx)**
_____

**APPELLANTS' EXCERPTS OF RECORD
Volume 1 of 2
Pages ER0001 – ER0051**
_____

Robert Corn-Revere
Ronald G. London
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800
Washington, DC  20006
(202) 973-4200

Janet L. Grumer
Matthew D. Peterson
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, CA  90017-2566
(213) 633-6800

Attorneys for Plaintiffs and Appellants
VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.;
JANE DOE a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce
(counsel continue on inside cover)

Paul J. Cambria, Jr.
LIPSITZ GREEN SCIME CAMBRIA LLP
1631 West Beverly Blvd., Second Floor
Los Angeles, CA  90026
(323) 883-1807

H. Louis Sirkin
SANTEN & HUGHES LPA
600 Vine Street, Suite 2700
Cincinnati, OH  45202
(513) 721-4450

# APPELLANTS' EXCERPTS OF RECORD

## Table of Contents

**Volume One**

| | Description | Docket No. | Date | Page |
|---|---|---|---|---|
| 1. | Order Denying in Part and Granting in Part Interveners' Motion Dismiss; Denying in Part and Granting in Part Plaintiffs' Motion for a Preliminary Injunction; and Vacating Plaintiffs' Motion for Judgment on the Pleadings | 79 | 8/16/13 | ER0001 |
| 2. | Order Denying Plaintiffs' Motion for Reconsideration | 78 | 8/2/13 | ER0035 |
| 3. | Order Granting Motion to Intervene | 44 | 4/16/13 | ER0040 |

**Volume Two**

| | Description | Docket No. | Date | Page |
|---|---|---|---|---|
| 4. | Plaintiffs' Notice of Appeal | 80 | 8/19/13 | ER0052 |
| 5. | Intervenors' Memorandum of Points and Authorities in Opposition to Motion for Reconsideration of Court's Order Granting Motion to Intervene | 71 | 7/22/13 | ER0059 |
| 6. | Reporter's Transcript of Hearing on Motions | | 7/11/13 | ER0067 |
| 7. | Order re: Motion for Preliminary Injunction and Motion to Dismiss | 66 | 7/11/13 | ER0073 |
| 8. | Plaintiffs' Notice of Motion and Motion for Reconsideration of Court's Order Granting Intervenors' Motion to Intervene | 63 | 7/5/13 | ER0074 |
| 9. | Plaintiffs' Notice of Supplemental Authority and Notice of Intent to File Motion for Reconsideration of Ruling on Motion to Intervene | 61 | 6/26/13 | ER0078 |
| 10. | Plaintiffs' Reply in Support of Motion for Preliminary Injunction | 59 | 6/17/13 | ER0083 |

| | Description | Docket No. | Date | Page |
|---|---|---|---|---|
| 11. | Intervenors' Request for Judicial Notice in Support of Opposition to Plaintiffs' Motion for Preliminary Injunction | 58 | 6/10/13 | ER0090 |
| 12. | Exhibit A to Intervenors' Request for Judicial Notice in Support of Opposition to Plaintiffs' Motion for Preliminary Injunction | 58-1 | 6/10/13 | ER0095 |
| 13. | Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction | 57 | 6/10/13 | ER0101 |
| 14. | Plaintiffs' Request for Judicial Notice; Declaration of Matthew D. Peterson | 56 | 5/29/13 | ER0108 |
| 15. | Plaintiffs' Notice of Motion and Motion for Preliminary Injunction | 55 | 5/29/13 | ER0115 |
| 16. | Declarations and Exhibits D-E in Support of Plaintiffs' Notice of Motion and Motion for Preliminary Injunction | 55-1 | 5/29/13 | ER0123 |
| 17. | Proposed Order RE Plaintiffs' Motion for Preliminary Injunction | 55-2 | 5/29/13 | ER0174 |
| 18. | Intervenors' Notice of Motion and Motion to Dismiss Complaint | 49 | 5/10/13 | ER0176 |
| 19. | Defendants' Response to Plaintiffs' Motion for Judgment on the Pleadings an Motion for Preliminary Injunction | 43 | 4/15/13 | ER0178 |
| 20. | Defendants' Supplemental Statement of Non-Opposition to Proposed Intervenors' Motion to Intervene | 35 | 3/29/13 | ER0181 |
| 21. | Plaintiffs' Opposition to Motion to Intervene | 34 | 3/25/13 | ER0184 |
| 22. | Defendants' Statement of Non-Opposition to Proposed Intervenors' Motion to Intervene | 28 | 3/11/13 | ER0190 |
| 23. | Proposed Intervenors' Notice of Motion, Motion to Intervene, and Memorandum of Points and Authorities in Support | 24 | 3/1/13 | ER0192 |
| 24. | Defendants' Answer to Plaintiffs' Complaint | 21 | 2/27/13 | ER0199 |

| | **Description** | **Docket No.** | **Date** | **Page** |
|---|---|---|---|---|
| 25. | Plaintiffs' Complaint for Declaratory and Injunctive Relief | 1 | 1/10/13 | ER0203 |
| 26. | Docket Report | | | ER0241 |

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE DOE a/k/a KAYDEN KROSS, | ) ) ) | Case No. CV 13-00190 DDP (AGRx) |
| Plaintiff, | ) ) ) | ORDER DENYING IN PART AND GRANTING IN PART INTERVENERS' MOTION TO DISMISS; DENYING IN PART AND GRANTING IN PART |
| v. | ) ) | PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; AND |
| JONATHAN FIELDING, DIRECTOR OF LOS ANGELES COUNTY DEPARTMENT OF PUBLIC HEALTH; JACKIE LACEY, LOS ANGELES COUNTY DISTRICT ATTORNEY, and COUNTY OF LOS ANGELES, | ) ) ) ) ) ) | VACATING PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS [Docket Nos. 49, 55, 64] |
| Defendants. | ) ) | |

## I. Background

Plaintiffs Vivid Entertainment, LLC ("Vivid") and Califa Productions, Inc., produce adult films. (Compl. ¶¶ 8-9, Docket No. 1.) Plaintiffs Jane Doe, known professionally as Kayden Kross ("Ms. Kross"), and John Doe, known professionally as Logan Pierce ("Mr. Pierce"), are performers who appear in adult films. (Id. ¶¶ 10-11.)

The adult film industry regularly tests actors for sexually transmitted infections ("STIs"). (Id. ¶¶ 20-31.) During the

ER0001

November 2012 elections, Los Angeles County passed, via referendum, The County of Los Angeles Safer Sex in the Adult Film Industry Act ("Measure "B"). (Id. ¶ 36; Docket No. 58-1 Ex. B text of Measure B); Los Angeles County Code § 11.39 ("§ 11.39"), et seq. (codifying Measure B). Measure B forces producers of adult films, before any production can occur, to pay a fee and obtain a permit from the County Department of Public Health (the "Department"), which is tasked with enforcing Measure B. (Id. ¶ 41-43.) The Department of Public Health, set the permit fee in the range of $2,000 to $2,500 per year. (Compl. ¶ 48.) Once approved, the film producers must display the permit at all times during filming. (Id. ¶ 41.) A permit is valid for two years, but is, at all times, subject to immediate revocation. (Id.) Once a permit is granted, Measure B requires that performers engaging in anal or vaginal sexual intercourse to use condoms during filming. (Compl. ¶ 42.)

Department inspectors are granted access to "any location suspected of conducting any activity regulated by" Measure B, without notice. § 11.39.130. Inspectors can look at personal property or private documents from any person present at any location if there is suspicion of a Measure B violation. See id.

Plaintiffs have sued various County officials for Declaratory and Injunctive Relief. (See generally Compl.) Because Defendants have declined to defend Measure B's constitutionality, this Court has allowed Michael Weinstein, Marijane Jackson, Arlette De La Cruz, Mark McGrath, Whitney Engeran, and the Campaign Committee Yes on B, Major Funding by the AIDS Healthcare Foundation ("Interveners") to intervene. (See generally Order Granting Motion to Intervene, Docket No. 44; Order Denying Plaintiffs' Motion for

2

ER0002

1   Reconsideration, Docket No. 78.)  Interveners were Measure B's

2   official proponents.  (Id. at 2:19-20.)  Presently before the Court

3   is Interveners' Motion to Dismiss and Plaintiffs' Motion for a

4   Preliminary Injunction.  (Docket Nos. 49, 55.)[1]

5   **II. Legal Standard**

6       **A. Motion to Dismiss**

7       A complaint will survive a motion to dismiss when it contains

8   "sufficient factual matter, accepted as true, to state a claim to

9   relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S.

10   662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

11   570 (2007)).  When considering a Rule 12(b)(6) motion, a court must

12   "accept as true all allegations of material fact and must construe

13   those facts in the light most favorable to the plaintiff."  Resnick

14   v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint

15   need not include "detailed factual allegations," it must offer

16   "more than an unadorned, the-defendant-unlawfully-harmed-me

17   accusation."  Iqbal, 556 U.S. at 678.  Conclusory allegations or

18   allegations that are no more than a statement of a legal conclusion

19   "are not entitled to the assumption of truth."  Id. at 679.  In

20   other words, a pleading that merely offers "labels and

21   conclusions," a "formulaic recitation of the elements," or "naked

22   assertions" will not be sufficient to state a claim upon which

23

24       [1]Plaintiffs argue the motion to dismiss is untimely because
the County has already filed an answer in this case.  Generally,
25   motions to dismiss must be filed before an answer.  United States
v. Real Prop. Located at 41430 De Portola Rd., Rancho California,
26   959 F.2d 243 (9th Cir. 1992).  It is unclear, though, how this rule
is applied in the intervener context.  Regardless, should the rule
27   apply to Interveners, the Court uses its discretion to convert the
motion to dismiss into a motion for judgment on the pleadings,
28   which is analogous to a motion to dismiss except that it may be
filed after an answer.  See id.

ER0003

1  relief can be granted.  <u>Id.</u> at 678 (citations and internal

2  quotation marks omitted).  "When there are well-pleaded factual

3  allegations, a court should assume their veracity and then

4  determine whether they plausibly give rise to an entitlement of

5  relief."  <u>Id.</u> at 679.

6      **B. <u>Motion for Preliminary Injunction</u>**

7      "[P]laintiffs seeking a preliminary injunction must establish

8  that (1) they are likely to succeed on the merits; (2) they are

9  likely to suffer irreparable harm in the absence of preliminary

10 relief; (3) the balance of equities tips in their favor; and (4) a

11 preliminary injunction is in the public interest."  <u>Sierra Forest</u>

12 <u>Legacy v. Rey</u>, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing <u>Winter</u>

13 <u>v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 29 (2008)).

14 **III. <u>Motion to Dismiss Analysis</u>**

15     After reviewing Interveners' motion to dismiss, the Court

16 GRANTS dismissal of Plaintiffs' claim that ballot initiatives

17 cannot, as a matter of law, implicate First Amendment rights, that

18 state law preempts Measure B, and that Measure B violates

19 Plaintiffs' due process rights (with the exception of Plaintiffs'

20 Fourth Amendment claim).  The Court DENIES dismissal on the

21 remaining claims.

22     **A. <u>Standing</u>**

23     Interveners claim that Plaintiffs do not have standing.

24 Standing is a "threshold question."  <u>Nat'l Org. for Women, Inc. v.</u>

25 <u>Scheidler</u>, 510 U.S. 249, 255 (1994).  The doctrine "is founded in

26 concern about the proper-and properly limited role-of the courts in

27 a democratic society."  <u>Wart v. Seldin</u>, 422 U.S. 490, 498 (1975).

28 The constitutional requirements of standing are:

ER0004

1  (1) injury in fact, by which we mean an invasion of a
   legally protected interest that is (a) concrete and
2  particularized, and (b) actual or imminent, not
   conjectural or hypothetical; (2) a causal relationship
3  between the injury and the challenged conduct, by which
   we mean that the injury fairly can be traced to the
4  challenged action of the defendant, and has not resulted
   from the independent action of some third party not
5  before the court; and (3) a likelihood that the injury
   will be redressed by a favorable decision, by which we
6  mean that the prospect of obtaining relief from the
   injury as a result of a favorable ruling is not too
7  speculative.

8  Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of

9  Jacksonville, 508 U.S. 656, 663-664 (1993).  Plaintiffs have the

10 burden of showing they have standing.  Lujan v. Defenders of

11 Wildlife, 504 U.S. 555, 562 (1992).  "[I]t is sufficient for

12 standing purposes that the plaintiff intends to engage in a course

13 of conduct arguably affected with a constitutional interest and

14 that there is a credible threat that the challenged provision will

15 be invoked against the plaintiff."  Arizona Right to Life Political

16 Action Comm. v. Bayless, 320 F.3d 1002, 1006 (9th Cir. 2003)

17 (internal quotation marks and citations omitted) (emphasis added).[2]

18 "Thus, when the threatened enforcement effort implicates First

19 Amendment rights, the inquiry tilts dramatically toward a finding

20 of standing."  Id.  Even outside the First Amendment context, pre-

21 enforcement standing is appropriate when the issue is a purely

22 legal one and it would be costly to comply with the challenged law

23 or regulation.  See Abbott Labs v. Gardner, 387 U.S. 136, 149

24 (1967).

25

26 _____

27      [2]The word "arguably" is important because standing must be
   decided before the merits are reached.  George E. Warren Corp. v.
28 U.S. E.P.A., 164 F.3d 676 (D.C. Cir. 1999).

ER0005

1    Here, standing is appropriate.  Vivid and Califa,

2  collectively, make, produce, and distribute adult films, and their

3  principle place of business is Los Angeles.  (Compl. ¶¶ 8-9.)

4  Plaintiffs Kross and Pierce perform in adult films produced Los

5  Angeles.  (Id. ¶¶ 10-11.)  On December 14, 2012, the Department

6  sent a letter to the "Producers of Adult Films in Los Angeles

7  County, indicating what steps the Department would take in

8  implementing and enforcing Measure B."  (Docket No. 56 Ex. 1; see

9  also Compl. ¶¶ 55, 61, 76, 89, 97.)  Vivid has presented evidence

10  that, as a result of Measurer B's passage, it has stopped shooting

11  adult films in Los Angeles, and has thus lost the value of the non-

12  Measure B filming permits for which it has already paid.  (Hirsch

13  Decl. ¶¶ 20-21.)[3]  Vivid has also presented evidence that filming

14  outside Los Angeles creates several difficulties: performers are

15  generally less available to film outside the County, fewer support

16  services are available outside the County, and fewer suitable

17  locations exist outside the County.  (Id. ¶¶ 28-32.)  Moreover,

18  Kross attests that she prefers to act with a partner not wearing a

19  condom, for reasons that range from comfort to the message she

20  wishes to portray, and she also attests that Measure B has reduced

21  the number of roles in which she has had the opportunity to act.

22

23    [3]"In evaluating a plaintiff's standing at the motion to
24  dismiss stage, a court may consider not only the allegations in the
   complaint, but also factual averments made by declaration or
   affidavit."  Am. Tradition Inst. v. Colorado, 876 F. Supp. 2d 1222,
25  1232 (D. Colo. 2012); Vildosola v. Hornbeck, No. CV 08-6590-VAP
   JEM, 2010 WL 1507100, at *8 (C.D. Cal. Feb. 25, 2010) (looking to
26  declarations to determine standing at the motion to dismiss stage).
    "[A] suit will not be dismissed for lack of standing if there are
27  sufficient allegations of fact—not proof—in the complaint or
   supporting affidavits.")  Gwaltney of Smithfield, Ltd. v.
28  Chesapeake Bay, 484 U.S. 49, 65 (1987) (emphasis added).

6

ER0006

(Kross Decl. ¶¶ 9-11, 15.)  Pierce makes similar attestations.
(Pierce Decl. ¶¶ 7-11.)  In light of the potential First Amendment
concerns that Measure B implicates, the costs and consequences of
complying with Measure B, and the County's expressed intent to
enforce Measure B, Plaintiffs have standing to challenge it.
Bayless, 320 F.3d at 1006; see also Abbott Labs, 387 U.S. at 149
(indicating that standing would be proper even outside the First
Amendment context).

### B. **Plaintiffs' State Law Preemption Claim**

Plaintiffs contend that Cal. Labor Code § 144.7 and California
Code of Regulations Title 8 § 5193 preempt Measure B  (Compl. ¶
101.)  Diversity jurisdiction is not alleged, and, therefore,
supplemental jurisdiction, 28 U.S.C. § 1367, is the only means by
which this Court may preside over Plaintiffs' state law preemption
claim.  However, 28 U.S.C. § 1367, grants courts the discretion to
"decline to exercise supplemental jurisdiction" over matters that
"raise[] a novel or complex issue of State law." Id.; Dream Palace
v. Cnty. of Maricopa, 384 F.3d 990, 1022 (9th Cir. 2004).  The
Ninth Circuit has upheld a decision to decline supplemental
jurisdiction over a claim that state law preempted a county
ordinance governing adult entertainment sites.  Dream Palace, 384
F.3d at 1022.  The district court in that case explained that "the
remaining state-law claims raise delicate issues involving the
interpretation and application of Arizona law and the balance of
powers within Arizona between state and local government." Id.
Since similar concerns about the balance of power in California are
present in Plaintiffs' novel preemption claim, this Court declines
supplemental jurisdiction.

7

### C. <u>**Plaintiffs' First Amendment Claim**</u>

1    Plaintiffs allege that requiring actors in adult films to wear
2  condoms violates their First Amendment rights. (Compl. ¶¶ 42, 51-
3  56.)  Such a requirement is a restriction on conduct.  However, not
4  all conduct receives First Amendment protection; only expressive
5  conduct is considered speech and implicates the First Amendment.
6  <u>See</u> <u>Nordyke v. King</u>, 319 F.3d 1185, 1189 (9th Cir. 2003).  The
7  Supreme Court has applied the First Amendment to restrictions on
8  nude dancing, adult movie theaters, adult bookstores, and live
9  adult theater performances because the First Amendment protects
10 sexually explicit speech.  <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S.
11 215, 224 (1990) (citing cases).  Presently at issue is whether
12 engaging in sexual intercourse for the purpose of making a
13 commercial adult film receives First Amendment protections.  The
14 Court is aware of no case that has analyzed this issue.  However,
15 given the multitude of cases that have analyzed restrictions on
16 adult entertainment under the First Amendment, this Court concludes
17 that sexual intercourse engaged in for the purpose of creating
18 commercial adult films is expressive conduct, is therefore speech,
19 and therefore any restriction on this expressive conduct requires
20 First Amendment scrutiny.  <u>See</u> <u>id.</u>

21    Measure B's stated purpose "is to minimize the spread of
22 sexually transmitted infections resulting from the production of
23 adult films in Los Angeles."  (Docket No. 58-1 Ex. B, Docket No.
24 58-1.)  Because this purpose focuses on the secondary effects of
25 unprotected speech, rather than the message the speech conveys, it
26 will be reviewed under intermediate scrutiny.  <u>See</u> <u>Fly Fish, Inc.</u>
27 <u>v. City of Cocoa Beach</u>, 337 F.3d 1301, 1306-09 (11th Cir.

8

1  2003)(evaluating an ordinance that prohibited "totally nude"

2  dancing in "adult entertainment establishments" under the <u>Renton</u>

3  intermediate scrutiny framework); <u>Heideman v. S. Salt Lake City</u>,

4  348 F.3d 1182, 1196. (10th Cir. 2003) (evaluating a similar

5  ordinance under intermediate scrutiny); <u>see generally Renton v.</u>

6  <u>Playtime Theatres, Inc.</u>, 475 U.S. 41, 47-48 (1986) (holding that

7  an ordinance that treated "theaters that specialize in adult

8  films" differently should be analyzed under a content neutral,

9  intermediate scrutiny framework because the ordinance was aimed at

10 the secondary effects of those theaters, not their content).[4]

11

12 [4]Plaintiffs state that Measure B requires strict scrutiny
   review for three reasons.  First, Measure B singles out adult
   films.  But the Ordinance in <u>Renton</u> also involved a statute that
13 singled out adult theaters.  <u>Renton</u>, 475 U.S. at 47-48.
   Plaintiffs' first argument, thus, fails.  Second, Plaintiffs argue
14 that <u>Renton</u>'s reasoning only applies in the context of zoning,
   because zoning does not prohibit what can be shown, only where
15 something can be shown.  Several Circuits have rejected that
   argument.  <u>See</u> <u>Fly Fish</u>, 337 F.3d at 1306-09; <u>Heideman</u>, 348 F.3d at
16 1196.  The Tenth Circuit has reasoned:
17         The fallacy in Plaintiffs' argument is to assume that the
           "adequate alternative avenues of expression" required
18         under the <u>Renton</u> line of cases refers exclusively to
           location.  Time, place, or manner regulations all are
19         partial limitations, but each is partial in a different
           way. . . .  "[M]anner" limitations require alternative
20         ways in which a message may be communicated.  A ban on
           nudity within sexually oriented businesses is a 'manner'
21         regulation, and Plaintiffs have provided no reason to
           believe that there do not exist other ways to get their
22         message across.
   <u>Heideman</u>, 348 F.3d at 1196 (citations omitted).  Third, Plaintiffs
23 suggest that requiring condoms "so interferes with the message that
   it essentially bans the message."  <u>City of Erie v. Pap's A.M.</u>, 529
24 U.S. 277, 293 (2000) (pl. op.).  Plaintiffs' third argument is
   composed of two sub-arguments, one made at oral argument and the
25 other made in briefing.  During oral argument, Plaintiffs stated
   that Measure B prevents them from making adult films depicting sex
26 during an historical period before condoms existed.  The Court
   notes anachronisms need not detract from a story.  Even assuming
27 that condoms interfere with storylines, Plaintiffs' argument, if
   accepted, would require every manner restriction to be reviewed
28 under strict scrutiny because any manner restriction inherently
                                              (continued...)

ER0009

1    Under intermediate scrutiny narrow tailoring, Interveners

2

3    _____

     [4](...continued)
4    interferes with a large number of storylines.  It is settled law,
     though, that manner restrictions only trigger intermediate
5    scrutiny.  <u>See</u> <u>Fly Fish</u>, 337 F.3d at 1306-09; <u>Heideman</u>, 348 F.3d
     at 1196; <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277 (2000); <u>Barnes v.</u>
6    <u>Glen Theatre, Inc.</u>, 501 U.S. 560, 576 (1991).  The condom
     requirement is analogous to requirements that nude dancers wear
7    pasties and G-strings, both of which are de minimis restrictions on
     a sexually explicit message that trigger intermediate scrutiny.
8    <u>Pap's</u>, 529 U.S. at 294 (pl. op.) ("Any effect on the overall
     expression [on account of requiring dancers to wear pasties and
9    G-strings] is de minimis."); <u>Schultz v. City of Cumberland</u>, 228
     F.3d 831, 847-48 (7th Cir. 2000) (noting that pasties and G-strings
10   are analyzed under intermediate scrutiny because they are de
     minimis restrictions); <u>Dream Palace</u>, 384 F.3d at 1021 (favorably
11   discussing <u>Schultz</u>).
          Plaintiffs' briefing argues and their declarations state that
12   not using a condom is intended to communicate a message.  (<u>See</u>
     Kross Decl. ¶¶ 12-13 (attesting that [c]ondoms are a reminder of
13   real-world concerns" such as "pregnancy and disease," and that
     requiring condoms in adult films' hinders those films' aim to
14   "suspend . . . concerns [about pregnancy and disease] and allow
     audience members to suspend their disbelief".))  If condomless sex
15   in adult films is inherently expressive, then requiring condoms
     would completely block that expression, and strict scrutiny would
16   be required.  <u>Pap's</u>, 529 U.S. at 293.
          "[T]he Supreme Court has 'extended First Amendment protection
17   only to conduct that is inherently expressive.'"  <u>Wong v. Bush</u>, 542
     F.3d 732, 736 (9th Cir. 2008) (quoting <u>Rumsfeld v. Forum for</u>
18   <u>Academic and Institutional Rights, Inc.</u>, 547 U.S. 47, 66 (2006)).
     An act is inherently expressive if the "likelihood [is] great that
19   the message would be understood by those who viewed it."  <u>Spence</u>,
     418 U.S. at 410-11.  The Supreme Court has cautioned that the
20   "inherently expressive" requirement means that words cannot be used
     to explain the message that conduct is meant to communicate,
21   because "[i]f combining speech and conduct were enough to create
     expressive conduct, a regulated party could always transform
22   conduct into 'speech' simply by talking about it."  <u>Rumsfeld</u>, 547
     U.S. at 66.  Like nude dancing, sexual intercourse performed for
23   the production of adult films inherently expresses an erotic
     message.  <u>See</u> <u>Pap's</u>, 529 U.S. at 301 (pl. op.) (recognizing erotic
24   message of nude dancing); <u>Dream Palace</u>, 384 F.3d at 1021 (same).
     But, without the explanatory declarations, it is unclear what
25   message condom-less sex conveys.  Just as the requirement that nude
     dancers wear pasties and G-strings is viewed as a restriction on
26   expressive conduct, so, too, is the requirement that adult film
     actors wear condoms a restriction on expressive conduct.  Put
27   differently, sexual intercourse performed for adult films and nude
     dancing both are expressive conduct, but requiring condoms for the
28   former and pasties for the latter are only de minimis restrictions
     on expressive conduct.

                                   10

                                                            **ER0010**

must "demonstrate that the recited harms" to the substantial
governmental interest "are real, not merely conjectural, and that
the regulation will in fact alleviate those harms in a direct and
material way."[5]  <u>Turner I</u>, 512 U.S. at 664-65.  While an ordinance
is "not invalid simply because there is some imaginable
alternative that might be less burdensome on speech," <u>Turner II</u>,
520 U.S. at 217, the Interveners must prove that the statute does
not "burden substantially more speech than is necessary to further
the government's legitimate interests."  <u>Turner I</u>, 512 U.S. at 665
(internal quotations omitted).  In light of the alleged effective,
frequent, and universal testing in the adult film industry,
Plaintiffs allege sufficient facts, which for purposes of this
motion must be assumed true and construed in the light most
favorable to Plaintiffs, to show that Measure B's condom
requirement does not alleviate the spread of STIs in a "direct and
material way."  <u>Turner I</u>, 512 U.S. at 664-65; (Compl. ¶¶ 18-31.)[6]
Thus, Interveners motion to dismiss Plaintiffs' First Amendment
claim is DENIED.

---

[5]Public health is a substantial government interest. <u>Rubin v. Coors Brewing Co.</u>, 514 U.S. 476, 485 (1995).

[6]Plaintiffs' over and under inclusive claims are also relevant to narrow tailoring.  (Compl. ¶¶ 78-90.)  Thus, these claims would be more appropriately combined with Plaintiffs' First Amendment claim, which for the reasons discussed above, survives dismissal. <u>Cf.</u> <u>Sec'y of State of Md. v. Joseph H. Munson Co., Inc.</u>, 467 U.S. 947 n.13 (1984) ("Overbreadth has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest. . . .  Whether that challenge should be called 'overbreadth' or simply a 'facial' challenge, the point is that there is no reason to limit challenges to case-by-case 'as applied' challenges when the statute on its face and therefore in all its applications falls short of constitutional demands.")

ER0011

D. **Plaintiffs' Claim That Referendums May Not Implicate the First Amendment**

Plaintiffs claim that referendums that implicate the First Amendment are inherently invalid, because they do not have legislative records and their findings deserve no deference. This claim appears to focus on Measure B's condom requirement. (Compl. ¶¶ 51-56 (emphasizing Measure B's condom-related findings).) As one court stated, "no court has accorded legislative deference to ballot drafters." Daggett v. Webster, No. 98-223-B-H, 1999 WL 33117158, at *1 (D. Me. May 18, 1999). Legislatures receive deference because they are "better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon ... complex and dynamic" issues. Turner I, 512 U.S. at 665-66. Because the referendum process does not invoke the same type of searching fact finding, a referendum's fact finding does not "justif[y] deference." California Prolife Council Political Action Comm. v. Scully, 989 F. Supp. 1282, 1299 (E.D. Cal. 1998), aff'd, 164 F.3d 1189 (9th Cir. 1999).

However, an undeferential review of Measure B's findings does not equate to an automatic resolution in Plaintiffs' favor. It means that Interveners must have a record sufficient for Measure B to withstand intermediate scrutiny, without the benefit of deference. Yniquez v. Arizonans for Official English, 69 F.3d 920, 945 (9th Cir. 1995), vacated on other grounds, Arizonans for Official English v. Arizona, 520 U.S. 43(1997)[7] ("There is no basis

_____

[7]"[A]t minimum, a vacated opinion still carries informational and perhaps even persuasive or precedential value." DHX, Inc. v. Allianz AGF MAT, Ltd., 425 F.3d 1169, 1176 (9th Cir. 2005).

12

ER0012

1    in the record to support the proponents' assertion that any of the

2    broad societal interests on which they rely  are served by the

3    provisions of Article XXVIII.  The absence of any evidence to this

4    effect is of particular significance given that . . . Article

5    XXVIII is a ballot initiative and thus was subjected to neither

6    extensive hearings nor considered legislative analysis before

7    passage.")  Accordingly, the Court GRANTS dismissal of Plaintiffs'

8    claim that referendums may not implicate the First Amendment.

9        **E. <u>Plaintiffs' Prior Restraint Claim</u>**

10       "The term prior restraint is used to describe administrative

11   and judicial orders forbidding certain communications when issued

12   in advance of the time that such communications are to occur."

13   <u>Alexander v. United States</u>, 509 U.S. 544 (1993).  "A permitting

14   requirement is a prior restraint on speech and therefore bears a

15   heavy presumption against its constitutionality."  <u>Berger v. City</u>

16   <u>of Seattle</u>, 569 F.3d 1029, 1037 (9th Cir. 2009) (internal

17   quotation marks and citation omitted).  Courts in this district

18   have found that a prior restraint exists when an individual must

19   obtain a permit to engage in nude dancing.  <u>Dease v. City of</u>

20   <u>Anaheim</u>, 826 F. Supp. 336, 342 (C.D. Cal. 1993); <u>Santa Fe Springs</u>

21   <u>Realty Corp. v. City of Westminster</u>, 906 F. Supp. 1341, 1363 (C.D.

22   Cal. 1995) (citing <u>Dease</u> and applying that case's logic).

23       Interveners claim that Measure B is not a prior restraint

24   because it does not require a permit to show films, it only

25   requires a permit to film certain types of films.  This

26   distinction is unhelpful.  Prior restraints are presumptively

27   invalid because they chill speech from occurring.  "The presumption

28   against prior restraints is heavier-and the degree of protection

                                    13

ER0013

broader-than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." <u>Se. Promotions, Ltd. v. Conrad</u>, 420 U.S. 546, 559 (1975). This policy concern would be upended if it were a prior restraint to require a permit for a film to be shown, a book to be published, or a painting to be displayed but not a prior restraint to require a permit for a movie to be filmed, a book to be written, or a painting to be painted. Therefore, Measure B, which requires producers to obtain a permit before shooting "any film, video, multimedia or other representation of sexual intercourse" is a prior restraint.[8]

Plaintiffs argue that Measure B does not provide sufficient procedural safeguards, does not have narrowly tailored requirements, and gives the County unbridled discretion. The Court generally agrees.[9]

---

[8]Interveners are incorrect in arguing that Plaintiffs must allege that they have applied for a permit in order to challenge Measure B. "Plaintiffs who challenge a permitting system are not required to show that they have applied for, or have been denied, a permit. . . . They must only have declined to speak, or have modified their speech, in response to the permitting system." <u>Kaahumanu v. Hawaii</u>, 682 F.3d 789, 796 (9th Cir. 2012); <u>see id.</u> (striking down a broad revocation and suspension provision even though "the record indicate[d] that permits . . . have been issued as a matter of course, and that the discretionary power reserved in [the revocation and suspension provisions] has never been exercised.") As outlined in the "Background" section and "Standing" subsection, Plaintiffs have modified their speech because of Measure B.

[9] Plaintiffs' Opposition to the Motion to Dismiss makes a broad, although conclusory, argument that requiring a permit itself is an invalid prior restraint. Docket No. 53 at 13-14. This argument, was not made in Plaintiffs' Preliminary Injunction brief.
(continued...)

14

ER0014

### 1. <u>Procedural Safeguards</u>

Plaintiffs focus on the procedural safeguards relating to revoking Measure B permits.[10]  Prior restraints that target adult entertainment, as Measure B does, must provide the following procedural safeguards: "the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied."  <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 228 (1990) <u>modified on other grounds</u>, <u>City of Littleton</u>, <u>Colo. v. Z.J. Gifts D-4, L.L.C.</u>, 541 U.S. 774, 776 (2004) (a prior restraint targeting adult businesses must "assure prompt judicial review of an administrative decision denying a license").  "[T]hese considerations apply to license suspensions and revocations as well as license denials."  <u>4805 Convoy, Inc. v. City of San Diego</u>, 183 F.3d 1108, 1114 (9th Cir. 1999).  License suspensions and revocations differ from the denial of a license application in that "preservation of the status quo means that the suspension or revocation cannot be enforced, and the business is allowed to continue to operate under its license," until there has been a judicial determination.  <u>Id.</u>  Measure B allows for the Department to revoke and suspend a permit, and once revocation or

---

[9](...continued)
Docket No. 55 at 8-10.  Because Plaintiffs state a valid prior restraint claim without this argument, the Court need not analyze it now.

[10] The procedural safeguards claims were raised in the complaint, and argued, though only with respect to revocations and suspensions, in Plaintiffs' preliminary injunction motion.  (Compl. ¶ 96; Docket No. 55 at 9:7-14 (citing provision of Measure B regarding suspensions and revocations).

ER0015

1  suspension has occurred, a permit holder must "cease filming any

2  adult film." § 11.39.110 (D), (H). These provisions of Measure B

3  are, thus, unconstitutional because they provide for suspensions

4  and revocations before a judicial determination.

5  **2. Unbridled Discretion**

6  Additionally, Government officials cannot have unbridled

7  discretion over permits that implicate First Amendment activity.

8  G.K. Ltd. Travel v. City of Lake Oswego, 436 F.3d 1064, 1082 (9th

9  Cir. 2006). Here, in order to receive and keep a permit, the

10  following is required: pay for the permit, complete an

11  application, conduct blood-borne pathogen training, post the

12  permit on the worksite, and use condoms during anal and vaginal

13  sex. § 11.39.080-11.39.110; (see Compl. ¶ 58.) These criteria

14  are clear and do not leave much, if any, room for discretion.

15  Another Measure B provision, though, is more problematic. (Docket

16  No. 53 at 14:17-15:4.)[11]

17

18  [11]Measure B states: "Upon successful completion of the permit
application process described in subsection A of this section, the
19  department shall issue an adult film production public health
permit to the applicant. The adult film production public health
20  permit will be valid for two years from the date of issuance,
unless revoked." § 11.39.080(B). In analyzing another statute
21  that singled out adult entertainment, the Supreme Court held that
"the licensor must make the decision whether to issue the license
22  within a specified and reasonable time period." FW/PBS, Inc. v.
City of Dallas, 493 U.S. 215, 228, 1990). Here, in light of the
23  obligation to, when possible, interpret an ordinance in a way that
maintains its constitutionality, the Court construes the word
24  "upon" to place sufficiently specific and reasonable time limit for
permit authorizations. See New York v. Ferber, 458 U.S. 747, 769
25  (1982) (discussing the importance of interpreting federal law to
preserve its constitutionality); see also Beaulieu v. City of
26  Alabaster, 454 F.3d 1219, 1232 (11th Cir. 2006) (essentially
applying the maxim to ordinances); Int'l Soc. for Krishna
27  Consciousness of Atlanta v. Eaves, 601 F.2d 809, 822 (5th Cir.
1979) (same). Because Webster's (available at
28  http://www.merriam-webster.com/) defines "upon" to mean "on,"
(continued...)

16

ER0016

1    Measure B, also, provides that after an administrative
2    review, "[t]he Department may . . . modify, suspend, revoke or
3    continue all such action previously imposed upon a permittee
4    pursuant to this chapter or impose any fine imposed by law for
5    violations of this chapter or any other law <u>or standards affecting</u>
6    <u>public health and safety</u>, including <u>but not limited to</u> [certain
7    laws and regulations]." § 11.39.110(F).  Thus, Measure B allows,
8    under some circumstances, for the denial of permits when adult
9    film makers violate unnamed, undescribed "standards affecting
10   public health."  This is unbridled discretion.[12]

11   For similar reasons, portions of § 11.39.110(E) are
12   unconstitutional.  If there is "any immediate danger to the public
13   health or safety is found or is reasonably suspected," that
14   provision allows the department to "immediately suspend . . . [a]
15   permit, initiate a criminal complaint and/or impose any fine

16

17       [11](...continued)
18   Measure B indicates that applications will be immediately reviewed.

19       [12]Plaintiffs also argue that the Department has unbridled
20   discretion in determining which blood-borne pathogen training class
     meets Departmental approval.  (Docket No. 53 at 15:5-11.)  The
21   Court need not address this issue because Plaintiffs have otherwise
     stated a valid prior restraint claim.  (<u>See</u> Docket No. 55 at 8-10).
22   However, the proper issue is whether the Department has too much
     discretion in terms of who receives a permit, not whether they have
23   too much discretion in selecting appropriate training classes.
     <u>G.K. Ltd.</u>, 436 F.3d at 1082 (9th Cir. 2006) ("The requirement of
24   sufficient direction for City officials seeks to alleviate the
     threat of content-based, discriminatory enforcement that arises
25   where the licensing official enjoys unduly broad discretion in
     determining whether to grant or deny a permit") (internal quotation
26   marks and citation omitted).  The appropriate way to challenge the
     training course requirement, or any other requirement (including
27   the requirement to get a permit), is to do so on narrow tailoring
     grounds.  <u>Berger</u>, 569 F.3d at 1041.  Since Plaintiffs do not argue
28   that the blood training course fails a narrow tailoring analysis,
     the Court will not analyze the issue.

17

**ER0017**

permitted by [Measure B]." The provision also states: "Immediate danger to the public health and/or safety shall include any condition, based upon inspection findings or other evidence, that can cause, or is reasonably suspected of causing, infection or disease transmission, or any known or reasonably suspected hazardous condition." This provision is too broad–it is not limited to Measure B's requirements, and it applies to conditions "reasonably suspected" to be "suspected of causing" the transmission of unnamed diseases. The department is given no guidance as what types or diseases or what types of transmission methods § 11.39.110(E) applies. Indeed, § 11.39.110(E) would seem to authorize revoking a permit if a cameraman were working with a cold. The discussed portions of § 11.39.110(E), therefore, are unconstitutional.

### 3. **Narrow Tailoring**

Pursuant to the most lenient scrutiny that Measure B could be reviewed under, a prior restraint's provisions must be narrowly tailored such that they do "not burden substantially more speech than is necessary to achieve a substantial government interest." Berger, 569 F.3d at 1041. Plaintiffs allege that "Measure B also prohibits the production of any adult film by any entity that has had a permit suspended or revoked." (Compl. ¶ 58.)[13] Because Interveners bear the burden of justifying a prior restraint's restrictions, because an alternative to revoking the permit

---

[13]A Measure B permit is issued to adult film producers. See generally § 11.39.080(A). The permit extends for two years, and is applicable to all films a producer makes. See § 11.39.080(B). Thus, revocation or suspension means a permit holder cannot produce any adult film.

18

ER0018

completely would be revoking the permit only as to the offending film, and because Interveners do not address Plaintiffs' claim that a total revocation is improper, Plaintiffs' prior restraint claim survives.  Id. at 1035 (discussing the burden), 1041 (holding that "the existence of obvious, less burdensome alternatives is a relevant consideration in determining whether the 'fit' between ends and means is reasonable") (internal quotation marks omitted); Docket No. 49 at 12-15 (ignoring Plaintiffs' revocation argument).

Plaintiffs claim that Measure B is not narrowly tailored because, although the condom requirement applies only to vaginal and anal sex, a Measure B permit is required to film much more.  A permit is required for "adult films," which are defined as "any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in oral, vaginal, or anal penetration, including, but not limited to, penetration by a penis, finger, or inanimate object; oral contact with the anus or genitals of another performer; and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials."[14]  The Court finds Plaintiffs have stated a claim on this issue.

---

[14]Although Plaintiffs have not raised the issue, the following clause of the "adult films" definition is problematic: "and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials."  The use of "or" indicates that filmed "sexual activity" that "results in the transmission of . . . other potentially infectious materials" requires a Measure B permit.  Sexual activity could mean many things.  Potentially, kissing could qualify, as saliva may contain infectious materials.  Therefore, the portion of adult film's definition discussed in this footnote is unconstitutionally overbroad and vague.

19

As discussed, Measure B's purpose is to prevent the spread of STIs, and requiring condoms is the means by which Measure B seeks to prevent their spread. (See Docket No. 58 Ex. B § 2 (Measure B's "findings and declarations"), § 3 ("purpose and intent"). Since Measure B only requires condoms for vaginal and anal sexual intercourse, and since Measure B's purpose is condoms-focused, Plaintiffs have stated a claim that the permit requirement is not narrowly tailored because it applies to adult films without vaginal or anal sexual intercourse.[15]

### F. **Plaintiffs' Fees Claim**

Prior restraints may only impose permit fees if they are revenue neutral, because the Government may not charge for the privilege of exercising a constitutional right. See Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1943); Cox v. New Hampshire, 312 U.S. 569, 577 (1941). The Sixth and Eleventh Circuits have applied this revenue-neutral rule to permit fees on adult entertainment businesses. Fly Fish, 337 F.3d at 1314; 729, Inc. v. Kenton Cnty. Fiscal Court, 515 F.3d 485, 510 (6th Cir. 2008). The Eighth Circuit, though, declined to do so. Jakes, Ltd., Inc. v. City of Coates, 284 F.3d 884, 890-891 (8th Cir. 2002). In analyzing the contrary Eighth Circuit authority, the Eleventh

---

[15]The Court rejects Plaintiffs' argument in its preliminary injunction brief that Measure B's criminal and civil penalties are not narrowly tailored and, therefore, constitute an invalid prior restraint. Prior restraint analysis looks to the requirements of and processes associated with obtaining and keeping a permit, not criminal penalties. Cf Conrad, 420 U.S. at 559 ("The presumption against prior restraints is heavier-and the degree of protection broader-than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.")

ER0020

Circuit noted that even though nude dancing was at the "outer perimeters of the First Amendment," because the government could not completely ban erotic dancing, the government cannot tax it without limit. <u>Fly Fish</u>, 337 F.3d at 1315. The Court agrees with the Eleventh Circuit's logic and finds it applies to Measure B's fees.

Courts applying the revenue-neutral rule to adult entertainment require the government to prove that revenues merely cover "the costs of administering [the] licensing program." <u>Id.</u> at 1314-15; <u>729</u>, 515 F.3d at 510. Even though the permit fee in this case, $2,000-$2,500, is relatively minimal, the Court will not assume that it is constitutionally permissible. See <u>Fly Fish</u>, 337 F.3d at 1315 (holding as unconstitutional a $1,250 fee per adult business because the "City . . . conducted no real accounting of the costs of administering its licensing program"). Since the Complaint does not allege facts suggesting that the fees are revenue neutral, the fees' claim survives the motion to dismiss. The Court notes, for reasons that will be relevant later, that Interveners provide no evidence of revenue neutrality. (<u>See</u> Docket No. 57 at 15:14-18.)

**G. <u>Plaintiffs' Vagueness Claim</u>**

Under the void-for-vagueness doctrine, "legislatures [are required] to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." <u>Smith v. Goguen</u>, 415 U.S. 566, 572-73 (1974). "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands

ER0021

a greater degree of specificity than in other contexts." <u>Id.</u> at 573.  All that is required is that there be "reasonably clear lines" such that "men of common intelligence [are] not forced to guess at the meaning of the criminal law."  <u>Id.</u> at 574 (internal quotation marks and citations omitted).

Plaintiffs' opposition brief and complaint conclusorily state that some of the terms in Measure B are unconstitutionally vague. (Docket No. 53 at 16:14-17; Compl. ¶¶ 71-77.)  This is a sufficient reason to dismiss the claim.  <u>See Iqbal</u>, 556 U.S. at 678-79.

Measure B defines three of Plaintiffs' challenged terms: "adult film," "exposure control plan," and "producer of adult film."[16]  Several other terms are not defined.  When statutory terms are undefined, they are given their "ordinary and natural meaning," and courts employ "general usage dictionaries to determine" that meaning.  <u>Castro v. Terhune</u>, 712 F.3d 1304, 1312 (9th Cir. 2013).  Measure B requires that "principal and management-level employees" complete blood borne pathogen training.  § 11.39.080.  Plaintiffs claim that the terms "principal" and "management-level employees" are unclear.  Webster

---

[16]For reasons discussed in the prior restraint analysis, "adult film" must be narrowed in scope.  After striking the offending portions of that term's statutory definition, and adding no new terms, it would be defined as "any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in vaginal or anal penetration by a penis."  § 11.39.010.
    "Exposure control plan" is defined as: "a written plan that meets all requirements of Title 8 California Code of Regulations sections 3203 and 5193, to minimize employees' risk of exposure to blood or potentially infectious material."  § 11.39.050.
    "Producer of adult film" is defined as: "any person or entity that produces, finances, or directs, adult films for commercial purposes."  § 11.39.075.

ER0022

defines "principal," in relevant part, as "a person who has controlling authority or is in a leading position."  Management is defined as "the collective body of those who manage or direct an enterprise," and manage is defined as "to exercise executive, administrative, and supervisory direction of <manage a business>."  These terms are sufficiently clear.[17]

Plaintiffs also challenge the following terms: "commercial purposes," "reasonably suspected," "hazardous condition," and "interference."  (Docket No. 53 at 16:15-16.)  Because Plaintiffs do not analyze these terms' meaning or their potential for confusion, for purposes of this Motion the Court finds that they are not vague.

**I. <u>Plaintiffs' Due Process Claim</u>**

Plaintiffs assert that Measure B violates their due process rights.  The Fourteenth Amendment prohibits the deprivation "of life, liberty, or property without due process of law."  Due process requires "some form of hearing before an individual is finally deprived of [a protected] interest."  <u>Matthews v. Eldridge</u>, 424 U.S. 319, 333 (1976).  Due process claims should be analyzed under the <u>Mathews v. Eldridge</u> weighing test.  <u>See</u> <u>id.</u> at 335.  However, Plaintiffs do not engage in such a weighing, and their due process claims generally dismiss the review procedures to which license holders and applicants are entitled under Measure B.  (Compl. ¶¶ 91-98); § 11.39.110(B),(D),(E)(2); <u>see also</u> Cent. Dist. L.R. 7-5 (moving papers must provide "a brief but complete memorandum in support thereof and the points and authorities upon

---

[17]All definitions are available at http://www.merriam-webster.com/.

23

ER0023

which the moving party will rely."). The Court, therefore, GRANTS dismissal of Plaintiffs' due process claims, with one exception discussed below. Regardless, Plaintiffs' due process arguments largely duplicate of their prior restraint arguments.

However, Plaintiffs make a Fourth Amendment challenge in the due process section of the Complaint that warrants further consideration. (Compl. ¶ 95.)[18] Plaintiffs claim that Measure B authorizes an unconstitutional system of warrantless searches and seizures. In a closely regulated industry, administrative warrantless searches are permitted so long as the following conditions are met: (1) "[t]here is [a] 'substantial' government interest that informs the regulatory scheme pursuant to which inspection is made," (2) "warrantless inspection is necessary to

---

[18]It is an open question whether a facial challenge of an administrative search scheme on Fourth Amendment grounds is permissible. 832 Corp. v. Gloucester Twp., 404 F. Supp. 2d 614, 620 (D.N.J. 2005) (noting the issue is unresolved, but assuming that such a challenge is allowable). In preliminarily enjoining an ordinance that permitted warrantless administrative searches of "Adult-Oriented Businesses," a district court in this circuit noted:

> There is arguably a question as to whether a party can assert a facial challenge to a statute permitting warrantless administrative searches. See, e.g., S & S. Pawn Shop Inc. v. City of Del City, 947 F.2d 432, 439–40 (10th Cir.1991) (identifying the issue, but declining to decide it). Despite some hesitation, the court entertains such a challenge here because the ordinances vest too much discretion in City officials conducting the inspection to qualify as a valid administrative inspection scheme. See City of Chicago v. Morales, 119 S.Ct. 1849, 1999 WL 373152 *15 (June 10, 1999) (Breyer, J., Concurring) ("The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in every case").

Le v. City of Citrus Heights, No. CIV.S-98-2305WBS/DAD, 1999 WL 420158, at *6 n.6 (E.D. Cal. June 15, 1999). Finding Le's facts sufficiently analogous and its reasoning persuasive, this Court concludes a facial challenge is permissible.

ER0024

further the regulatory scheme," and (3) the "inspection program, in terms of certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant" (i.e. "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers"). <u>New York v. Burger</u>, 482 U.S. 691, 703 (1987) (citations omitted). "In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope." <u>Id.</u> (internal quotation marks and citation omitted).

Plaintiffs' Fourth Amendment allegations and briefing focus on <u>Burger</u>'s requirement that administrative searches be limited in time, place, and scope. (Compl. ¶ 95.) Specifically, Measure B states:

> The county health officer may enter and inspect any location suspected of conducting any activity regulated by this chapter, and, for purposes of enforcing this chapter, the county health officer may issue notices and impose fines therein and take possession of any sample, photograph, record or other evidence, including any documents bearing upon adult film producer's compliance with the provision of the chapter. Such inspections may be conducted as often as necessary to ensure compliance with the provisions of this chapter.

§ 11.39.130. The "any location" language of § 11.39.130 violates the Fourth Amendment. In upholding warrantless administrative searches, courts emphasize the limited nature of what may be searched. <u>United States v. Delgado</u>, 545 F.3d 1195, 1203 (9th Cir. 2008) (holding that a statute was constitutional in part because it was "limited to commercial vehicles,"); <u>Burger</u>, 482 U.S. at 711 (emphasizing that the statute was limited to "vehicle dismantling

25

business[es]"). Given that adult filming could occur almost anywhere, Measure B would seem to authorize a health officer to enter and search any part of a private home in the middle of the night, because he suspects violations are occurring. This is unconstitutional because it is akin to a general warrant. Therefore, the Court DENIES dismissal of Plaintiffs' Fourth Amendment claim. See Rush v. Obledo, 756 F.2d 713, 717, 722 (9th Cir. 1985) (holding that a statute "authoriz[ing] any officer, employee, or agent of the Department to enter and inspect any place providing personal care, supervision, and services at any time, with or without notice, to secure compliance with, or to prevent a violation of, any applicable statute" unconstitutional because it "permitt[ed] general searches at any time of any place providing care and supervision to children"); United States v. 4,432 Mastercases of Cigarettes, More Or Less, 448 F.3d 1168, 1180 (9th Cir. 2006) (stating that the procedural safeguards of warrantless administrative searches that implicate homes must be strong and citing Rush as "str[iking] down as unconstitutional a regulation that enabled warrantless searches of family-home day care facilities because it failed to place any limits on the time of searches, the area that could be searched, or the regularity of searches").[19]

**IV. Preliminary Injunction Analysis**

Because Plaintiffs' First Amendment claim regarding Measure B's condom requirement is unlikely to succeed on the merits, the

---

[19]Under very different circumstances, a narrow and constrained warrantless administrative search of a home is permissible. See Rush, 756 F.2d at 717 (upholding such a search when regulations limited a statute's reach).

ER0026

Court DENIES a preliminary injunction on that issue. As detailed below, the Court GRANTS a preliminary injunction on Plaintiffs' other claims that survived the motion to dismiss.

### A. **Plaintiffs' First Amendment Claim**

The First Amendment claim, which focuses on narrow tailoring (and specifically testing as an adequate alternative to condoms), is unlikely to succeed on the merits. Plaintiffs focus their First Amendment analysis on arguing that Measure B's condom requirement should be reviewed under strict scrutiny. (Docket No. 55 at 7-8.) However, for the reasons discussed in the motion to dismiss analysis, intermediate scrutiny should be employed.

Plaintiffs also make a narrow tailoring argument. Id. at 5:3-6. Interveners have presented evidence that the harms Measure B targets "are real, not merely conjectural, and that [Measure B] will in fact alleviate those harms in a direct and material way." Turner I, 512 U.S. at 664-65. Jonathan Fielding, the Director and Health Officer at the Los Angeles County Department of Public Health, has stated:

> Since 2004 DPH received reports of 2,396 cases of Chlamydia (CT), 1389 cases of gonorrhea (GC), and five syphilis cases among AFI performers; 20.2% of performers diagnosed with STD had one or more repeat infections within a one year period. Between 2004 and 2008, repeat infections were reported for 25.5% of individuals. Due to the failure to routinely screen for rectal and oral pharyngeal infections, a sustained high level of endemic disease among AFT workers persists. Furthermore, these disease rates and reinfection rates are likely to be significantly underestimated as rectal and oral screening is not done routinely and these anatomic sites are likely to be a reservoir for repeat reinfection. Analyses of 2008 data also indicated that AFI performer experience significantly higher rates of infection (20%) than the general public (2.4%) or in the area of the County (SPA 6) experiencing the highest rates of STDs (4.5%).

27

ER0027

> Data is less clear for HIV since occupation is not reported in HIV/AIDS reports. Since 2004, AIM has reported 25 cases of HIV. However, it is difficult to confirm the number of actual performers infected with HIV/AIDS as not all those tested are current performers and may have other roles in tlle AFI, or are partners of an AFI performer, or may otherwise be referred to AIM for testing. AIM claims that a minority of the 25 cases are performers, but even if this is accurate, it is reasonable to assume that some of the remaining 25 infected individuals were tested because they wished to work in the AFI in Los Angeles or were partners of AFI performers.

(Docket No. 58-1 Ex. A at 2.) Plaintiffs, by contrast, have presented evidence from individuals in the adult film industry, but not in the public health or medical profession, who claim testing is so effective and universal that condoms are unnecessary. (See, e.g., Hirsch Decl. ¶¶ 8-16). Plaintiffs' and Interveners' evidence are in tension. However, the Court finds the Department of Public Health's detailed explanation compelling, especially in light of its unique role in protecting the community's health.

Interveners' evidence also indicates that Measure B does not "burden substantially more speech than is necessary to further the government's legitimate interests." Turner I, 512 U.S. at 665. Measure B "need not be the least restrictive or least intrusive means available." Berger, 569 F.3d at 1041. Here, Interveners' evidence indicates that testing for STIs has proven insufficient to prevent their spread. (Docket No. 58-1 Ex. A at 2.) Because testing is Plaintiffs' proffered alternative, and because evidence indicates it may be ineffective, requiring condoms is a permissible way (at least at this stage) to target and prevent the

ER0028

spread of STIs.  For these reasons, Plaintiffs' claim challenging the condom requirement is not likely to succeed on the merits.[20]

**B. Plaintiffs' Remaining Claims**

Plaintiffs' claims concerning the following Measure B provisions are likely to succeed on the merits: the fees provision, the administrative search provision, and the prior restraint provisions explicitly found to have survived the motion to dismiss.  The fees provision and the prior restraint provision concerning Measure B's broad revocation policy (i.e. that a revoked permit means a producer cannot work on any adult films, instead of simply the offending film) are likely to succeed on the merits because Interveners' have offered no evidence that these provisions are narrowly tailored.  (See Docket No. 57 at 14-15 (not discussing the broad revocation policy), 15:14-18 (faulting Plaintiffs for providing no evidence concerning the fee's

---

[20]Plaintiffs' over and under inclusive arguments also bear on narrow tailoring.  However, these arguments fail to show that Plaintiffs are likely to succeed on the merits.  Plaintiffs fault Measure B for not applying generally to the entire population of Los Angeles County.  (Docket No. 55 at 13:14-16.)  However, Measure B would be patently unconstitutional if it applied to individuals having sex in a private place for non-commercial purposes.  Griswold v. Connecticut, 381 U.S. 479 (1965); Lawrence v. Texas, 539 U.S. at 562 (2003).  Sex in public places appears to be already prohibited by public decency laws.  See Los Angeles County Code § 13.22.020.  Plaintiffs' also claim that Measure B "applies only to adult films produced for a commercial purpose, to the exclusion of non-commercial films whose performers are exposed to risks (accepting arguendo the Measure's assumptions) that are the same as those for performers in commercial adult entertainment."  (Docket No. 55 at 13:14-16.)  But Plaintiffs provide no evidence about these "non-commercial" films, such as the percent of adult films that are non-commercial and that could be regulated without violating the type of privacy rights expressed in Griswold and Lawrence.  Besides, intermediate scrutiny does not require a perfect fit, Berger, 569 F.3d at 1041, and at this stage Interveners have provided evidence that the adult film industry is uniquely problematic in the spread of STIs.  (Docket No. 58-1 Ex. A.)

29

ER0029

reasonableness, but providing no evidence that the fee is revenue neutral)); Turner I, 512 U.S. at 664-65 (indicating that Interveners bear the burden of proving narrow tailoring). The remaining provisions are likely to succeed on the merits because, as discussed previously, Measure B's text indicates they are unconstitutional.

Once a Plaintiff shows that a constitutional rights claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction. Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012))([T]he deprivation of constitutional rights unquestionably constitutes irreparable injury. . . . [I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citations omitted); Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009) ("The balance of equities and the public interest thus tip sharply in favor of enjoining the ordinance. As our caselaw clearly favors granting preliminary injunctions to a plaintiff like Klein who is likely to succeed on the merits of his First Amendment claim, we see no reason to remand for further proceedings with respect to Klein's motion in this case.")

**C. Severability**

Whether Measure B's offending provisions are severable is a "a matter of state law." Leavitt v. Jane L., 518 U.S. 137, 139 (1996). "Invalid provisions of a statute should be severed whenever possible to preserve the validity of the remainder of the statute." Briseno v. City of Santa Ana, 6 Cal. App. 4th 1378, 1384 (1992). "The California Supreme Court has held that there

30

are three criteria for severability under California law: the provision must be grammatically, functionally, and volitionally separable." <u>Valley Outdoor, Inc. v. Cnty. of Riverside</u>, 337 F.3d 1111, 1114 (9th Cir. 2003). However, "[t]he final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable." <u>Id.</u> (quoting <u>Calfarm Ins. Co. v. Deukmejian</u>, 48 Cal.3d 805, 821 (1989).

As an initial matter, Measure B contains an unambiguous severability clause: "If any provision of this Act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of the Act are severable." Docket No. 58 Ex. B § 8.[21] This clause establishes that the voters wanted Measure B, even if portions were found unconstitutional, to survive, if at all possible. "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment." <u>Calfarm Ins. Co. v. Deukmejian</u>, 48 Cal. 3d 805, 821 (1989)

"An enactment passes the grammatical test where the language of the statute is mechanically severable, that is where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase or even single words." <u>Barlow v. Davis</u>, 72 Cal. App. 4th

---

[21]It is unclear where this severability clause was codified within the Los Angeles County Code.

31

ER0031

1258 (1999). The permit fee requirement is easily separable from its relevant provisions. The same is true of the provisions concerning revoking and suspending Measure B permits.[22]

The provision authorizing administrative searches is self contained, so enjoining it creates no grammatical issues. § 11.39.130.

In § 11.39.110(F), which concerns the Department's authority to revoke a permit and levy other penalties against a permittee after an administrative review, the following words can be stricken without any grammatical problems: "modify, suspend, revoke or any other laws or standards affecting public health and safety, including but not limited to the Los Angeles County Code, the California Health and Safety Code, the blood borne pathogen standard, California Code of Regulations Title 8, section 5193 or the exposure control plan of the permittee, or any combination thereof, or for interference with a county health officer's performance of duty."[23] The provision requiring permits for

---

[22]Had the Court only enjoined the revocation and suspension provisions of Measure B on grounds that the status quo is disrupted before judicial review, the Court would have only enjoined the County from "enforcing a license suspension or revocation for ninety days after an administrative appeal becomes final, the time allowed for filing a writ of administrative mandamus under the California statutory scheme." Convoy, 183 F.3d at 1116.

[23]That is to say, § 11.39.110(F) paragraph makes grammatical sense when read as follows: "The department may, after an administrative review or waiver thereof continue all such action previously imposed upon a permittee pursuant to this chapter or impose any fine imposed by law for violations of this chapter." Thus, what remains of § 11.39.110(F) is the Department's authority to initiate fines or criminal charges, as provided for in Measure B for Measure B violations only, against Measure B violators. Of course, this order affects no other provision of law outside of Measure B. Although the term "modify" has not previously been discussed, it is also unconstitutional as its vagueness permits

(continued...)

32

ER0032

anything other than vaginal or anal sexual intercourse can be similarly successfully edited.[24]  The provision concerning emergency fines and revocations, § 11.39.110(E), is not completely self contained, as it continues to § 11.39.110(E)(1)-(2). Therefore, subsections (1) and (2) of § 11.39.110(E) are also be enjoined.

Under the functionality test, the Court must decide whether Measure B remains "operational" without the offending language. Valley Outdoor, 337 F.3d at 1114.  Here, adult film actors must still use condoms.  A permit is still required.  Although the permit may not be modified, suspended, or revoked, fines and criminal charges may still be brought against offenders, as described in footnote 23.

While administrative searches cannot occur, nothing prevents law enforcement from obtaining a warrant to enforce Measure B.

Regarding fees, since there is no evidence that Measure B's fees are revenue neutral, there is no reason to believe the Department's Measure B duties cannot be performed without fees-or performed at least until the fees' defect is cured, either by enacting a new, constitutional ordinance or providing this Court with evidence of revenue neutrality.  See Wal Juice Bar, Inc. v. City of Oak Grove, No. CIV.A. 5:02CV-252-R, 2005 WL 2333636, at

---

[23](...continued)
unbridled discretion, and, given its undefined scope, allows the Department to effectively suspend or revoke a license.  See G.K. Ltd., 436 F.3d 1082 (discussing unbridled discretion).

[24] § 11.39.010 then reads: "An 'adult film' is defined as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in vaginal, or anal penetration by a penis."

ER0033

*5-6 (W.D. Ky. Sept. 22, 2005) (deciding that a license fee for sexually-oriented businesses was unconstitutional, but stating that the fee was severable in part because the ordinance remained functional without the fee provision). For these reasons, Measure B remains operational.

The volitional test asks "whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." <u>Gerken v. Fair Political Practices Com.</u>, 6 Cal. 4th 707, 714-15 (1993). A ballot initiative passes the volitional test when "it seems eminently reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose." <u>Id.</u> at 715. Here, in light of Measure B's stated purpose of preventing the spread of STIs and for the reasons discussed above in the operational analysis, it seems that those who "favored [Measure B] would be happy to achieve" what remains of it." <u>Id.</u>

**V. Conclusion**

As set forth above, this Court GRANTS in part and DENIES in part Interveners' Motion to Dismiss, and GRANTS in part and DENIES on part Plaintiffs' Motion for a Preliminary Injunction.

In light of this Order, Plaintiffs' motion for judgment on the pleadings is vacated. (Docket No. 64.)

IT IS SO ORDERED.

Dated: August 16, 2013

DEAN D. PREGERSON
United States District Judge

34

1

2

3                                                                          O

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11  VIVID ENTERTAINMENT, LLC;        )  Case No. CV 13-00190 DDP (AGRx)
    CALIFA PRODUCTIONS, INC.;        )
12  JANE DOE a/k/a KAYDEN KROSS,     )  ORDER DENYING PLAINTIFFS' MOTION
                                     )  FOR RECONSIDERATION
13              Plaintiffs,          )
                                     )  [Docket No. 63]
14      v.                           )
                                     )
15  JONATHAN FIELDING, DIRECTOR      )
    OF LOS ANGELES COUNTY            )
16  DEPARTMENT OF PUBLIC HEALTH;     )
    JACKIE LACEY, LOS ANGELES        )
17  COUNTY DISTRICT ATTORNEY,        )
    and COUNTY OF LOS ANGELES,       )
18                                   )
                Defendants.          )
19  _____ )

20

21  **I. Introduction**

22      On November 6, 2012, Los Angeles County approved Measure B,

23  which requires producers of adult films to obtain a permit from the

24  Los Angeles County Department of Public Health before production

25  can take place.  (Compl. ¶¶ 36, 41.)  Measure B also requires the

26  use of condoms by performers for all acts of anal or vaginal sex

27  during the production of adult films. (*Id.* ¶ 42.)  Plaintiffs Vivid

28  Entertainment, LLC ("Vivid"), Califa Productions, Inc., Jane Doe,

**ER0035**

1  and John Doe are in the adult film industry.  (Id. ¶¶ 10-11.)

2  Plaintiffs have sued Jonathan Fielding, Director of Los Angeles

3  County Department of Public Health; Jackie Lacie, Los Angeles

4  County District Attorney; and County of Los Angeles (the "County

5  Defendants") for Declaratory and Injunctive Relief, claiming that

6  Measure B is unconstitutional.  (See generally id.)  The County

7  Defendants have declined to defend Measure B's constitutionality.

8  (Order at 9.)  The County, however, has taken steps to begin

9  enforcing Measure B.  (Docket No. 56 Ex. 1.)

10       On April 16, 2013 this Court granted Michael Weinstein,

11  Marijane Jackson, Arlette De La Cruz, Mark McGrath, Whitney

12  Engeran, the Campaign Committee Yes on B, and Major Funding by the

13  AIDS Healthcare Foundation's ("Interveners") Motion to Intervene.

14  (See generally Order Granting Motion to Intervene ("Order"), Docket

15  No. 44.)  "Interveners were the official proponents of Measure B;"

16  they "drafted the language that would become Measure B, collected

17  signatures to qualify the Measure for the November 2012 ballot,

18  submitted the signatures for verification, raised funds, and

19  drafted an argument for the appearance of the Measure on the

20  ballot."  (Order at 2.)

21       In light of the recent Supreme Court decision in

22  Hollingsworth v. Perry, 133 S.Ct. 2652 (2013), Plaintiffs have

23  filed a Motion to Reconsider ("Motion") this Court's Order.

24  (Docket No. 63)

25  **II. Legal Standard**

26       Local Rule 7-18 provides the framework under which non-final

27  judgments may be reconsidered.  In relevant part, it states that

28  reconsideration is appropriate when there is a "material difference

2

ER0036

1  in fact or law from that presented to the Court before such
2  decision that in the exercise of reasonable diligence could not
3  have been known to the party moving for reconsideration at the time
4  of such decision."

5  **III. <u>Analysis</u>**

6      In <u>Perry</u> the Supreme Court held that the interveners, who were
7  also Proposition 8's proponents, did not have standing to appeal
8  the district court's judgment. <u>Perry</u>, 133 S. Ct. at 2668.
9  Plaintiffs claim that <u>Perry</u> requires Interveners to show they have
10 standing independent of the County Defendants.  The Court
11 disagrees.

12     In <u>Perry</u>, as here, the government officials, who were named as
13 defendants enforced but "refused to defend the law." <u>Id.</u> at 2660.
14 The district court allowed Proposition 8's proponents to intervene.
15 <u>Id.</u>  When the district court declared Proposition 8
16 unconstitutional, the defendants elected not to appeal to the Ninth
17 Circuit, but the Interveners did. <u>Id.</u>  The Supreme Court later
18 vacated the Ninth Circuit's ruling because the Interveners did not
19 have standing to appeal the district court. <u>Id.</u> at 2668.  The
20 Supreme Court made clear that initiative proponents do not have
21 standing to defend their ballot measures after those measures
22 become law. <u>Id.</u> at 2663 ("[O]nce Proposition 8 was approved by the
23 voters, the measure became a duly enacted constitutional amendment
24 or statute.  Petitioners have no role—special or otherwise—in the
25 enforcement of Proposition 8.") (internal quotation marks and
26 citations omitted).  However, the Supreme Court, left the district
27 court's judgment intact. <u>Id.</u> at 2668.  In so doing, it implicitly
28 approved of the framework currently at issue: at the district court

3

1   level, intervention by initiative proponents is proper when the

2   government is enforcing the initiative but refuses to defend it,

3   regardless of whether the interveners have standing independent of

4   the government defendants.

5       Additionally, as the Order recognized, Ninth Circuit

6   precedent, though somewhat ambiguous, generally indicates that

7   interveners are not required to demonstrate Article III standing

8   independent of the defendants.  (Order at 4-5); see State of

9   California Dep't of Soc. Servs. v. Thompson, 321 F.3d 835, 846 (9th

10  Cir. 2003) ("Ms. Rosales did not need to meet Article III standing

11  requirements to intervene.")  Thus, unless Perry "undercut the

12  theory or reasoning underlying the prior circuit precedent in such

13  a way that the cases are clearly irreconcilable," the Court must

14  follow the Ninth Circuit precedent.  Miller v. Gammie, 335 F.3d

15  889, 900 (9th Cir. 2003).  Because Perry only held that interveners

16  must have independent standing to bring an appeal that the

17  government defendants decline to, it did not undercut prior

18  authority indicating that interveners do not need to establish

19  independent standing at the district court level.

20      Finally, denying intervention in this case would upend one of

21  the key purposes of standing doctrine.  One reason standing is

22  required is to "sharpen[ ] the presentation of issues upon which

23  the court so largely depends for illumination of difficult ...

24  questions."  Baker v. Carr, 369 U.S. 186, 204 (1992).  Even without

25  Interveners, there would still be standing to resolve this case

26  because the County is enforcing Measure B.  See United States v.

27  Windsor, 133 S. Ct. 2675, 2685 (2013) ("Even though the Executive's

28  current position was announced before the District Court entered

4

ER0038

1  its judgment, the Government's agreement with Windsor's position

2  would not have deprived the District Court of jurisdiction to

3  entertain and resolve the refund suit; for her injury (failure to

4  obtain a refund allegedly required by law) was concrete,

5  persisting, and unredressed.")  Because the Defendants refuse to

6  defend Measure B's constitutionality, Interveners are needed to

7  sharpen the issues this Court will be required to answer.

8  **III.  Conclusion**

9       For the reasons stated herein, the Motion is DENIED.

10  IT IS SO ORDERED.

11

12

13  Dated: August 2, 2013

14                                     DEAN D.  PREGERSON
                                       United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

ER0039

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE DOE a/k/a KAYDEN KROSS, | ) ) ) | Case No. CV 13-00190 DDP (AGRx) |
| Plaintiff, | ) ) ) | **ORDER GRANTING MOTION TO INTERVENE** |
| v. | ) ) ) | [Dkt. No. 24] |
| JONATHAN FIELDING, DIRECTOR OF LOS ANGELES COUNTY DEPARTMENT OF PUBLIC HEALTH; JACKIE LACEY, LOS ANGELES COUNTY DISTRICT ATTORNEY, and COUNTY OF LOS ANGELES, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) ) ) | |

_____

Presently before the court is Proposed Intervenors Michael Weinstein, Marijane Jackson, Arlette De La Cruz, Mark McGrath, Whitney Engeran, and the Campaign Committee Yes on B, Major Funding by the AIDS Healthcare Foundation (collectively "Proposed Intervenors")'s Motion to Intervene. Having considered the parties submissions and heard oral argument, the court adopts the following order.

ER0040

## I. BACKGROUND

On November 6, 2012, 57% of voters in Los Angeles County approved Measure B. (Compl. ¶ 36.) Measure B requires producers of adult films to obtain a permit from the Los Angeles County Department of Public Health before production can take place. (<u>Id.</u> ¶ 41.) To obtain the permit, valid for two years but subject to revocation, a producer must pay a fee and evidence successful completion of a blood borne pathogen training course. (<u>Id.</u>) Additionally, Measure B requires the use of condoms by performers for all acts of anal or vaginal sex during the production of adult films. (<u>Id.</u> ¶ 42.)

Plaintiffs are corporations and individuals involved in the adult film industry as producers, employers, and performers. (<u>Id.</u> ¶¶ 8-11.) On January 10, 2013, they filed this action against Jonathan Fielding, Director of Los Angeles County Department of Public Health, in his official capacity; Jackie Lacey, Los Angeles County District Attorney, in her official capacity; and the County of Los Angeles (collectively "Defendants").

Proposed Intervenors were the official proponents of Measure B. Proposed Intervenors drafted the language that would become Measure B, collected signatures to qualify the Measure for the November 2012 ballot, submitted the signatures for verification, raised funds, and drafted an argument for the appearance of the Measure on the ballot. (Weinstein Decl. ¶¶ 3, 5-7.) They filed this Motion to Intervene on March 1, 2013.

## II. LEGAL STANDARD

Rule 24(a)(2) of the Federal Rule of Civil Procedure governs intervention as of right and provides, in pertinent part: "On

2

1  timely motion, the court must permit anyone to intervene who . . .

2  claims an interest relating to the property or transaction that is

3  the subject of the action, and is so situated that disposing of the

4  action may as a practical matter impair or impede the movant's

5  ability to protect its interest, unless existing parties adequately

6  represent that interest."  Fed. R. Civ. P. 24(a)(2).

7      To intervene as of right under Rule 24(a)(2), the movant must

8  demonstrate that: "(1) it has a significant protectable interest

9  relating to the property or transaction that is the subject of the

10  action; (2) the disposition of the action may, as a practical

11  matter, impair or impede the applicant's ability to protect its

12  interest; (3) the application is timely; and (4) the existing

13  parties may not adequately represent the applicant's interest."

14  United States v. City of Los Angeles, 288 F.3d 391, 397 (9th Cir.

15  2002)(quoting Donnelly v. Glickman, 159 F.3d 405, 409 (9th Cir.

16  1998)).  The movant-intervenor bears the burden of showing that all

17  the requirements for intervention have been met.  Id. at 397.

18      In determining whether intervention is appropriate, courts are

19  guided by practical and equitable considerations, and the

20  requirements for intervention are broadly interpreted in favor of

21  intervention.  Donnelly, 159 F.3d at 409; Forest Conservation

22  Council v. U.S. Forest Serv., 66 F.3d 1489, 1493 (9th Cir. 1995).

23      Additionally, under Rule 24(b)(1)(B), a court "may permit" a

24  party to intervene who has (1) timely made a motion to intervene

25  and (2) has a claim or defense that shares with the main action a

26  common question of law or fact.  Fed. R. Civ. P. 24(b)(1)(B).

27  **III. DISCUSSION**

28      **A. Intervention and Article III Standing**

3

1     Plaintiffs assert that in order to intervene under Rule 24,
2  Proposed Intervenors must meet not only the criteria for
3  intervention of right under the Federal Rules but also must
4  independently fulfill the requirements of Article III standing.
5  (Opp. at 15-18.)  Neither the United States Supreme Court nor the
6  Ninth Circuit has explicitly addressed this issue.  <u>Perry v.</u>
7  <u>Proposition 8 Official Proponents</u>, 587 F.3d 947, 950 n.2 (9th Cir.
8  2009)("We have yet to decide whether putative intervenors must
9  satisfy standing independently of the parties to the case. The
10 circuits are split on this issue."); <u>see also</u> <u>Prete v. Bradbury</u>,
11 438 F.3d 949, 955 n.8 (9th Cir. 2006)(citing cases that demonstrate
12 circuit split).  However, the Ninth Circuit has repeatedly allowed
13 intervention without requiring a demonstration of Article III
14 standing.  <u>See, e.g.</u>, <u>Sagebrush Rebellion, Inc., v. Watt</u>, 713 F.2d
15 525, 527 (9th Cir. 1983)(internal quotation marks
16 omitted)(mentioning a case in which "a public interest group was
17 entitled as a matter of right to intervene in an action challenging
18 the legality of a measure which it had supported," and noting that
19 "Rule 24 traditionally has received a liberal construction in favor
20 of applicants for intervention."); <u>Doe v. Harris</u>, no. C12-5713 THE,
21 2013 WL 140053, at *2 (N.D. Cal. Jan. 10, 2013)(granting permissive
22 intervention and stating that proponents of a ballot proposition
23 "are not required to demonstrate that they have independent Article
24 III standing in order to be permitted to intervene in this
25 action").

26    Because of the "liberal construction" of Rule 24 in this
27 circuit, the court declines to require that Proposed Intervenors
28

4

ER0043

1 meet not only the Rule 24 requirements but also satisfy the

2 requirements for Article III standing.

3      **B. Intervention as of Right**

4      Proposed Intervenors argue that they are entitled to intervene

5 as a matter of right. Defendants do not oppose the Motion.

6 Plaintiffs do not challenge Proposed Intervenors' assertion that

7 they meet the first three criteria but do challenge their assertion

8 that they meet the fourth criterion (inadequate representation of

9 interests).  The court will nonetheless consider whether Proposed

10 Intervenors meet all four Rule 24(a)(2) criteria.

11      **1. Timeliness**

12      To determine whether a motion to intervene is timely, the

13 court considers the following criteria: "(1) the stage of the

14 proceedings; (2) whether the parties would be prejudiced; and (3)

15 the reason for any delay in moving to intervene." Nw. Forest Res.

16 Council v. Glickman, 82 F.3d 825, 836 (9th Cir. 1996).

17      Here, the Complaint was filed on January 10, 2013, and served

18 on January 14, 2013. The Answer was initially due on February 4,

19 2013, and the parties stipulated to a 23-day extension, making the

20 Answer due on February 27.  Proposed Invervenors filed this Motion

21 on March 1, 2013.

22      The court finds that Proposed Intervenors' Motion was filed at

23 an early stage of the proceedings and that there is no evidence of

24 any delay in so filing, thus meeting the first and third criteria.

25 Neither Plaintiffs nor Defendants argue that they would be

26 prejudiced by the timeliness of the Motion.  The court therefore

27 finds that the second criterion is also met, and that the Proposed

28 Intervenors' Motion was timely.

ER0044

## 2. Significant Protectable Interest

Proposed Intervenors argue that they have a significant protectable interest in defending Measure B because they were the proponents of the ballot measure.  They point to the recent California Supreme Court decision articulating the particular interests of ballot measure proponents, grounded in the California political process:

> [B]ecause the initiative process is specifically intended to enable the people to amend the state Constitution or to enact statutes when current government officials have declined to adopt (and often have publicly opposed) the measure in question, the voters who have successfully adopted an initiative measure may reasonably harbor a legitimate concern that the public officials who ordinarily defend a challenged state law in court may not, in the case of an initiative measure, always undertake such a defense with vigor or with the objectives and interests of those voters paramount in mind. As a consequence, California courts have routinely permitted the official proponents of an initiative to intervene or appear as real parties in interest to defend a challenged voter-approved initiative measure in order to guard the people's right to exercise initiative power or, in other words, to enable such proponents to assert the people's, and hence the state's, interest in defending the validity of the initiative measure. Allowing official proponents to assert the state's interest in the validity of the initiative measure in

6

ER0045

1         such litigation (along with any public officials who may

2         also be defending the measure) (1) assures voters who

3         supported the measure and enacted it into law that any

4         residual hostility or indifference of current public

5         officials to the substance of the initiative measure will

6         not prevent a full and robust defense of the measure to

7         be mounted in court on the people's behalf, and (2)

8         ensures a court faced with the responsibility of

9         reviewing and resolving a legal challenge to an

10         initiative measure that it is aware of and addresses the

11         full range of legal arguments that reasonably may be

12         proffered in the measure's defense. In this manner, the

13         official proponents' general ability to appear and defend

14         the state's interest in the validity of the initiative

15         measure and to appeal a lower court judgment invalidating

16         the measure serves to enhance both the fairness of the

17         judicial process and the appearance of fairness of that

18         process.

19 Perry v. Brown, 52 Cal. 4th 1116, 1125-26 (2011) (internal citation

20 and quotation marks omitted). In short, under California law

21 proponents of a ballot measure are considered to have a protectable

22 interest that they have assumed on behalf of the state and the

23 voters, regardless of any separate, individual interest in the

24 measure that proponents may be able to demonstrate.

25       Consistent with the California Supreme Court decision, the

26 Ninth Circuit has held that initiative proponents have an interest

27 sufficient to meet the Rule 24 requirements. See, e.g. Prete, 438

28 F.3d at 954(internal quotation marks omitted)("for purposes of

7

1  intervention as of right, a public interest group that has

2  supported a measure (such as an initiative) has a significant

3  protectable interest in defending the legality of the measure").

4     It is uncontested that Proposed Intervenors were the official

5  proponents of Measure B. (See generally Weinstein Decl.)  As such,

6  the court finds that they have a significant protectable interest

7  in the subject matter of the litigation, sufficient to support

8  intervention.

9           **3. Impairment of Interests**

10    "[I]f an absentee would be substantially affected in a

11  practical sense by the determination made in an action, he should,

12  as a general rule, be entitled to intervene."  Sw Center for

13  Biological Diversity v. Berg, 268 F.3d 810, 822 (9th Cir.

14  2001)(quoting Fed. R. Civ. P. 24 advisory committee's

15  notes)(internal quotation marks omitted).  "[A]n adverse court

16  decision on [a ballot measure supported by a public interest group]

17  may, as a practical matter, impair the interest held by the public

18  interest group."  Prete, 438 F.3d at 954.  Because Plaintiffs are

19  challenging the constitutionality of Measure B and seeking to

20  enjoin its enforcement, a decision in their favor would impair the

21  interests of Proposed Intervenors and their organization, the AIDS

22  Healthcare Foundation, who were the official proponents of the

23  ballot measure and who have an interest in taking steps they deem

24  necessary to ensure workplace protection from sexually transmitted

25  diseases for adult film performers.  See Sagebrush Rebellion, 713

26  F.2d at 528 ("An adverse decision in this suit would impair the

27  society's interest in the preservation of birds and their

28  habitats.").

ER0047

1    Plaintiffs do not challenge Proposed Intervenors' ability to
2  meet this criterion, and the court agrees that Proposed
3  Intervenors' interests would be impaired by a decision in favor of
4  Plaintiffs in this suit.  Accordingly, Proposed Intervenors meet
5  the third criterion for intervention.

### 4. Adequate Representation of Interests

7    To determine whether a party will adequately represent the
8  interests of a proposed intervenor, the court considers "whether
9  [that party] will undoubtedly make all of the intervenor's
10 arguments, whether [that party] is capable of and willing to make
11 such arguments, and whether the intervenor offers a necessary
12 element to the proceedings that would be neglected."  _Id._

13   Proposed Intervenors argue that the County will not adequately
14 represent their interests because the County Board of Supervisors
15 voted against adopting Measure B, County Counsel expressed
16 skepticism toward Measure B, and the Defendants desire the same
17 legal outcome as Plaintiffs.  (Mot. at 16-17.)  Most significantly,
18 Defendants have indicated that they "have declined to defend the
19 constitutionality of Measure B and have taken a position of
20 neutrality regarding whether Measure B is constitutional and/or
21 preempted by California law."  (Defendants' Supplemental Statement
22 of Non-Opposition to Proposed Intervenors' Motion to Intervene at
23 2.)[1]

---

[1] This is a more explicit statement of Defendants' position on
defending the Measure than that offered in their Answer, where they
stated:
   Plaintiffs' Complaint presents important constitutional
   questions that require and warrant judicial
   determination.  In a constitutional democracy, it is the
   role of the courts to determine and resolve such
                                          (continued...)

9

ER0048

1       Plaintiffs argue in their Opposition, submitted before they

2   had the benefit of Defendants' Supplemental Statement of Non-

3   Opposition, that Proposed Intervenors have not demonstrated that

4   they are not adequately represented by Defendants because, since

5   the Measure became law, Defendants have acted to implement,

6   enforce, and defend it.  (Opp. at 4.)  They point to a letter sent

7   to "producers of adult films in Los Angeles County" explaining the

8   ordinance and its requirements.  (Corn-Revere Decl. ¶ 2, Exh. A.)

9   They also point out that Proposed Intervenors do not cite any

10  statements made by Defendant critical of Measure B dating from

11  after it became law.  (Id.)  They assert further that "there is no

12  evidence in the record or the Motion from after November 6, 2012 to

13  support Proposed Intervenors' claim that Defendants desire Measure

14  B to be declared unconstitutional."  (Opp. at 12.)

15      The court finds that Defendants' clear statement that it does

16  not intend to defend Measure B in this litigation is sufficient to

17  indicate that they are not adequately representing Proposed

18  Intervenors' interests.  Insofar as Defendants have indicated that

19  they do not intend to make arguments in support of the

20  constitutionality and other validity of the Measure, there is a

21  clear indication of their inadequate representation of the

22  _____

23  [1](...continued)
    questions.  To the extent that Plaintiffs have stated a

24      justiciable controversy, setting forth federal
    constitutional challenges to the County of Los Angeles

25      Safer Sex in the Adult Film Industry Act ("Measure B"),
    it is appropriate for the federal courts to determine and

26      resolve those challenges.  Defendants encourage the Court
    to resolve the merits of this action expeditiously.

27  (Answer at 1.)  Among their affirmative defenses, Defendants
"reserve the right to have proponents of Measure B intervene and

28  defend the constitutionality of Measure B in light of Perry v.
Brown, 52 Cal.4th 1116 (2011)."  (Id. at 13.)

ER0049

interests of Proposed Intervenors. Because Defendants decline to defend the Measure substantively, Proposed Intervenors will offer an element to the proceedings that would otherwise be neglected, namely, a full defense of the constitutionality and validity of the Measure. "[I]n an instance . . . in which the public officials have totally declined to defend the initiative's validity at all, . . . it would clearly constitute an abuse of discretion for a court to deny the official proponents of an initiative the opportunity to participate as formal parties in the proceeding, either as interveners or as real parties in interest, in order to assert the people's and hence the state's interest in the validity of the measure . . . ." <u>Perry v. Brown</u>, 52 Cal.4th at 1126.[2]

The court finds that Defendants will not adequately represent the interests of Proposed Intervenors.

### 5. Conclusion on Intervention as of Right

Proposed Intervenors have met all four factors under Rule 24(a)(2) and the court therefore GRANTS intervention.

### C. Permissive Intervention

Because the court has found that intervention by right is appropriate, it need not consider permissive intervention.

///

///

///

---

[2] Even if the government defendants were defending the measure, intervention by the official proponents might still be warranted. <u>Perry v. Brown</u>, 52 Cal.4th at 1126 ("[I]n most instances it may well be an abuse of discretion for a court to fail to permit the official proponents of an initiative to intervene in a judicial proceeding to protect the people's right to exercise their initiative power even when one or more government defendants are defending the initiative's validity in the proceeding.").

ER0050

**IV. CONCLUSION**

For these reasons, the court GRANTS the Motion to Intervene.

IT IS SO ORDERED.

Dated: April 16, 2013

DEAN D. PREGERSON
United States District Judge

12

ER0051

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 16, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I further certify that Putative Intervenors below, who were served with the Notice of Appeal and were listed in the Representation Statement, and who have not entered an appearance in this matter, and whose attorneys do not appear to be registered CM/ECF users for this case, have been mailed a courtesy copy of the foregoing document by First-Class Mail, postage prepaid, to the following address:

> Tom Myers
> Samantha R. Azulay
> Christina Yang
> AIDS HEALTHCARE FOUNDATION
> 6255 W. Sunset Blvd., 21st Floor
> Los Angeles, CA 90028
> Telephone:        (323) 860-5200
> Facsimile:        (323) 467-8450


     /s/ Matthew D. Peterson
Matthew D. Peterson

i