9th Circuit Case No. 13-56445

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————

VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE DOE
a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce,
*Plaintiffs-Appellants,*
vs.
JONATHAN FIELDING, Director of Los Angeles County Department of
Public Health; JACKIE LACEY, Los Angeles County District Attorney;
and COUNTY OF LOS ANGELES,
*Defendants-Appellees*
and
MICHAEL WEINSTEIN, MARIJANE JACKSON, ARLETTE DE LA CRUZ,
MARK McGRATH, WHITNEY ENGERAN, and the CAMPAIGN COMMITTEE
YES ON B, Major Funding by the AIDS Healthcare Foundation
*Intervenor Defendants-Appellees*

On Appeal From The United States
District Court for the Central District of California
Hon. Dean D. Pregerson, District Court Case No. CV13-00190 DDP (AGRx)

—————————

# INTERVENOR DEFENDANTS-APPELLEES'
# ANSWERING BRIEF

—————————

THOMAS R. FREEMAN - SBN 135392
TRF@BIRDMARELLA.COM
MITCHELL A. KAMIN — SBN 202788
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS & LINCENBERG, P.C.
1875 CENTURY PARK EAST, 23RD FLOOR
LOS ANGELES, CALIFORNIA 90067-2561
TELEPHONE: (310) 201-2100
FACSIMILE: (310) 201-2110

TOM MYERS — SBN 176008
LAURA BOUDREAU — SBN 181921
SAMANTHA R. AZULAY — SBN 283424
CHRISTINA YANG — SBN 266363
AIDS HEALTHCARE FOUNDATION
6255 W. SUNSET BLVD., 21ST FL.
LOS ANGELES, CA 90028
TELEPHONE: (323) 860-5200
FACSIMILE (323) 467-8450

*Attorneys for Intervenor Defendants-Appellees*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE .....................................................................1

I.    STATEMENT OF FACTS .................................................................3

    A.    History Of STD Infection and Transmission During Filming of
        Sexual Intercourse in Los Angeles County ....................................3

    B.    Background And History of Measure B's Passage .......................5

    C.    Measure B Was Intended To Reduce The Risk of STD Infection
        By Requiring Condoms When Filming Acts of Sexual Intercourse ..........6

II.   PROCEDURAL BACKGROUND ....................................................7

    A.    Proceedings in the District Court.................................................7

        1.    Intervention By Proponents.................................................7

        2.    The Preliminary Injunction Motion ...................................8

    B.    Ninth Circuit Proceedings ..........................................................11

STANDARD OF REVIEW .......................................................................11

SUMMARY OF ARGUMENT...................................................................12

LEGAL ARGUMENT ...........................................................................14

I.    Measure B Proponents Are Not Required To Establish Standing .....................14

      A.    Article III Standing Is Only Required Of Parties Who *Invoke* The Federal Court's Jurisdiction Seeking Relief For A Concrete and Particularize *Injury* ...........................................................................14

            1.    The Supreme Court specified that a party *invoking* the court's jurisdiction must have standing—not a party merely seeking to *participate* in litigation ..........................................................14

            2.    Standing is uniquely applicable to *plaintiffs* and *appellants* because *defendants* and *appellees* suffer no injury for which they seek relief ...................................................................15

            3.    The appellant/appellee distinction is not a "minor twist," it is fundamental to the standing doctrine ...........................................16

            4.    Vivid improperly relies on *Bowsher*, *Clinton* and *Diamond* ...............16

      B.    Intervention Was Required Because There Is No Other Party To Defend The Constitutionality Of Voter Passed Measure B.....................17

      C.    *Hollingsworth* Did Not Change Ninth Circuit Law On Intervention ........19

II.   The Condom Use Requirement Does Not Violate The First Amendment ...........................................................................20

      A.    Measure B is subject to intermediate First Amendment review ..............20

            1.    The Supreme Court has established a special framework for reviewing laws targeting adult entertainment operations that have adverse impacts unrelated to their messages .................20

            2.    Measure B is not a "complete ban" on a form of expression, it merely regulates the *manner* of expression ...............21

            3.    Measure B is a "time, place and manner" regulation subject to intermediate First Amendment review .......................................25

B.    Measure B Does Not Violate The First Amendment ................................26

    1.    The transmission of STDs in the adult film industry poses a public health problem and requiring the use of condoms is a reasonable strategy for curbing it ....................................................26

    2.    Measure B is narrowly tailored ...........................................31

    3.    The "alternative channels for communicating" requirement is satisfied because the condom rule, like other manner requirements, does not eliminate a channel of communication ....................................................................35

C.    Measure B Is Not Underinclusive, Overinclusive Or Vague ..................37

    1.    Measure B is not underinclusive ........................................37

    2.    Measure B is not overinclusive or vague ...........................38

D.    There Is No Basis For Challenging The Remaining Requirements .........38

III.    Severance Effectuates The Voters' Intent In Passing Measure B.......................38

A.    The Severance Doctrine Requires Preservation Of The Condom Use Requirement Through The Permitting Process ................................40

    1.    The invalid provisions are grammatically separable ......................41

    2.    The initiative, as modified, would have been passed by the voters, thereby meeting the "volitional" standard .........................44

CONCLUSION .........................................................................................46

CERTIFICATE OF COMPLIANCE...............................................................47

STATEMENT OF RELATED CASES ............................................................48

CERTIFICATE OF SERVICE.......................................................................49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Already, LLC v. Nike, Inc.,*
  133 S.Ct. 721 (2013) ........................................................................ 15, 2

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991) ........................................................ 22, 23, 36, 37

*Ben's Bar, Inc. v. Villiage of Somerset,*
  316 F.3d 702 (7th Cir. 2003) ........................................................ 22

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ........................................................................ 16

*Brown v. Board of Education,*
  347 U.S. 483 (1954) ........................................................................ 14

*Center for Fair Public Policy v. Maricopa County, Az.,*
  336 F.3d 1153 (9th Cir. 2003) ............................... 20-21, 27, 37-38

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) ...................................................... 21, 22, 23

*City of Los Angeles v. Alameda Books, Inc.,*
  535 U.S. 425 (2002) .................................... 20, 25, 27, 29, 30

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1985) ........................................ 20, 21, 24, 35, 36, 37

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ........................................................................ 16

*Colacurcio v. City of Kent,*
  163 F.3d 545 (9th Cir. 1998) .................................... 25, 31, 32, 35

*Comite de Jornaleros v. City of Redondo Beach,*
  657 F.3d 936 (9th Cir. 2011) .............................................. 18, 39

*Diamond v. Charles,*
  476 U.S. 54 (1986) .................................................. 15, 16, 17, 19

*Dream Palace v. County of Maricopa*,
   384 F.3d 990 (9th Cir. 2004) ................................................................. 21, 24

*Fly Fish, Inc. v. City of Cocoa Beach*,
   337 F.3d 1301 (11th Cir. 2003) .................................................................. 21

*Gammoh v. City of La Habra*,
   395 F.3d 1114 (9th Cir. 2005) ................................................ 22-26, 32, 35

*Heideman v. South Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003), explained ............................................... 36

*Hollingsworth v. Perry*,
   133 S.Ct. 2652 (2013) ..................................................................... passim

*Hollingsworth v. Perry*,
   133 U.S. 2652 (2013) ............................................................................ 14, 15

*Katz v. Children's Hospital of Orange Cty.*,
   28 F.3d 1520 (9th Cir.1994) ...................................................................... 44

*Kev, Inc. v. Kitsap County*,
   793 F.2d 1053 (9th Cir. 1986) ............................................................25, 35-37

*Leigh v. Salazar*,
   677 F.3d 892 (9th Cir. 2012) ..................................................................... 11

*Marks v. United States*,
   430 U.S. 188 (1976) ............................................................................ 21, 22

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ................................................................................. 14

*Penson v. Ohio*,
   488 U.S. 75 (1988) ................................................................................... 18

*Prete v. Bradbury*,
   438 F.3d 949 (9th Cir. 2006) ..................................................................... 19

*Sekiya v. Gates*,
   508 F.3d 1198 (9th Cir. 2007) ................................................................... 38

*Southwest Center for Biological Diversity v. Berg,*
    268 F.3d 810 (9th Cir. 2001) ...................................................................18

*Sullivan v. Dollar Tree Stores,*
    623 F.3d 770 (9th Cir. 2010) ...................................................................38

*Valley Outdoor, Inc. v. County of Riverside,*
    337 F.3d 1111 (9th Cir. 2003) .................................................................40

*Yniguez v. State of Arizona,*
    939 F.2d 1319 (9th Cir. 1991) .................................................................18

**STATE CASES**

*Borikas v. Alameda Unified School District,*
    214 Cal.App.4th 135 (2013) (*review denied,* June 12, 2013) .................... 40, 42

*California Redevelopment Assn. v. Matosantos,*
    53 Cal.4th 231 (2011) ......................................................................... 40, 41

*City of Dublin v. County of Alameda,*
    14 Cal.App.4th 264 (1993) ......................................................................43

*Gerken v. Fair Political Practices Com.,*
    6 Cal.4th 707 (1993) ......................................................................40, 44, 46

*McMahan v. City & County of San Francisco,*
    127 Cal.App.4th 1368 (2005) ..........................................................39, 44, 45

*Pala Band of Mission Indians v. Bd. of Supervisors,*
    54 Cal.App.4th 565 (1997) ......................................................................40

*Perry v. Brown,*
    52 Cal.4th 1116 (2011) ...........................................................................18

**STATE STATUTES**

California Constitution, Article XI, § 7 .............................................................43

Cal. Gov't Code § 9118 ...................................................................................5

Cal. Gov't Code § 14999.20 ............................................................................2

Cal. Health & Safety Code § 120575 ........................................................... 5, 27

California Health and Safety Code §§ 120175 ....................................................5

**RULES**

Federal Rule of Civil Procedure 24..............................................................passim

## INTRODUCTION

Requiring adult film performers to wear condoms while having vaginal or anal sexual intercourse, as a precaution against the spread of sexually-transmitted diseases, is not a violation of the constitutional right to free speech.

## STATEMENT OF THE CASE

The "Safer Sex in the Adult Film Industry Act," codified as Los Angeles County Code Chapter 11.39 and referred to as "Measure B," is an effort by the citizens of Los Angeles County to address the known, documented, and extensive public health risks of sexually transmitted disease (STD) infection, including HIV/AIDS infection. The rate of infection is abnormally and extraordinarily high in a commercial enterprise unique to Los Angeles—the large scale production of commercial films during which performers actually engage in vaginal and anal sexual intercourse. It is undisputed and indisputable that making such films can and does result in STD transmission and infection among performers, which, in turn, can be transmitted to Los Angeles residents.

The marquee feature of Measure B is the requirement that performers in such films wear condoms during the filming of vaginal and anal sexual intercourse. The voters enacted Measure B to prevent the spread of STDs within the adult film industry and, through performers in that industry, to the County's general population. Requiring commercial businesses to assure the health and safety of its workers and the public in general is not unusual, not even in the film industry. The condom requirement is a sensible workplace and public safety measure that has been endorsed by the County Department of Public Health and numerous professional public health organizations such as the American Medical Association, the American Public Health Association, and the National Coalition of Sexually Transmitted Disease Directors.

Significantly, Measure B in no way dictates what films may be shown or viewed in Los Angeles County, nor does it dictate the contents or viewpoints of any films. While Measure B requires performers to wear condoms, it does not require filmmakers to depict the use of condoms. The sole purpose of Measure B is to protect against the transmission of STDs.

Measure B is therefore aimed at the harmful "secondary effects" of making films where performers actually engage in sexual intercourse. It was enacted because, despite the widespread knowledge of the public health risks inherent in large scale commercial filming of sexual intercourse, and despite the Los Angeles County Department of Public Health's endorsement of requiring condom use during filming to prevent STD infections and transmission, the government of Los Angeles County affirmatively refused to take such measures. Even now, the County declines to defend Measure B's validity, leaving it to Intervenor Defendants and Appellees, who were the official sponsors of the ballot initiative, their campaign committee, and the major funding entity (collectively, "Proponents"), to defend the public interest in a valid law that was approved by 57% of the voters.

Measure B seeks to regulate and prevent harms that can occur when filming motion pictures. This is hardly a novel objective. It is well-settled that local governments, like Los Angeles County, may condition the filming of motion pictures on obtaining permits that impose conditions on the filming process. *See, e.g.,* Cal. Gov't Code § 14999.20 *et seq.* There are numerous Los Angeles County laws regulating the production of commercial films. Under existing law, all filmmakers, including Plaintiffs-Appellants, *already* are required to obtain a temporary use permit when filming on location. Los Angeles County Code § 22.56.1830 *et seq.* Under this regime, filmmakers are required to ensure that the means and methods of filming will not present an undue risk to public health and safety.

Similarly, permits imposing safety conditions are required when filmmakers use explosive pyrotechnics for special effects. *See, e.g.,* Los Angeles County Code § 32.105.6.36 and related statutes—regardless of whether such conditions happen to limit the actors' performances in any way. Finally, Chapter 48 of the California Fire Code, which has been adopted by Los Angeles County (§ 31.100), sets out very specific requirements concerning the size of film sets, electrical engineering, wiring, and fire detectors that must be met in order for a permit to issue. These rules must be followed regardless of whether a producer or performer feels they limit their creative choices and, in that manner, impact the film's content.

All of these laws may impact the expressive content of a film, yet none are considered in any way unusual or onerous. Such is the case with Measure B.

## I.    STATEMENT OF FACTS

### A.    History Of STD Infection and Transmission During Filming of Sexual Intercourse in Los Angeles County

Los Angeles County is the epicenter of what is colloquially known as the "porn industry," where performers actually engage in sexual intercourse during the filming process. *Appellants Opening Brief* ("OB"), 10. During the making of these films, performers are exposed to, and contract, sexually transmitted diseases. *Excerpts of Record* ("ER"), 96-100.

On September 17, 2009, Jonathan Fielding, the Director of the Los Angeles County Department of Public Health, wrote a letter to the Los Angeles County Board of Supervisors reporting on the Department's investigation into the status of STD infection in the making of adult films. ER 96. In the letter, Dr. Fielding noted that, as a result of their filming activities, thousands of STD infections of performers were reported to the County Health Department, including numerous cases of HIV. ER 96-97. Dr. Fielding also found that:

- One-fifth of performers diagnosed with an STD had one or more repeat infections within a one year period, and within a four year period, 25% of performers diagnosed with an STD had a repeat infection.

- The rates of STD infections for performers was up to ten times higher than the general public, and over four times higher than the area of the County with the highest STD infection rate.

- Even these rates of infection and reinfection are likely to be significantly underestimated. *ER* 97.

The letter also states that, in June 2004, the Department of Public Health testified before a California Assembly Committee in support of legislation that would require performers to wear condoms while filming scenes in which the performers actually engage in sexual intercourse or other high risk sexual encounters. *ER* 98.

Finally, addressing the use of STD testing and screening to prevent infections, Dr. Fielding stated, "It has been the consistent position of the Department that screening alone is insufficient to prevent STDs and HIV/AIDS. . . . [T]here are other preventive measures that should be employed in the [adult film industry] such as condom use and hepatitis B vaccination." ER 98. The position that condom use would reduce STD infection has been endorsed by numerous professional public health organizations such as the American Medical Association, the American Public Health Association, and the National Coalition of Sexually Transmitted Disease Directors. ER 228.

The porn industry, represented in this case by two large production companies and two popular performers (collectively, "Vivid"), has consistently resisted condoms. While Vivid insists that industry testing and screening regimes fully protect again STD infection, STD infections resulting from the filmed acts of sexual intercourse continue as a result of filming sexual intercourse, including recent instances of HIV/AIDS

infection. As a result, the industry has had to impose moratoriums on filming, for weeks at a time and on at least *three separate occasions* since just August 2012, due to STD infections among performers who are filmed engaging in sexual intercourse, including syphilis and HIV/AIDS infections. Two of these outbreaks occurred during the pendency of this appeal. *Request for Judicial Notice* (filed Oct. 18, 2013).

**B.    Background And History of Measure B's Passage**

Heeding Dr. Fielding's findings and conclusions regarding the adverse public health impact of adult film production, concerned citizens and organizations in Los Angeles sought to persuade County government to take effective action to protect the public health by requiring the use of condoms when filming scenes of actual sexual intercourse. The County bureaucracy, however, was unwilling to take action. The advocates then sought to compel County action via petition to State court for a writ of mandate, arguing that under California Health and Safety Code Sections 120175 and 120575, the County had a ministerial duty to take further steps to protect the public health. The advocates were unsuccessful in that effort. *Dist. Ct. Dk.* No. 70-1, pp. 8-15 of 133.

Recognizing that they would be unable to get relief through governmental or judicial action, the advocates constructed a ballot initiative, to be submitted directly to the voters of Los Angeles County. During that process Proponents satisfied the legal requirements to put the initiative, Measure B, on the County ballot for the November 6, 2012 election. Once Measure B qualified for the ballot, the Los Angeles County Board of Supervisors had the option of formally adopting it. The Board declined to do so, ensuring that it would be put before the voters. *Cal. Gov't Code* § 9118.

On November 6, 2012, Measure B passed by a 57% majority. ER 41.

## C.    Measure B Was Intended To Reduce The Risk of STD Infection By Requiring Condoms When Filming Acts of Sexual Intercourse

The primary intent and purpose of Measure B is to prevent STD infection and transmission by requiring the use of condoms during the filming of vaginal and anal sexual intercourse. As stated in the "Findings and declarations" portion of Measure B, Section 2 (*ER*, 228):

- "Safer sex practices are a prime method of preventing and reducing the spread of HIV/AIDS and other sexually transmitted infections." *Measure B*, Section 2(b).

- "The Los Angeles County Department of Public Health has stated that the use of condoms is the best and most effective way to stem the spread of sexually transmitted infections within the adult film industry." *Measure B*, section 2(e).

- "Multiple organizations committed to protecting the public health have called for use of condoms in the production of adult films. . . ." *Measure B*, Section 2(f).

- "Producers of adult films are required by [California State law] to use barrier protection, including condoms, to protect employees during the production of adult films." *Measure B*, Section 2(g). ER 228.

Likewise, Measure B's "Purpose and Intent" section, Section 3, states in pertinent part:

> The people of the County of Los Angeles hereby declare their purpose and intent in enacting this ordinance is to minimize the spread of sexually transmitted infections resulting from the production of adult films in the County of Los Angeles . . . . This Act will require that producers . . . comply with preexisting law requiring, among other things, that performers are protected from sexually transmitted infections by condoms. ER 228 (*Measure B*, Section 3).

## II.     PROCEDURAL BACKGROUND

**A.     Proceedings in the District Court**

**1.     Intervention By Proponents**

On January 10, 2013, Plaintiffs-Appellants Vivid Entertainment, LLC, Califa Productions, Inc., Jane Doe, and John Doe (collectively, "Vivid") brought suit against Defendants-Appellants Jonathan Fielding, Jackie Lacey, and the County of Los Angeles (collectively, "County"), seeking to invalidate Measure B. Vivid claimed that Measure B violates their First Amendment rights, permits unreasonable searches and seizures, and impermissibly interferes with State regulation of workplace safety. *Dist. Ct. Dk.* No. 1.

On approximately February 27, 2013, County answered the complaint, expressing their intent not to defend Measure B's validity, and "reserv[ing] the right" to have the proponents of Measure B intervene and defend the validity of Measure B. *Dist. Ct. Dk.* No. 21. The County has not defended Measure B in any of the proceedings and has indicated that it will not do so on appeal either. *See Dist. Ct. Dk.* Nos. 21, 28, 35, 43; *Ninth Circuit Dk.* No. 36.

On approximately March 1, 2013 Intervenor Defendants and Appellees Michael Weinstein, Marijane Jackson, Arlette De La Cruz, Mark McGrath Whitney Engeran, and Campaign Committee Yes on B, Major Funding by the AIDS Healthcare Foundation (collectively, "Proponents"), moved the Court to intervene to defend Measure B's validity. Pursuant to California law, the individual Proponents are the "Official Proponents" of Measure B, (California Elections Code Section 342), and the Campaign Committee was the primary vehicle by which Proponents' efforts to enact Measure B were undertaken. *Dist. Ct. Dk.* Nos. 24-26.

By Order dated April 16, 2013, Judge Pregerson found that, pursuant to Federal Rule of Civil Procedure 24, Proponents had established that (1) they had timely filed their Motion, (2) they had a significant protectable interest in the subject matter of the litigation, (3) their interest would be impaired by a decision in favor of Vivid, and (4) County, by its previous statements and actions evidencing antipathy toward Measure B, and by explicitly stating in its statement of non-opposition to Proponents' Motion that they "have declined to defend the constitutionality of Measure B and have taken a position of neutrality regarding whether Measure B is constitutional and/or preempted by California law," would not adequately represent Proponents' interests in the litigation. Therefore, Proponents were allowed to intervene as a matter of right. ER 40-51.

On approximately July 5, 2013, Vivid sought Reconsideration of the intervention ruling based on the Supreme Court's decision in *Hollingsworth* , 133 S.Ct. 2652 (2013) *Dist. Ct. Dk*. No. 63. Judge Pregerson denied Vivid's motion on August 2, 2013, finding that *Hollingsworth*, which only found that the interveners in that case did not have standing to independently appeal a decision to a circuit court, does not require a party to have Article III standing in order to intervene as a defendant in the district court. *ER* 35-39.

## 2.    The Preliminary Injunction Motion

On May 29, 2013, Vivid filed a motion for a preliminary injunction. *Dist. Ct. Dk. No*. 55. As they do here on appeal, Vivid primarily argued that Measure B's condom requirement while filming actual sexual intercourse is an impermissible content-based speech restriction. In Opposition, Proponents pointed out that Measure B in no way dictates the content of a film, does not require that any particular message or viewpoint be expressed by the filmmaker, nor dictates what viewers may see, and thus did not implicate speech rights in the first place.

Proponents also argued that, to the extent Measure B has any impact on speech, it is a permissible content-neutral regulation designed to address the harmful secondary effects of STD infection when performers are filmed actually engaging in sexual intercourse, and which has only a *de minimis* impact on speech. *Dist. Ct. Dk. No.* 57.

At about the same time, Proponents also filed a Motion to Dismiss, and Vivid filed a Motion for Judgment on the Pleadings. *Dist. Ct. Dk. Nos.* 49, 64.

By Order dated August 16, 2013, Judge Pregerson partially granted and partially denied Proponents' Motion to Dismiss, partially granted and partially denied Vivid's Motion for Preliminary Injunction, and vacated Vivid's Motion for Judgment on the Pleadings. ER 1-34. Vivid has only appealed that portion of the order regarding the Preliminary Injunction Motion.

In his Order, Judge Pregerson:

- Dismissed Vivid's state law preemption claim, declining to exercise supplemental jurisdiction over it. ER 7. Vivid does not appeal this decision.

- Dismissed Vivid's claim that initiatives that implicate the First Amendment are presumptively invalid, because they purportedly do not contain sufficient legislative records and findings justifying the enactment. ER 12-13. Vivid does not appeal this decision. *OB,* 15.

- Denied Vivid's request to preliminarily enjoin Measure B's requirement that condoms be used when filming acts of sexual or anal intercourse. ER 8-11, 27-29. The Court found it unlikely that Vivid would succeed on the merits because this requirement (1) is content-neutral, focusing on the secondary effects (STD infection) of any speech, rather than the message the speech conveys, and (2) the evidence presented indicates that Measure B does not burden substantially more speech than is necessary to further County's legitimate interest in preventing STD infection and transmission.

- Denied Vivid's request to preliminarily enjoin Measure B's requirement that producers filming actual acts of sexual or anal intercourse obtain a permit, finding at this stage that sufficient evidence was presented that County has appropriately limited discretion in granting permits. ER 16.

- Denied Vivid's request to preliminarily enjoin Measure B on the ground that its terms and definitions were unconstitutionally vague, finding sufficient evidence at this stage that the terms used are sufficiently clear to allow people to understand and comply with them. ER 21-23.

- Dismissed Vivid's claim that Measure B's permitting process, and criminal penalties and fines provisions for violation of the law, violated Vivid's due process rights. ER 23-24.

- Granted Vivid's request to preliminarily enjoin Measure B's requirement that producers obtaining a permit pay a permit fee, finding that at this stage there was insufficient evidence to establish revenue neutrality. ER 20-21, 29-30.[1]

- Granted Vivid's request to preliminarily enjoin a portion of Measure B's enforcement scheme that allowed for revocation of permits, finding at this stage that there was insufficient evidence to establish that permit revocation is narrowly tailored. ER 29-30.

- Granted Vivid's request to preliminarily enjoin a portion of Measure B's enforcement scheme that allowed administrative searches, finding at this stage that there was insufficient evidence to establish that the authorization for such searches was properly limited in time, place, and scope. ER 24-26.

---

[1] Proponents reserve their rights with respect to the District Court's adverse rulings as those issues may be raised in further proceedings.

**B.      Ninth Circuit Proceedings**

Vivid filed a timely Notice of Appeal on August 19, 2013. *Dist. Ct. Dk.* No. 80. It filed its Opening Brief on September 16, 2013. *Ninth Cir. Dk. Entry* No. 11. In its Opening Brief, Vivid argued that Proponents lacked standing to participate in either the District Court or Ninth Circuit proceedings based on the Supreme Court's decision in *Hollingsworth v. Perry*, 133 S.Ct. 2652 (2013).

Proponents filed a motion for an extension of time to file their Answering Brief on September 27, 2013. *Ninth Cir. Dk. Entry* No. 30. Vivid opposed the motion and, in doing so, again argued that Proponents lacked standing to participate in either the District Court or Ninth Circuit proceedings. *Ninth Cir. Dk. Entry* No. 31.

On October 1, 2013, an order was enter granting in part the motion to extend the time for filing Proponents' Answering Brief and construing Vivid's opposition as a "Motion to Dismiss" for lack of jurisdiction. Proponents were ordered to file a response within in 10 days of the order and Vivid was directed to file a reply within 7 days after service of Proponents' response. *Ninth Cir. Dk. Entry* No. 33.

Proponents filed their Response to Motion to Dismiss on October 8, 2013. *9th Cir. Dk. Entry* No. 37. Vivid filed its Reply on October 15, 2013. *Ninth Cir. Dk. Entry* No. 39.

## STANDARD OF REVIEW

On appeal of a denial of preliminary injunction, the application of preliminary injunction factors are reviewed for an abuse of discretion. The district court's legal conclusions are subjected to de novo review. *Leigh v. Salazar*, 677 F.3d 892, 896 (9th Cir. 2012).

## SUMMARY OF ARGUMENT

**Article III standing is not required.** The contention that Measure B Proponents are required to establish "standing" to participate as intervening defendants and now appellees is incorrect. Standing must be established by one of the parties *invoking* the federal court's jurisdiction to remedy that party's injury. Once a party invoking the court's jurisdiction establishes its standing, the court has been presented with a justiciable case or controversy that it has an obligation to resolve. Consequently, there is no need or requirement for any other party to demonstrate standing for that case or controversy.

Moreover, the contention that defendants before the district court and appellees before the court of appeals must prove they have "standing" makes no sense since standing means that they suffered an injury in fact. Defendants do not suffer injuries, they are alleged to have caused them. And appellees are the prevailing parties before the district court, who have no appealable injury and therefore no standing to appeal. Thus, the Proponents, who are intervening defendants and appellees, cannot be required to demonstrate "standing."

**Intervention assures the voters' initiative will be defended.** Proponents are proper intervenors in this case because, as the official ballot sponsors, they have a protectable interest in defending Measure B—as established by Ninth Circuit precedent governing intervention under Rule 24(a)(2) of the Federal Rules of Civil Procedure. Intervention is also necessary because there would be no other party to defend the constitutionality of the voter approved initiative. The pragmatic standard governing intervention thereby compels intervention. While the Supreme Court's recent decision in the Proposition 8 case holds that official ballot sponsors lack Article III standing, that decision has no impact on Ninth Circuit precedent holding that such an interest is sufficient under the less stringent Rule 24 standard. Moreover,

under the Rule 24 multi-factor standard, the fact that a state voter approved initiative would not have any defenders in federal court compels intervention by the ballot sponsors. Otherwise, a federal court would be put in the position of invalidating a state voter initiative without allowing anyone to represent the voters' interests during adversarial proceedings in federal court challenging the state initiative.

**Mandated condom use during filming is constitutional.** The secondary effects doctrine allows government to impose restrictions on sexually-explicit speech intended to prevent adverse secondary effects that are unrelated to the speaker's message. Measure B requires that condoms be worn during the commercial filming of vaginal or anal sexual intercourse as a precaution against the spread of STDs. This requirement is narrowly tailored to address the high rate of STDs among adult film performers and the risk that infected individuals from the industry pose to the general population. Significantly, the condom-use law does not require the depiction of condoms in films, only their use during the filming of performers actually having vaginal or anal sexual intercourse. Thus, any impact on the message communicated in such films is *de minimis*.

**Severance effectuates the voters' intent to require condom usage.** State law governs whether severance can be used to preserve the enforceable sections of an ordinance deemed partially unconstitutional. California's severance doctrine compels the effectuation of the voters' intent where, as in this case, (1) the core element of the initiative—the mandated use of condoms during the filming of sexual intercourse—is constitutional, (2) it can be said with confidence that the voters who supported what was colloquially referred to as the "Condoms in Porn" initiative would have voted for the condom-use rule if it had been separately presented from the ancillary provisions deemed unconstitutional, and (3) the ordinance can be cured of the invalid provisions by excising any word or group of words.

## LEGAL ARGUMENT

### I.    Measure B Proponents Are Not Required To Establish Standing

#### A.    Article III Standing Is Only Required Of Parties Who *Invoke* The Federal Court's Jurisdiction Seeking Relief For A Concrete and Particularize *Injury*

Vivid erroneously contends the Supreme Court in *Hollingsworth* held that any party seeking to *participate* in a federal case must establish Article III standing. *Ninth Circuit Dk.* No. 39, p. 6 of 20 (Reply in Support of Motion to Dismiss) ("Reply").

##### 1.    The Supreme Court specified that a party *invoking* the court's jurisdiction must have standing—not a party merely seeking to *participate* in litigation

The Court carefully chose very specific language in stating its holding in one of the most anticipated decisions since *Brown v. Board of Education*, 347 U.S. 483 (1954).

Chief Justice Roberts' majority opinion announces, on the first page, the Court's holding that (**1**) "the party *invoking* the power of the [federal] court" to decide a case (**2**) must have Article III "'standing,' which requires, among other things, that it have suffered *a concrete and particularized injury.*'" *Hollingsworth v. Perry*, 133 U.S. 2652, 2659 (2013) (emphasis added). The Court later quotes *Massachusetts v. Mellon,* 262 U.S. 447, 488 (1923), for the same proposition: "The party who invokes the [judicial] power must be able to show ... that he has sustained or is immediately in danger of sustaining some direct injury ... and not merely that he suffers in some indefinite way in common with people generally." *Hollingsworth*, 133 S.Ct. at 2662. And the opinion's concluding section restates the holding in the same terms: "The Article III requirement that [1] a party invoking the jurisdiction of a federal court seek relief for [2] a personal, particularized injury serves vital interests going to the role of the Judiciary in our system of separated powers." *Id.* at 2667.

Contrary to Vivid's contention, the opinion's language unambiguously imposes the standing requirement on the party *invoking* the court's jurisdiction to decide the

case. Indeed, close inspection of Vivid's selective quotations (*Reply*, p. 12 of 20), and the language omitted from them, reveals that the "litigant" and "party" referenced in the quoted language is indeed the party "invoking" the court's jurisdiction to remedy a concrete and particularized injury. *Hollingsworth*, 133 U.S. at 2661 (*see* references to "the litigant" and "the party"), 2662 ("litigant").

Vivid also argues that the Court uses the term "invoke" to mean "to call on." *Reply*, p. 15 of 20. But "to call on" changes nothing. What is being invoked or *called upon* is the jurisdiction of the federal court to decide a "case or controversy" as defined under Article III—which is what *plaintiffs*, *appellants* and *petitioners* do—not what *defendants*, *appellees* and *respondents* do. Before any "call" to exercise federal jurisdiction is answered by a federal court, the standing doctrine requires the "calling" party to satisfy Article III's case or controversy requirement by demonstrating (1) the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions" and (2) "that *the party seeking judicial resolution of a dispute* 'show that he has personally suffered some actual or threatened injury as a result of the putatively illegal conduct' party." *Diamond v. Charles*, 476 U.S. 54, 61-62 (1986) (emphasis added).

## 2.     Standing is uniquely applicable to *plaintiffs* and *appellants* because *defendants* and *appellees* suffer no injury for which they seek relief

Vivid argues that *defendants* and *appellees* must demonstrate that they have standing, just as *plaintiffs* and *appellants* do. But what can that mean? Standing is "a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Already, LLC v. Nike, Inc.*, 133 S.Ct. 721, 726 (2013). Defendants qua defendants do not have injuries—they are alleged to have caused them. That is why defendants are not required to demonstrate that they have standing.

As the Supreme Court has explained, the Article III standing analysis *changes* on appeal if the defendant loses at the trial court level. Prevailing plaintiffs "no longer have any injury to redress—they have won," while the losing defendants are injured because they are subject to an adverse ruling. *Hollingsworth*, 133 S.Ct. at 2662. At that point, the plaintiffs have no injury and therefore lack standing (or any need) to appeal. It is the defendants who have the injury after an adverse judgment, which confers on them standing to appeal. *Id.* at 2662; *Diamond*, 476 U.S. at 62-63.

Standing is therefore required only of plaintiffs before the district court and appellants before the court of appeals because only they have suffered an injury.

### 3.    The appellant/appellee distinction is not a "minor twist," it is fundamental to the standing doctrine

Vivid complains that Proponents seek to avoid *Hollingsworth*'s holding based on "the minor twist" that Proponents are appellees and the Prop 8 proponents were appellants. But that's no minor twist. The Prop 8 proponents were the sole appealing party and therefore the only party invoking this Court's and the Supreme Court's jurisdiction to decide the constitutionality of Prop 8. Both the Ninth Circuit and the Supreme Court recognized that the Prop 8 proponents were required to demonstrate standing and, if they could not, those courts could not decide the constitutionality of Prop 8. The difference in this case, where Proponents are the appellees, is that Vivid is invoking this Court's jurisdiction to decide the constitutionality of Measure B—so the Court will decide the issue regardless of whether Proponents have Article III standing. As a result, there is no reason to impose the Article III case or controversy requirement on Proponents. The applicable standard is the more pragmatic Rule 24 standard.

### 4.    Vivid improperly relies on *Bowsher*, *Clinton* and *Diamond*

Vivid relies on *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) and *Clinton v. City of New York*, 524 U.S. 417, 434 (1998) to establish that "appellees" must demonstrate

standing to participate on appeal as appellees. But the Supreme Court in these cases considered the *plaintiffs'* standing to bring the constitutional challenges before the district court, not their "standing" to participate as *appellees* on appeal. The cases do not therefore support the notion that appellees, by virtue of their status as appellees, must demonstrate standing to participate in appellate proceedings.

Vivid also relies on *Diamond*, 476 U.S. 54, a decision that supports Proponents' position. In *Diamond*, the Supreme Court held that if an intervening *appellant* is the *only* party seeking to invoke the court's jurisdiction to decide the appeal, that appellant must demonstrate Article III standing. *Id.* at 68-69. That is so even if the appellant was an intervening defendant before the district court and did not therefore have to establish standing at the trial court level. *Id.* at 68. The Court noted that the standing analysis changes on appeal, as reconfirmed in *Hollingsworth*, because a defendant taking an appeal becomes the party invoking the court's jurisdiction to decide the appeal. If the defendant before the district court elects to appeal, the intervening defendant/appellant is allowed to "piggyback" off the other appellant's standing since the party appellant has already established the standing necessary to invoke the court's jurisdiction. But if the intervenor is the sole appealing party, then he must demonstrate standing because there is no other party to invoke the court's jurisdiction to decide the appeal. Without an appellant with standing, there is no "case or controversy" for the court to decide. *Id.* at 63-64, 68.

### B.  Intervention Was Required Because There Is No Other Party To Defend The Constitutionality Of Voter Passed Measure B

Intervention is liberally granted under the *Sagebrush Rebellion* standard based on a multi-factor test that favors the intervention of those who actively supported challenged legislation or government action. *Ninth Circuit Dk*. No. 37 (Response to Motion to Dismiss), pp. 14-18, 27-28 of 31. Indeed, the Circuit has applied a "virtual per se rule that the sponsors of a ballot initiative have a sufficient interest in the

subject matter of litigation concerning that initiative to intervene pursuant to Fed.R.Civ.P. 24(a)." *Yniguez v. State of Arizona,* 939 F.2d 1319, 733 (9th Cir. 1991), *vacated on other grounds sub nom. Arizonans for Official English*, 520 U.S. 43 (1997).

The *Sagebrush Rebellion* standard is "practical" and broadly considers the intervention applicant's interest in the case and the adequacy of the existing parties in protecting those interests. *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 818, 822-23 (9th Cir. 2001). The fact that there will be no party to defend Measure B in Proponents' absence weighs compellingly in favor of intervention. A federal court's action in striking down a state law as unconstitutional "is an exercise of enormous power" that "strains federal-state relations and undermines popular sovereignty by limiting the authority of elected officials to serve their constituents." *Comite de Jornaleros v. City of Redondo Beach*, 657 F.3d 936, 965 (9th Cir. 2011) (Kozinski, C.J., dissenting). It is inconceivable that a federal court would exercise its discretion under the *Sagebrush Rebellion* standard to exclude the official ballot sponsors from participating in legal proceedings challenging the constitutionality of their initiative when no other party is participating in the defense.

Vivid's assertion that "[t]his Court is more than capable of resolving the issues Appellants raise" (*Reply*, p. 11 of 20) ignores "the paramount importance of vigorous representation" inherent in "our adversarial system of justice." *Penson v. Ohio*, 488 U.S. 75, 84 (1988). Consistent with the adversarial nature of our system of justice, Proponents must be allowed to participate as intervenors. As the California Supreme Court recognized, the ballot sponsors are "the most obvious and logical private individuals to ably and vigorously defend the validity of the challenged measure on behalf of the interests of the voters who adopted the initiative into law." *Perry v. Brown*, 52 Cal.4th 1116, 1160 (2011).

### C. *Hollingsworth* Did Not Change Ninth Circuit Law On Intervention

Vivid's assertion that *Hollingsworth* "resolved a circuit split" by holding that Rule 24 interveners must establish Article III standing is frivolous. *Reply*, p. 8 of 20. The Supreme Court does not resolve circuit splits sub silentio—especially decades-old splits like this, which have been referenced in prior Supreme Court opinions. *See Diamond*, 476 U.S. at 68, n. 21.

Further, the Supreme Court's ruling that the Prop 8 proponents' status as ballot sponsors was insufficient to confer Article III standing does not imply that ballot sponsor status does not demonstrate a sufficient interest under Rule 24. Indeed, this Circuit rejected the same argument in *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006), after the Supreme Court in *Arizonans for Official English*, 520 U.S. 43, expressed "grave doubts" that initiative sponsors had Article III standing. *Id.* at 955-96. Despite the apparent inadequacy of the ballot sponsors' interest for *standing* purposes, this Court held that "under *Sagebrush Rebellion,* intervenor-defendants have a 'significant protectable interest' related to this action and an adverse judgment may impair or impede that interest." *Id.*

Finally, Vivid's assertion that Proponents are taking a "radical position" is absurd. Proponents simply assert that Rule 24 intervention does not require compliance with Article III requirements unless the intervention applicant seeks to invoke the federal court's jurisdiction to decide the case and no other party with standing is also invoking that authority. That is the position taken by most federal circuits and commentators. *Ninth Circuit Dk.* No. 37 (Response to Motion to Dismiss), pp. 12-13 of 31. And Proponents' position that ballot sponsors have a sufficient interest to intervene goes no further than long-standing Ninth Circuit precedent. *Id.* at 14-18 of 31.

## II.    The Condom Use Requirement Does Not Violate The First Amendment

### A.    Measure B is subject to intermediate First Amendment review

Vivid argues that Measure B's condom use requirement is subject to strict scrutiny because Measure B "targets" commercial adult films. *OB*, 40-42. Vivid, however, fails to acknowledge that regulations imposed on sexually-oriented businesses to control the secondary effects of their business operations are subject to review under the framework established in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1985). Under the *Renton* "secondary effects" standard, Measure B is subject to intermediate review, not strict scrutiny, because it imposes restrictions designed to limit the spread of STDs in the adult film industry, not squelch the erotic message conveyed by adult films.

### 1.    The Supreme Court has established a special framework for reviewing laws targeting adult entertainment operations that have adverse impacts unrelated to their messages

The Supreme Court, in adopting the *Renton* standard, has expressly authorized courts to apply a special analytical framework for assessing regulations designed to control the adverse secondary effects of adult entertainment if those regulations are unrelated to the message expressed. The "targeting" of adult entertainment in that manner is *not* subject to strict scrutiny unless the predominant purpose of the regulation is to curb speech, not control secondary effects. *Center for Fair Public Policy v. Maricopa County, Az.*, 336 F.3d 1153, 1161-62 (9th Cir. 2003).

In *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), the Supreme Court reaffirmed the central holding in *Renton*: There is "no First Amendment objection" to regulations that decrease the adverse "secondary effects" associated with sexually-explicit expression and "at the same time leave the quality and accessibility of the speech substantially undiminished." *Alameda Books*, 535 U.S. at 445 (Kennedy, conc.), *id.* at 434 (plurality op.); *See Center for Fair Public Policy*, 336 F.3d at 1161-62

(explaining that Justice Kennedy's concurrence, as the narrowest opinion joining in the judgment, is controlling under *Marks v. United States*, 430 U.S. 188, 193 (1976)). "Justice Kennedy quite clearly agreed with the plurality that laws 'designed to decrease secondary effects … should be subject to intermediate rather than strict scrutiny,'" despite the characterization of such laws as content-based restrictions on sexually-explicit expression. *Center for Fair Public Policy*, 336 F.3d at 1161-62.[2] "Simply put, the *Renton* framework is *all about* singling out adult and erotic entertainment, so long as the government does so for the right reasons. '[T]he State may legitimately use the content of these materials as the basis for placing them in a different classification....'" *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1016 n. 18 (9th Cir. 2004).

### 2. Measure B is not a "complete ban" on a form of expression, it merely regulates the *manner* of expression

This Court must apply the "now familiar three-part [*Renton*] analytical framework for evaluating the constitutionality of sexually-oriented business regulations." *Center for Fair Public Policy*, 336 F.3d at 1159. The first part of the *Renton* framework requires the court to determine whether the challenged regulation "is a complete ban on protected expression," which would be subject to strict scrutiny, or a

---

[2]   Vivid asserts in a footnote that the "secondary effects" doctrine applies only in "zoning cases." But the Supreme Court has confirmed that the secondary effects doctrine is not limited to zoning laws, it applies equally to licensing/permitting laws like Measure B. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 296 (2000) (plurality opinion) (recognizing that laws that target adult entertainment businesses are subject to the secondary effects doctrine, even if those laws are not traditional zoning regulations, if designed to combat secondary effects associated with adult entertainment unrelated to the suppression of the erotic message); *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1308 (11th Cir. 2003) (holding that secondary effects doctrine is not limited to zoning laws and is applicable to licensing requirements imposed on adult entertainment to control secondary effects).

regulation on the manner of performance, which may be subject to intermediate review. *Gammoh v. City of La Habra*, 395 F.3d 1114, 1122 (9th Cir. 2005).

Measure B is not a "complete ban" on protected expression. It merely requires performers to wear condoms when having vaginal or anal sexual intercourse; thereby regulating the manner of their expression. This is analogous to *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), where public indecency regulations had the effect of requiring dancers in adult entertainment establishments to wear pasties and G-strings. As Justice Souter observed in his controlling concurrence, "Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree. Dropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." *Id.* at 587 (Souter, J., concurring); See *Ben's Bar, Inc. v. Villiage of Somerset*, 316 F.3d 702, 718 n. 24 (7th Cir. 2003) (explaining that Justice Souter's concurrence is controlling precedent under the *Marks* doctrine). Chief Justice Rehnquist, speaking for a four-justice plurality in *Barnes*, made the same point: "[T]he requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic. The perceived evil that Indiana seeks to address is not erotic dancing, but public nudity." *Id.* at 571 (plurality op.).

Thus, as later reconfirmed by the Supreme Court in *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), public indecency regulations that prohibit nudity and thereby require dancers to wear pasties and G-strings have only a "*de minimis*" effect on the protected right of expression. *Erie*, 529 U.S. at 294. Here, as Judge Pregerson observed, just as the required use of pasties and G-strings impose only a *de minimis* impact on the performers' expression of their erotic messages, the required use of condoms during a filmed performance likewise imposes only a *de minimis* effect on the

right of expression. ER 10. The only difference between the condoms required here and the pasties and G-strings in *Barnes* and *Erie*, in terms of the ability to express the erotic message during the performance, is that the condoms can be hidden through special effects, editing and strategic placement, while pasties and G-strings cannot be "edited-out" of the live dance performance. The condom requirement is therefore even less impactful on the right to expression than the *de minimis* impact of requiring live dancers to wear pasties and G-strings. *See Barnes*, 501 U.S. at 587 (Souter, J.) (court must consider the regulation's impact on expression "when measured against the dancer's remaining capacity and opportunity to express the erotic message").

Vivid, however, claims that the condom requirement interferes with the producer or performer's expressive choices, including the expressive choice of expressing the message of "condomless sex," thereby "completely blocking that expression." *OB*, 42. In making that argument, Vivid simply labels the restriction a "form of expression," thereby guaranteeing that the restriction will be deemed a "complete ban" on that form of expression; Here, the message of condomless sex is being, according to Vivid, "completely block[ed]." That raises the question of whether the pasties and G-strings required in *Barnes* and *Erie* "completely blocked" the performers' expression of their *completely naked* dancing message? The answer would be "yes" only if the protected form of expression can simply be defined in terms of the regulation. But that tautological method for defining the expression subject to First Amendment protection would doom any secondary effects regulation.

This Court rejected the circular logic of that methodology in *Gammoh*, 395 F.3d 1114, where the City of La Habra enacted an ordinance precluding "adult cabaret dancers" from touching or being touched by patrons and required that performers remain two feet away from patrons. *Id.* at 1118. Plaintiffs challenged the constitutionality of the two-foot rule, arguing that it was a complete ban on protected

expression. *Id.* at 1122-23. This Court rejected that characterization: "The two-foot rule merely requires that dancers give their performances from a slight distance; it does not prohibit them from giving their performances altogether. The rule limits the dancers' freedom to convey their erotic message but does not prohibit them from performing erotic one-on-one-dances for patrons." *Id.* at 1122-23 (*citing Renton*, 475 U.S. at 46). The Court contrasted the two-foot rule, which allows dancing to continue albeit "from a slight distance," with the flat prohibition of all nude and semi-nude dancing in *Dream Palace*, 384 F.3d 990, which was properly treated by the *Dream Palace* panel as a complete ban on a form of expression, subject to strict scrutiny. *Id.* at 1123. In holding that intermediate review was appropriate in *Gammon* because the two-foot rule was not a "complete ban" on expression, the court explained that "the Ordinance prescribes *where* offstage dancing can occur (at least two feet away from patrons) but it does not ban any form of dancing." *Id.* at 1123 (emphasis added).

Invoking the same tautological technique as Vivid, the plaintiffs in *Gammoh* argued that the performers' expressive conduct was not just erotic dancing, but the exact form of erotic dancing prohibited by the ordinance. Plaintiffs argued that "close propinquity to patrons is a key element of the dancers' expressive activity, and that the Ordinance is therefore a complete ban on a form of expression: 'proximate dancing.'" *Gammoh*, 395 F.3d at 1123. Not surprisingly, the Court rejected the notion that restrictions on the manner of performance may be subject to strict scrutiny simply by characterizing the manner restriction as complete ban on a form of expression:

> It is true that if the dancers' expressive activity is considered "erotic dance within two feet of patrons" and not merely "erotic dance," this activity is completely banned. However, virtually no ordinance would survive this analysis: the "expression" at issue could always be defined to include the contested restriction. *Gammoh*, 395 F.3d at 1123.

"While the dancer's erotic message may be slightly less effective from [two] feet away, the ability to engage in the protected expression is not significantly impaired." *Id.* (*quoting Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1061 (9th Cir. 1986)).

Similarly, Measure B does not "completely ban" performers from expressing their erotic message, it merely requires that they wear condoms while having vaginal or anal sexual intercourse. Just as the plaintiffs in *Gammoh* argued that the two-foot rule limited their "freedom to convey their erotic message" (*Gammoh*, 395 F.3d at 1122), Vivid complains that its performers are similarly deprived of freedom in conveying their condomless sex message. But, as in *Gammoh*, the performance itself may continue and the erotic message may be expressed. Indeed, unlike the restrictions in *Gammoh*, condoms can be concealed from the viewer. The regulation does not therefore prevent the message from being conveyed during the film performance.

### 3. Measure B is a "time, place and manner" regulation subject to intermediate First Amendment review

Regulations imposed on the adult entertainment industry are subject to intermediate scrutiny if "1) the ordinance regulates speech that is sexual or pornographic in nature; and 2) the primary motivation behind the regulation is to prevent secondary effects." *Gammoh*, 395 F.3d at 1123 (*citing Center for Fair Public Policy*, 336 F.3d at 1164-65 (*citing Alameda Books*, 535 U.S. at 434, 448)). Because there is no dispute that the speech Measure B regulates—the potentially expressive act of having sexual intercourse while filming adult entertainment—is "sexual or pornographic in nature," we focus on the second requirement.

An ordinance regulating sexually-explicit speech is subject to intermediate review if its "predominant purpose" is combating secondary effects. *Gammoh*, 395 F.3d at 1124; *Colacurcio v. City of Kent*, 163 F.3d 545, 551 (9th Cir. 1998). In undertaking that inquiry, courts "generally accept that a regulation's purpose is to combat

secondary effects if the enactment can be justified without reference to speech." *Id.* at 1124. As a result, this is "a difficult standard [for plaintiffs] to overcome." *Id.*

"To determine the purpose of the Ordinance, [courts] look to 'objective indicators of intent.'" *Gammoh*, 395 F.3d at 1124. Because Measure B is a ballot initiative enacted into law by popular vote, the only "objective" indicators (or indicators of any kind) are the written materials presented to the voters. The record here is limited to the text of Measure B, which provides, in Section 3, that the "purpose and intent" of the people "in enacting this ordinance is to minimize the spread of sexually transmitted infections resulting from the production of adult films in the County of Los Angeles, which have caused a negative impact on public health and the quality of life of citizens living in Los Angeles." ER 228.

This statement of purpose and intent makes clear that the voters' intention was to reduce a secondary impact of adult filmmaking in the County, namely the spread of sexually transmitted diseases during filming. Consequently, Measure B regulates expression that is sexually-explicit in nature and the voters' primary purpose in enacting it was to reduce secondary effects. Measure B is therefore subject to intermediate review.

### B.     Measure B Does Not Violate The First Amendment

An ordinance regulating sexual or pornographic expression will survive intermediate scrutiny if it: "1) is designed to serve a substantial government interest; 2) is narrowly tailored to serve that interest; and 3) leaves open alternative avenues of communication." *Gammoh*, 395 F.3d at 1125-26.

### 1.     The transmission of STDs in the adult film industry poses a public health problem and requiring the use of condoms is a reasonable strategy for curbing it

The first requirement is that the government regulation be designed to serve a "substantial government interest." There can be no question that the County has a

substantial interest in curbing the spread of socially-transmitted diseases within the County and Vivid does not suggest otherwise.[3]

There are, however, two disputed questions. First, Vivid suggests that there is no basis for concern about the spread of sexually-transmitted diseases in the County due to unprotected sexual intercourse during filming, either within the adult film industry or the general population, because "the leading adult filmmakers" have implemented testing and reporting regimes that "ensure" safe and healthy working environments." *OB*, 6, 21, 43, 45. Vivid thereby implies that Measure B is a solution in search of a problem.

The standard that Proponents must meet to demonstrate a basis for their secondary effects concerns is minimal. As Justice Kennedy emphasized in *Alameda Books*, "very little evidence" is needed to justify a secondary effects ordinance like Measure B. *Center for Fair Public Policy*, 336 F.3d at 1168 (*quoting Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring)). While courts will not permit the supporting evidence to be "shoddy," there are no specific "methodological standards to which their evidence must conform" and the suggestion that *Daubert*-like expert evidence is necessary has been flatly rejected. *Gammoh*, 395 F.3d at 1126-27 & n. 5.

That evidentiary burden is easily satisfied here. Measure B was based on the September 2009 County Public Health report raising substantial concerns about the spread of sexually transmitted diseases through unprotected sexual intercourse in the adult film industry. ER 96. The Department had been investigating "sexually

---

[3]  *See* Cal. Health & Safety Code §§ 120575 ("It is the duty of the local health officers to use every available means to ascertain the existence of cases of [STDs] . . . and to take all measures reasonably necessary to present the transmission of infection"); 120175 ("Each health officer . . . shall take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases").

transmitted disease related to the adult film industry (AFI)." *Id.* Its report highlighted substantial reasons for concern about the spread of disease through the industry. That threat stems from the basic workplace environment: "Working conditions in the AFI typically involve a worker having unprotected, prolonged and repeated sexual intercourse with multiple sexual partners over short periods of time, increasing the likelihood of transmission of sexually transmitted diseases including HIV." *Id.*

Significantly, the Report considered that industry organizations "provide STD and HIV screening." ER 97. Despite the screening protocol, the Department found high rates of STD infection and reinfection in the adult film industry:

> Since 2004 [the Department] received reports of 2,396 cases of Chlamydia (CT), 1389 cases of gonorrhea (GC), and five syphilis cases among AFI performers; 20.2% of performers diagnosed with STD had one or more repeat infections within a one year period. Between 2004 and 2008, repeated infections were reported for 25.5% of individuals. ER 97.

And, contrary to Vivid's Pollyannaish description, the Department highlighted inadequacies with the industry screening process:

> Due to the failure to routinely screen for rectal and oral pharyngeal infections, a sustained high level of endemic disease among AFI workers persists. Furthermore, these disease rates and reinfection rates are likely to be significantly underestimated as rectal and oral screening is not done routinely and these anatomic sites are likely to be a reservoir for repeat reinfection. ER 97.

The Department cautioned that the infection data for HIV is unclear because the HIV/AIDS reports do not identify occupations. Just one entity that provides testing for the industry, however, reports 25 cases of HIV between 2004 and 2009. ER 97.

The Department concluded that screening is not sufficient to curb the spread of STDs within the adult film industry—condoms are necessary to achieve that goal:

> It has been the consistent position of the Department that screening alone is insufficient to prevent STDs and HIV/AIDS. Screening can only detect infection and while it is vital for containing new or existing

> infections, there are other preventative measures that should be employed in the AFI such as condom use and hepatitis B vaccination. ER 98.

The need for condoms in the adult film industry is reinforced by the Department's finding that "AFI performers experience significantly higher rates of infection (20%) than the general public (2.4%) or in the area of the County (SPA 6) experiencing the highest rate of STDs (4.5%)." ER 97.

There is no question that the Department's Report establishes that the spread of sexually-transmitted diseases within the adult film industry is significantly higher than within the general population and that those exposed to STDs pose a public health threat to members of the general population.

The second disputed question is whether the record "demonstrate[s] a connection between the speech regulated … and the secondary effects that motivated the adoption of the ordinance." *Alameda Books*, 535 U.S. at 441. It is difficult to imagine a more direct connection between the interest in this case—*curbing the spread of sexually-transmitted diseases resulting from performers having unprotected sexual intercourse during filming*—and the regulation—requiring performers to *wear condoms while having vaginal or anal sexual intercourse during filming*. The Department's Report made this connection unambiguously clear: "Screening can only detect infection and while it is vital for containing new or existing infections, there are other preventative measures that should be employed in the AFI such as condom use and hepatitis B vaccination." ER 98. Thus, the condom requirement is directly connected to the concern with the spread of sexually-transmitted disease within the industry.

Vivid bears the burden of "cast[ing] doubt on [the Department's] rationale [for recommending the use of condoms in the adult film industry], either by demonstrating that [the Department's Report] does not support its rationale or by

furnishing evidence that disputes the [Department's] factual findings." *Alameda Books*, 535 U.S. at 441. Vivid did not meet that burden.

Vivid argues that the Department's Report is inadequate because it contains "no findings that allegedly higher incidents of STDs in the adult film industry have any impact on the health of the general population." *OB*, 43. But formal factual findings are not necessary because the Department is "entitled to rely" on knowledge gleaned from experience and any "inferences [that] appear reasonable" in coming to its conclusions. *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring). Here, the data show a far higher STD infection rate among adult film performers than in the general population—making those performers a danger to the general population. The County was not required to undertake a scientific study to support the common sense conclusion that adult film performers who contract STDs during filming pose a risk to County residents outside the industry. The risk that infected performers will have unprotected sex with residents establishes the link between the heightened risk of STDs among adult film performers and the County's general population.

Vivid also argues that the Department Report must be faulty because the County recently posted a "Comprehensive" HIV Plan" that "does not even mention 'adult films,' 'pornography,' or any other activity Measure B targets." *OB*, 43. Vivid attempts to bolster this seeming non sequitor with a folksy aside (instead of reasoned argument): "If the spread of STDs among and/or by adult film performers played any significant role in the incidence of HIV in the County, one would think that would warrant at least a mention in the Plan." *OB*, 43. The Department's September 2009 Report, however, makes clear that its recommendation was to support a *statewide* regulation requiring the use of condoms during filming, not a *local ordinance* because the Department was primarily concerned that local regulation would be too "resource intensive." ER 99. While the voters disagreed with the Department's budgetary

concerns, the voters and the Department agreed that adult film performers should be legally required to wear condoms during sexual intercourse. The fact that the County's HIV Plan does not reference the adult film industry is simply a function of the County's policy decision that the State should pass the mandatory condom use rule.

Finally, Vivid takes the absurd position that Measure B can have "no impact" on the County's general population because "filmmakers need only cross the Los Angeles County line if they wish to film condomless scenes of vaginal or anal sexual intercourse." *OB*, 44. The logic of Vivid's argument is that (1) every single production that would have filmed a sexual intercourse scene in Los Angeles County will "cross the line" into a neighboring county to film without condoms and (2) the performers will promptly return to have unprotected sex with County residents in the same total numbers as if the sex scene had been shot within the County. But if any productions remain in Los Angeles County (with condoms) or if any performers crossing county lines do not return for unprotected sex in Los Angeles, Measure B will have made a difference by lowering the risk to County residents.

Since there is no basis for Vivid's drastic assumptions, Vivid fails to demonstrate that Measure B's condom requirement will have absolutely no impact whatsoever in curbing secondary effects.

### 2. Measure B is narrowly tailored

"A regulation of time, place or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests, but it need not be the least restrictive or the least intrusive means of doing so." *Colacurcio*, 163 F.3d at 553 (*citing Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989)). The narrow tailoring requirement is satisfied so long as the government's asserted interest "would be achieved less effectively absent the regulation." *Colacurcio*, 163 F.3d at 553 (*quoting Ward*, 491 U.S. at 799).

The narrow tailoring rule was applied to the "manner" restriction in *Gammoh*, where the ordinance required patrons to remain at least two feet away from "adult cabaret performers" during off-stage dances (where the performer is neither nude nor topless). *Gammoh*, 395 F.3d at 1127-28. The Court ruled that the two-foot rule was "narrowly tailored to prevent the exchange of money or drugs and to allow enforcement of the 'no touching' provisions." *Id.*; *See also Colacurcio*, 163 F.3d at 553-54 (upholding a ten-foot separation requirement for nude dancing).

The question in this case is whether the government's interest in lowering the rate of STD infection among adult film performers in Los Angeles County would be advanced by implementation of the condom-use requirement. Vivid argues that condoms would provide *no benefit* beyond that already provided by the existing screening protocol. *OB*, 44-46 (characterizing condom use as providing "**no** public health benefit) (emphasis in original). That is, according to Vivid, condoms are *redundant* because they provide no protection beyond that which is already provided by the screening process. The District Court ruled that Proponents were likely to prevail on these issues and thereby denied a preliminary injunction (*ER*, 26-27), but it denied Proponents' motion to dismiss on the ground that Vivid's condoms-are-redundant theory must be deemed true in an attack on the pleadings. (*ER*, 11). Proponents are not only likely to prevail on this issue, as the District Court concluded, Proponents will prevail as a matter of law because Vivid's redundancy theory is necessarily false.

The Department, in its September 2009 Report, concluded that "Screening can only detect infection and while it is vital for containing new or existing infections, there are other preventative measures that should be employed in the AFI such as condom use and hepatitis B vaccination." ER 98. Thus, screening, *even if 100% reliable and accurate*, would still not eliminate the need for condom usage to curb STD infection rates because performers who become infected between tests create a risk

that only condoms can diminish. That flaw is inherent in any screening program. For that reason alone, Vivid's argument that condoms provide "no benefit" must be rejected and the condom requirement must be deemed narrowly tailored.

The actual facts—beyond the inherent limitations of a screening protocol—illustrate the substantial risks created by a screening-only program that eschews the use of condoms. Performers are tested "every 14-28 days," with Vivid only requiring testing "once every 28 days." ER 126 ¶¶13-14. Absent a foolproof mechanism for guaranteeing complete abstinence from any *outside* sexual relations for each and every performer during the 14-28 period between tests, including purely personal sexual relations and while working on films outside the County's jurisdiction,[4] there is absolutely *no protection whatsoever* from the transmission of disease between tests. As a matter of logic, the risk of getting or passing on a sexually-transmitted disease during the 14-28 day period would be substantially reduced by requiring condom usage. This is the *only* effective precaution available during the 14-28 days hiatus period in which performers have sexual intercourse with *numerous* partners within the industry and presumably outside the industry. As a matter of mathematical calculation and therefore logical necessity, condoms thereby provide a significant benefit in the effort to curb the transmission of sexually transmitted disease in the adult film industry.

The risk is even higher because, contrary to Vivid's implication, there are *fundamental flaws* with the screening system that go beyond the gap between tests, as described above in the *Legal Argument Section B.1* (*citing* ER 97). Due to this screening deficiency, some unknown number of performers with "clean" test results have been

---

[4] There is no reliable mechanism for guaranteeing 24/7 abstinence, but if there was such a mechanism, it would be substantially more invasive of individual privacy rights

infected and are having unprotected sexual intercourse with unsuspecting partners, further spreading STDs despite the screening protocol. Condoms would provide effective protection against this risk too, further demonstrating that screening without the mandated use of condoms is less effective in curbing the spread of sexually-transmitted disease.

The infection rates also evidence the inadequacy of the screening-only system. If the screening process were as effective as Vivid asserts, performers would experience an infection rate lower than the 2.4% experienced by the general population (whose members do not have the benefit of the industry's screening program), not the *20%* industry infection rate documented in the Department's September 2009 Report.

The scope of risk created by the 14-28 day screening hiatus and the inadequacies of the screening protocol is illustrated in the article "No Condoms in Porn Country" which Vivid submitted as evidence and relies upon to prove the truth of matters asserted in the article.[5] Plaintiff Logan Pierce, who is now among the most successful young performers in the industry (*ER*, 148-49), describes performing in a scene at the very beginning of his career, where six men had sex with a single woman at the same time. ER 164-65. If any one of those performers became infected after his

---

than the requirement to use condoms while having sexual intercourse during commercial filmmaking.

[5]   Vivid has vouched for the trustworthiness of the hearsay attributable to the Vivid parties by seeking judicial notice of and relying upon hearsay within the article. ER 121 & n. 13 (citing the article for statements attributed to Proponents as evidence that they made the attributed statements); ER 145 ¶14 (declaration submitting article in support of Vivid); ER 148-170 (the article).

or her last test, the entire group would be exposed to the risk of infection—a risk that could have been virtually eliminated if condoms had been worn by the performers.

### 3. The "alternative channels for communicating" requirement is satisfied because the condom rule, like other manner requirements, does not eliminate a channel of communication

A valid time, place and manner regulation must "leave open ample alternative channels of communication." *Colacurcio*, 163 F.3d at 554 (*quoting Ward*, 491 U.S. at 791). The "Supreme Court will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." *Id.* at 555.

Measure B does not close off a "channel of communication." Vivid can still make pornographic movies in the County, the only limitation is that its performers must wear condoms while having vaginal or anal sexual intercourse. That limitation on the *manner* of expression does not foreclose a *channel* of communication. The Measure B condom requirement is analogous to the two-foot rule in *Gammoh* because they both restrict the *manner* of expressing the erotic message, but neither precludes the performer from expressing the message. As explained in *Gammoh*, "the Ordinance is not a complete ban on protected expression" because it "leaves dancers free to convey their erotic message as long as they are two feet away from patrons. Although the message may be slightly impaired from this distance, it cannot be said that a dancer's performance 'no longer conveys eroticism' from two feet away." *Gammoh*, 395 F.3d at 1128. Because the dancer's message may still be communicated albeit from a distance, the Ordinance survives this final prong of the *Renton* analysis." *Id.*

Similarly, in *Kev*, an ordinance regulating dancing (1) prohibited dancers and patrons from fondling or caressing each other; (2) required that all dancing occur at

least ten feet from patrons on a raised stage that was at least two feet high; and prohibited patrons from tipping dancers. *Kev*, 793 F.2d at 1061. The stated purposes of these secondary effects regulations were to prevent patrons and dancers from negotiating for narcotics and sexual favors. *Id.* After concluding that the restrictions were reasonable methods for achieving the stated purposes, the panel rejected the contention that the restrictions impaired the dancers' First Amendment rights:

> [T]hese regulations do not significantly burden first amendment rights. While the dancer's erotic message may be slightly less effective from ten feet, the ability to engage in the protected expression is not significantly impaired. Erotic dancers still have reasonable access to their market. *See Ellwest Stereo Theatres* [*v. Wenner*]*, 681 F.2d [1243] at 1246 [(9th Cir. 1982)](open booths regulation did not affect access to adult films). Similarly, while the tipping prohibition may deny the patron one means of expressing pleasure with the dancer's performance, sufficient alternative methods of communication exist for the patron to convey the same message. *Kev*, 793 F.2d at 1061-62.

As a result, the panel concluded that "the regulations are reasonable time, place, and manner restrictions that only slightly burden speech." *Id.*

That is consistent with *Barnes* and *Erie*, in which the Court determined that the dancers' ability to convey their erotic messages was not precluded by the requirement to wear pasties and G-strings. *Barnes*, 501 U.S. at 571; *Erie*, 529 U.S. at 294.

The court in *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1195 (10th Cir. 2003), explained how the "alternative channels of communication" requirement" is commonly misunderstood when a regulation involves the *manner* of expression:

> The fallacy in Plaintiffs' argument is to assume that the "adequate alternative avenues of expression" required under the *Renton* line of cases refers exclusively to location. Time, place, or manner regulations all are partial limitations, but each is partial in a different way. "Place" limitations require alternative locations; "time" limitations require alternative times; and "manner" limitations require alternative ways in which a message may be communicated. A ban on nudity within sexually oriented businesses is a "manner" regulation . . . While "there may be

36

cases in which banning the means of expression so interferes with the message that it essentially bans the message, that is not the case here."

Here, the use of a condom, like the use of pasties and G-strings in *Barnes* and *Erie* and the distance restrictions in *Gammoh* and *Kev*, is a restriction on the *manner of expression* that may make the performers' expression of their erotic message "slightly less effective," but it does not "significantly impair" the performers' "ability to engage in the protected expression." *Kev*, 793 F.2d at 1061-62. Indeed, given the marvels of film technology, not only can condoms be completely hidden from view, filmmakers can create the illusion of condomless sexual intercourse through special effects, camera angles, and editing. Thus, no alternative "channels of communication" are needed because condoms do not prevent Vivid or its performers from communicating an erotic message.

### C.    Measure B Is Not Underinclusive, Overinclusive Or Vague

#### 1.    Measure B is not underinclusive

Vivid argues that Measure B is underinclusive because it fails to impose the condom-use requirement on the general population or on the makers of non-commercial pornographic movies. *OB*, 48-49. Vivid's theory is that condom requirements cannot be placed on commercial adult entertainment films unless they are applied to (1) all private citizens and (2) performers in non-commercial films.

Contrary to Vivid's theory, there is no constitutional prohibition against the government passing laws to protect against a public health risk just because the law is not applied to all entities and does not cover all activities that expose the public to a similar risk. Indeed, this argument was raised and rejected in *Renton*, 475 U.S. at 52-53, and more recently in *Center for Fair Public Policy*, 336 F.3d at 1170, where the panel explained that the Court in *Renton* rejected the same type of underinclusiveness theory, "holding that simply because the city 'chose first to address the potential problems created by one particular kind of adult business in no way suggests that the city has

'singled out' adult theaters for discriminatory treatment.'" *Id.* (*quoting Renton*, 475 U.S. at 53). The panel also rejected the claim that the adult entertainment industry had been singled-out: "The Supreme Court has consistently explained that so long as the legislature's motive is the amelioration of secondary effects, sexually-oriented businesses may indeed be singled out." *Id.*

### 2.    Measure B is not overinclusive or vague

Vivid states that the District Court failed adequately to consider its contention that aspects of Measure B were unconstitutionally overinclusive or vague. *OB*, 47-51. But Vivid fails to make a single argument demonstrating any such unconstitutionality. *See Sullivan v. Dollar Tree Stores*, 623 F.3d 770, 776 n. 3 (9th Cir. 2010) (holding that appellant's summary contention that district court erred by disregarding admissions was insufficiently specific to reveal basis of contention).

### D.    There Is No Basis For Challenging The Remaining Requirements

Vivid similarly makes no argument that the remaining portions of Measure B's permitting requirements are unconstitutional or otherwise unenforceable and thereby waives any such argument as well. *See Sekiya v. Gates*, 508 F.3d 1198, 1200 (9th Cir. 2007) (holding that party's bare assertions unaccompanied by analysis and supporting case law falls short of its obligation to present issue for court's resolution).

## III.    Severance Effectuates The Voters' Intent In Passing Measure B

The Los Angeles County residents who voted for Measure B well understood its purpose was to require adult film performers to wear condoms while having sexual intercourse during filming. A simple Google search of the terms "Measure B" and "condoms" reveals endless headlines referring to Measure B as the "Condoms in

Porn," "Porn's Mandatory Condoms," "Forced Condoms," or simply "Condoms" initiative.[6]

The District Court honored the voters' intent to require that adult film performers wear condoms by severing that core requirement. Yet Vivid accuses the District Court of improperly employing "heroic measures" to honor the voters' intent. *OB*, 24. But that is precisely what California law mandates—that the initiative process be protected by preserving the enforceable provisions whenever "it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed [*i.e.*, validated] so that it would have separately considered and adopted them in the absence of the invalid portions." *McMahan v. City & County of San Francisco*, 127 Cal.App.4th 1368, 1374 (2005) (*quoting Gerken v. Fair Political Practices Com.*, 6 Cal.4th 707, 714-15 (1993)) (bracketed text in *McMahan*).

When federal courts find portions of state laws unconstitutional, severance is "the prudent thing to do." *Comite de Jornaleros*, 657 F.3d at 965 (Kozinski, C.J., dissenting). As Chief Judge Kozinski has explained, a federal court's action in striking down a state law as unconstitutional "is an exercise of enormous power" that "strains federal-state relations and undermines popular sovereignty by limiting the authority of elected officials to serve their constituents." *Comite de Jornaleros*, 657 F.3d at 965 (Kozinski, C.J., dissenting). It is therefore "a power that we should exercise cautiously and narrowly—as a scalpel rather than a machete." *Id.* Severing to preserve constitutional provisions from any unconstitutional provisions exemplifies a proper wielding of the judicial scalpel. "This usually causes the least damage to the statutory scheme, and thus the least friction between the federal government and the states." *Id.*

---

[6]    See https://www.google.com/#q=measure+b+condoms

## A.    The Severance Doctrine Requires Preservation Of The Condom Use Requirement Through The Permitting Process

Whether the constitutional provisions of an ordinance are severable presents a question of state law. *Valley Outdoor, Inc. v. County of Riverside*, 337 F.3d 1111, 1114 (9th Cir. 2003). When a portion of an initiative like Measure B is deemed unconstitutional, "the void provision must be stricken but the remaining provisions should be given effect if the invalid provision is severable." *Pala Band of Mission Indians v. Bd. of Supervisors*, 54 Cal.App.4th 565, 585-86 (1997) (*citing Gerken*, 6 Cal.4th at 721).[7]

Measure B contains a severability clause stating that "[i]f any provision of this Act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of the Act are severable." ER 236 (Measure B, Section 8). "The presence of such a clause establishes a presumption in favor of severance." *Borikas v. Alameda Unified School District*, 214 Cal.App.4th 135, 165 (2013) (*review denied*, June 12, 2013). Although the presumption is not conclusive, it "is persuasive evidence of the enacting body's intent." *Id.*

Courts "will consider three additional criteria: '[T]he invalid provision must be grammatically, functionally, and volitionally separable.'" *California Redevelopment Assn. v. Matosantos*, 53 Cal.4th 231, 270-71 (2011). "***Grammatical separability***, also known as mechanical separability, depends on whether the invalid parts can be removed as a whole without affecting the wording or coherence of what remains. ***Functional separability*** depends on whether 'the remainder of the statute is complete in itself. ***Volitional separability*** depends on whether the remainder would have been adopted

by the legislative body had the latter foreseen the partial invalidation of the statute." *Id.* at 271 . Vivid argues that the District Court violated the *grammatical* and *volitional* criteria (not the functionality criterion). *OB*, 29-31.

### 1.    The invalid provisions are grammatically separable

 "To be grammatically separable, the valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase or even single words." *Borikas*, 214 Cal.App.4th at 166. The grammatical requirement is satisfied if the "defect," a term used to refer to the invalid provisions' effect on the initiative, "can be cured by excising any word or group of words." *Id.* (*quoting People's Advocate, Inc. v. Superior Court*, 181 Cal.App.3d 316, 330 (1986)). The District Court properly ruled that the grammatical test was satisfied in this case. ER 31-33.

Vivid argues that "[g]rammatical severability . . . does not permit individual words to be excised from the middle of a clause or phrase." *OB*, 30 (emphasis added). Vivid characterizes the District Court's severance of language from the definition of "adult films" as its "most glaring" violation of the grammatical severability criterion. *OB*, 26-27. But the Court simply modified the definition of "adult films" to comport with the constitutional scope of the condom use requirement. To effectuate that narrowing, the Court struck language from the Section 11.39.010 definition of "adult films."

Where, as here, the scope of an initiative must be narrowed to preserve its constitutional provisions, scope-defining provisions will inevitably need to be modified. There is nothing ungrammatical about doing so. Recently, the court of

---

[7]   Note that some courts refer to the constitutional or valid provisions as being severed (*Gerken*, 6 Cal.4th at 714-15) and some refer to the unconstitutional or invalid provisions as being severed (*Pala Band of Mission Indians*, 54 Cal.App.4th at 585).

appeal in *Borikas*, 214 Cal.App.4th 135, effected a similar modification by severing language needed to narrow the scope of an initiative. In that case, the voters passed Measure H, a school district parcel tax that imposed differing tax rates on property owners based the *residential* or *commercial/industrial* use of their property and based on the size of their commercial/industrial property. The court of appeal ruled that the provisions imposing differing tax rates were unenforceable because they violated a statute requiring that "special taxes" be applied uniformly.

After finding the differing tax rates unenforceable, the court applied the severance doctrine to preserve the balance of Measure H. To accomplish that, the provision setting forth the special tax levy was modified to remove all language referring to differing rates, leaving "a uniform tax of $120 per parcel per year." *Id.* Similar to the District Court's modification of Measure B, the court in *Borikas* struck language from that measure's *central provision*, its special tax levy provision, as follows:

> (A) **On each taxable,** ~~residential~~ **parcel at the rate of $120 per year,** ~~and (B) on each taxable, commercial or industrial property at the rate of $0.15 per square foot per year (but commercial or industrial property of 2,000 square feet or smaller paying $120 per year and commercial or industrial property larger than 2,000 square feet paying a maximum of $9,500 per year)~~**.**

*Borikas*, 214 Cal.App.4th at 166. A similar edit was made to Measure H's introductory paragraph where "the phrase 'levy a temporary 4-year emergency tax of $120 per residential parcel and 15¢ per square foot for commercial/industrial parcels ...' was modified to read 'levy a temporary 4-year emergency tax of $120 per residential parcel.'" The court held that this application of the severance doctrine left intact a grammatically separable, coherent and functioning tax measure. *Id.* at 166. Contrary to Vivid's assertion, the fact that these revisions, which in part excised an individual word from the middle of a clause or phrase, occurred in the measure's central provision did not render it non-grammatical.

To the extent Vivid seems to argue that it is somehow improper to strike language from a definition or a "central" definition, there is no support for that proposition either. In *City of Dublin v. County of Alameda*, 14 Cal.App.4th 264 (1993), the voters passed Measure D, an initiative to amend the county's charter to authorize the county to implement a "Source Reduction and Recycling Plan," a program designed to minimize waste and support recycling. One of the cities within the county objected because the Plan covered both *unincorporated* and *incorporated* parts of the county by virtue of the Measure's stated definition of "County" to mean "the geographic entity, including both the incorporated and unincorporated areas." *Id.* at 273, n. 5. Under Article XI, Section 7 of the California Constitution, however, the police power bestowed upon a county may be exercised "only in the *unincorporated* area of the county." *Id.* at 274-75.

Severance of the invalid portion of Measure D would therefore require a judicial editing of the definition of "County," a critical definition within Measure D— which is precisely the type of definition that Vivid argues cannot be modified without violating the grammatically separable requirement. But the court in *City of Dublin* held that "[t]he reference to incorporated areas may be grammatically excised from the definition [of the term "County"], and severance would not impair the rest of the measure." *Id.* at 275. The grammatically separable requirement does not therefore preclude courts from excising language from an initiative's central definitions.

Thus, Measures B (in this case), D (in *County of Dublin*) and M (in *Borikas*) satisfy the "grammatical" criterion because the unenforceable defect in each case "can be cured by excising" the offending "word or group of words." *Borikas*, 214 Cal.App.4th at 166.

### 2.    The initiative, as modified, would have been passed by the voters, thereby meeting the "volitional" standard

The final criterion is volitional severability, which is the "most important" factor in the severability analysis. *Katz v. Children's Hospital of Orange Cty.*, 28 F.3d 1520, 1531 (9th Cir.1994). The District Court properly ruled that the volitional standard is easily satisfied in this case. ER 34.

Volitional severability requires that "the remainder [of the initiative] … is complete in itself and would have been adopted by the legislative bodies [or voters for an initiative] had the later foreseen the partial invalidation of the statute … or constitutes a completely operative expression of the legislative [or voters'] intent." *Borikas*, 214 Cal.App.4th at 167 (citations omitted). To pass the volitional test, "'the provisions to be severed [meaning saved] must be so presented to the electorate in the initiative that their significance may be seen and independently evaluated in light of the assigned purposes of the enactment. The test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed [i.e., saved] so that it would have separately considered and adopted them in the absence of the invalid portions.'" *Gerken*, 6 Cal.4th at 714-15. "If a part to be severed [and therefore saved] reflects a 'substantial' portion of the electorate's purpose, that part can and should be severed and given operative effect." *Id.* at 715.

In *McMahan v. City and County of San Francisco*, 127 Cal.App.4th 1368, the court applied the volitional test in a context similar to Measure B. San Francisco voters passed a ballot initiative, Proposition N, popularly known as the "Care Not Cash" initiative, which required San Francisco to provide in-kind benefits to the homeless instead of the existing cash grant program. The initiative's funding mechanism, however was unenforceable, raising the question of whether the initiative's substantive provisions could be severed from the invalid funding mechanism. *Id.* at 1374. The court of appeal held that the volitional test was satisfied because the Care

Not Cash initiative's "core purposes," to replace each indigent's cash grant with services, was "presented to the electorate as a distinct aim, separate and apart from the measure's funding mandate." *Id.* The initiative's title also made clear the voters' intent to assure that indigents would receive services instead of cash. *Id.* This "core goal" was reinforced by the text of the initiative, which underscored the initiative's primary purpose of providing services instead of cash. *Id.* at 1375.

Measure B is titled the "Safer Sex in the Adult Film Industry Act," with the term "safer sex" connoting the mandated use of condoms in the adult film industry. Measure B's stated "purpose and intent" make explicit that it was designed "to minimize the spread of sexually transmitted infections resulting from the production of adult films in the County of Los Angeles" by requiring producers "to obtain a permit from the Los Angeles County Department of Public Health to ensure that producers comply with preexisting law requiring, among other things, that performers are protected from sexually transmitted infections by condoms." ER 228 (Measure B, Section 3).

As with the Care Not Cash initiative, Measure B's core "Condoms in Porn" purpose was popularly known and prominently stated on the face of the ballot. The core condom use requirement was therefore separate from the more technical, ancillary provisions that were later deemed unenforceable. It is clear that County voters would have voted for Measure B even if they had known that the condom requirement would only apply to vaginal and anal sexual intercourse, but not "oral . . . penetration, including, but not limited to, penetration by a . . . finger, or inanimate object, oral contact with the anus or genitals of another performer." Similarly, Vivid cannot plausibly contend that voters would have rejected Measure B if they had known it would be judicially modified to (1) narrow the scope of "adult films" covered by Measure B or (2) remove certain administrative, investigative, funding and

enforcement powers. As the California Supreme Court observed in *Gerken*, 6 Cal.4th at 715, "it seems eminently reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose."

## CONCLUSION

For these reasons and those stated in Proponents' Response to Motion to Dismiss, this Court should affirm the District Court's denial of the requested preliminary injunction.

DATED: October 18, 2013

By:   s/Thomas R. Freeman
_____
Thomas R. Freeman
*Attorneys for Intervenor Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, the undersigned hereby certifies that this Opening Brief contains 13,980 words, which is less that the 14,000 word limitation, and the type size and typeface comply with the requirements set forth in Federal Rule of Appellate Procedure 32(a)(5) and (6).

DATED: October 18, 2013

By:     s/Thomas R. Freeman
_____
Thomas R. Freeman
Attorneys for Intervenor Defendants-Appellees

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned certifies that the following cases are related to the instant appeal:  None.


DATED: October 18, 2013


By:     s/Thomas R. Freeman

Thomas R. Freeman

Attorneys for Intervenor Defendants-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

As to the participants in the case who are registered CM/ECF users, service will be accomplished by the appellate CM/ECF system.  To my knowledge there are no participants who are not registered CM/ECF users.

s/Thomas R. Freeman

Thomas R. Freeman