**No. 13-56445**
_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

**VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE
DOE a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce,**
*Plaintiffs-Appellants,*
v.
**JONATHAN FIELDING, Director of Los Angeles County Department of
Public Health; JACKIE LACEY, Los Angeles County District Attorney;
and COUNTY OF LOS ANGELES,**
*Defendants-Appellees.*
_____

**On Appeal from the United States
District Court for the Central District of California
Hon. Dean D. Pregerson, Case No. CV13-00190 DDP (AGRx)**
_____

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS
VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.;
JANE DOE a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce**
_____

Robert Corn-Revere                     Janet L. Grumer
Ronald G. London                       Matthew D. Peterson
DAVIS WRIGHT TREMAINE LLP              DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., NW, Suite 800  865 South Figueroa Street, Suite 2400
Washington, DC  20006                  Los Angeles, CA  90017-2566
(202) 973-4200                         (213) 633-6800

Attorneys for Plaintiffs and Appellants
VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.;
JANE DOE a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce
(counsel continue on inside cover)

Paul J. Cambria, Jr.
LIPSITZ GREEN SCIME CAMBRIA LLP
1631 West Beverly Blvd., Second Floor
Los Angeles, CA  90026
(323) 883-1807

H. Louis Sirkin
SANTEN & HUGHES LPA
600 Vine Street, Suite 2700
Cincinnati, OH  45202
(513) 721-4450

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT ..........................................................................................1

I.  WHETHER VIEWED AS A MATTER OF ARTICLE III
    STANDING OR RULE 24 INTERVENTION, PUTATIVE
    INTERVENORS ARE NOT PROPER PARTIES UNDER
    *HOLLINGSWORTH* ......................................................................1

II. THE SEVERANCE OF MEASURE B BELOW CONSTITUTED
    IMPERMISSIBLE JUDICIAL LEGISLATION, AND DID NOT
    LEAVE BEHIND AN ORDINANCE THAT IT CAN BE FAIRLY
    SAID VOTERS WOULD HAVE ADOPTED ...............................5

    A.  The Preservation of Certain Measure B Provisions Fails the
        Test for Volitional Severability..............................................7

    B.  Measure B's Remnants Fail the Test for Grammatical
        Severability..........................................................................10

    C.  Measure B's Remnants Fail the Test for Functional Severability ......13

III. MEASURE B DOES NOT WITHSTAND ANY LEVEL OF FIRST
     AMENDMENT SCRUTINY ........................................................15

    A.  Measure B is an Invalid Prior Restraint ...............................15

    B.  Measure B Fails Intermediate First Amendment Scrutiny.................20

        1.  The Asserted Governmental Interest is Unsupported...............20

        2.  Measure B Does Not Alleviate in a Direct and Material
            Way the Harms that it Targets ...................................23

        3.  Measure B Burdens Substantially More Speech Than
            Necessary ........................................................25

CONCLUSION.......................................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Acosta v. City of Costa Mesa*,
   718 F.3d 800 (9th Cir. 2013) ........................................................................*passim*

*Berger v. City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009) (*en banc*)......................................................*passim*

*Brown v. Entm't Merchs. Ass'n*,
   131 S. Ct. 2729 (2011).....................................................................................19

*California Prolife Council PAC v. Scully*,
   989 F. Supp. 1282 (E.D. Cal. 1998) ...............................................................21

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
   508 U.S. 520 (1993)...................................................................................16, 17

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993)...................................................................................16, 18

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000).........................................................................................19

*Colacurcio v. City of Kent*,
   163 F.3d 545 (9th Cir. 1998) ..........................................................................16

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ...................................................................6, 7, 12

*Daggett v. Webster*,
   1999 WL 33117158 (D. Me. May 18, 1999)...................................................21

*Fly Fish, Inc. v. City of Cocoa Beach*,
   337 F.3d 1301 (11th Cir. 2003) ......................................................................19

*Gammoh v. City of La Habra*,
   395 F.3d 1114 (9th Cir. 2005) ..................................................................16, 20

*Hollingsworth v. Perry*,
   133 S. Ct. 2652 (2013)...............................................................................1, 3, 4

*Ibanez v. Florida Dept. of Bus. & Prof. Reg.*,
    512 U.S. 136 (1994).............................................................................22

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976).............................................................................17

*Prete v. Bradbury*,
    438 F.3d 949 (9th Cir. 2006) ...............................................................4

*R.V.S., L.L.C. v. City of Rockford*,
    361 F.3d 402 (7th Cir. 2004) ...............................................16, 22, 23

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995).............................................................................22

*Sagebrush Rebellion, Inc. v. Watt*,
    713 F.2d 525 (9th Cir. 1983) ...........................................................3, 4

*Schneider v. State of New Jersey*,
    308 U.S. 147 (1939).............................................................................25

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969).............................................................................6

*Sorrell v. IMS Health Inc.*,
    131 S. Ct. 2653 (2011).........................................................................17

*Tollis, Inc. v. County of San Diego*,
    505 F.3d 935 (9th Cir. 2007) ...............................................................25

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994).......................................................................20, 23

*United States v. Buckland*,
    289 F.3d 558 (9th Cir. 2002) ...............................................................11

*United States v. Playboy Entm't Group, Inc.*,
    529 U.S. 803 (2000).......................................................................19, 26

*United States v. Stevens*,
    559 U.S. 460 (2010).............................................................................6

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*,
  536 U.S. 150 (2002) .......................................................................17, 24

*Yagman v. Republic Ins. Co.*,
  987 F.2d 622 (9th Cir. 1993) ...............................................................22

*Yniguez v. State of Arizona*,
  939 F.2d 727 (9th Cir. 1991) *vacated on other grounds sub nom. Yniguez
  v. Arizonans for Official English*, 520 U.S. 43 (1997) .........................3

**State Cases**

*Borikas v. Alameda Unified School District*,
  214 Cal. App. 4th 135 (2013) ...............................................................12

*City of Dublin v. County of Alameda*,
  14 Cal. App. 4th 264 (1993) .................................................................13

*In re Berry*,
  68 Cal. 2d 137 (1968) .............................................................................6

*McMahan v. City and County of San Francisco*,
  127 Cal. App. 4th 1368 (2005) ...............................................................9

*Metromedia, Inc. v. City of San Diego*,
  32 Cal. 3d 180 (1982) ...........................................................................10

*MHC Fin. Ltd. P'ship Two v. City of Santee*,
  125 Cal. App. 4th 1372 (2005) ...............................................................7

*Perry v. Brown*,
  52 Cal. 4th 1116 (2011) ..........................................................................3

*Westfield Ins. Co. v. Galatis*,
  797 N.E.2d 1256 (Ohio 2003) ................................................................5

**Constitutional Provisions**

U.S. Const., amend. I .......................................................................*passim*

U.S. Const., Art. III..........................................................................*passim*

**Statutes**

Los Angeles Safer Sex in the Adult Film Industry Act, Measure B, *codified as* Los Angeles County *Code* § 11.39 *et seq.* ...................................................*passim*

L.A. Code § 22.56.1925.C ...............................................................................14, 26

**Rules**

Federal Rule of Civil Procedure 24 .............................................................1, 2, 4, 5

**Regulations**

California Code of Regulations Title 8, § 5193 ......................................................15

**Other Authorities**

http://quickfacts.census.gov/qfd/states/06/06037.html ...........................................20

http://voterguide.sos.ca.gov/ ..................................................................................9

http://www.ebudget.ca.gov/2013-14/pdf/BudgetSummary/Introduction.pdf .........14

http://www.lao.ca.gov/reports/2013/bud/spending-plan/spending-plan-073013.aspx ...........................................................................................................14

## ARGUMENT

I.   **WHETHER VIEWED AS A MATTER OF ARTICLE III STANDING OR RULE 24 INTERVENTION, PUTATIVE INTERVENORS ARE NOT PROPER PARTIES UNDER *HOLLINGSWORTH***

Although Putative Intervenors have vacillated about the requirement that they satisfy Article III standing criteria, *see* Reply to Opposition to Motion to Dismiss at 11-12 n.6, they now concede that they do not have such standing. *E.g.*, Ans. Br. 12 ("the Supreme Court's recent decision in the Proposition 8 case holds that *official ballot sponsors lack Article III standing*") (emphasis added).  They underscore this concession by insisting – repeatedly – that they need only satisfy the "protectable interest" inquiry governing intervention under Rule 24.  *See id*. 16-18; *see also* Opp. to Mot. to Dismiss 9-12.  But *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), makes clear that ballot initiative sponsors cannot, without more, satisfy *either* Article III or Rule 24.  Thus, Putative Intervenors are not proper parties, regardless whether that is for reasons arising under the Constitution, or under the Federal Rules. [1]

In their novel interpretation of *Hollingsworth*, Putative Intervenors place far more weight on the Supreme Court's use of the word "invoke" than that fragile term can bear.  *See* Ans. Br. § I.A.1.  They ignore the fact that, as intervenors, they

---

[1]   Putative Intervenors do not dispute that, if they were improperly admitted as parties, it was error for the District Court to rely on evidence they submitted.  *See* Op. Br. 36-38.

1

*are* "invoking the power of the [federal] court," by asking it to take legally binding action. By definition they are not in the same position as a defendant, as asserted. Ans. Br. 15. Unlike defendants, whom a plaintiff makes party to a case by naming them, and brings under a court's jurisdiction by serving them, intervenors pro-actively seek to join a case. Thus, intervenors "invoke" a court's jurisdiction by seeking to join as full parties to a case, regardless of which side they seek to enter. *See* Reply to Opp. to Mot. to Dismiss 3-5.

Putative Intervenors' insistence that Article III standing is relevant only to plaintiffs and appellants is unsupported by authority, and simply makes no sense. Ans. Br. 15-16. They claim, incongruously, that "Defendants qua defendants do not have injuries," *id*. 15, yet in the next breath assert that "losing defendants are injured because they are subject to an adverse ruling." *Id*. 16. The Answering Brief fails to address Appellants' showing that, under Putative Intervenors' view of Article III (and Rule 24), any member of the public affected by a statute, regulation or ordinance would be permitted to intervene as a party in any federal case challenging it. Reply to Opp. to Mot. to Dismiss 1, 9-10. There is no answer to the argument that such a permissive standard is no different from taxpayers seeking to pursue "generalized grievances," which of course is insufficient to be a party to a federal case. *See* Op. Br. 33. Putative Intervenors not only fail to cite authority to support their novel theory, they decline to address the decisions of

other circuits explaining why intervenors must meet Article III standing require-ments, as *Hollingsworth* affirmed.  *See* Reply to Opp. to Mot. to Dismiss at 3-4 & n.1 (discussing Circuits requiring Article III standing for intervenors).

Putative Intervenors instead cite the rights that California accords initiative sponsors under *state* law,[2] which the Supreme Court has explicitly rejected as a basis for party status.  *See Hollingsworth*, 133 S. Ct. at 2664-67.  Their argument on this point boils down to the "*Sagebrush Rebellion* rule" and the extent to which this Court's pre-*Hollingsworth* cases allowed ballot initiative proponents to inter-vene.  Putative Intervenors rely heavily on how pre-*Hollingsworth* jurisprudence "favor[ed] intervention of those who actively supported challenged legislation," Ans. Br. 17 (citing *Sagebrush* and *Yniguez*), and on cases where "the California Supreme Court recognized [that] ballot sponsors are the most obvious and logical [] individuals to ably and vigorously defend" their measure.  *Id*. (quoting *Perry v. Brown*).  But *Hollingsworth* bars these arguments based on state law,[3] and Putative Intervenors do not even try to explain how any other view is possible.

---

[2]  Ans. Br. 17-18 (citing *Yniguez v. State of Arizona*, 939 F.2d 727, 733 (9th Cir. 1991) *vacated on other grounds sub nom. Yniguez v. Arizonans for Official English*, 520 U.S. 43 (1997), and *Perry v. Brown*, 52 Cal. 4th 1116, 1160 (2011)). *See infra* 4-5.

[3]  *See Yniguez*, 939 F.2d at 733 (ballot initiative sponsor's "heightened interest" rested on Arizona law); *Perry*, 52 Cal. 4th at 1165 (official proponents of a voter-approved initiative were authorized to defend under California law). *Sagebrush Rebellion, Inc. v. Watt*, wellspring of the "*Sagebrush Rebellion* rule," had nothing

As the Supreme Court held, "standing in federal court is a question of federal law, not state law." *Hollingsworth*, 133 S. Ct. at 2667. Accordingly, "the fact that a State thinks a private party should have standing to seek relief for a generalized grievance cannot override" federal requirements. *Id*. This answers in full the relevant question here for *both* Article III standing *and* Rule 24 intervention, where those wishing to intervene seek to do so only on the basis that a law they sponsored through enactment has been challenged in federal court.

As with Proposition 8 at issue in *Hollingsworth*, once Measure B "became a 'duly enacted … statute,'" Putative Intervenors had "no role – special or otherwise – in [its] enforcement." *Id*. at 2663 (citation omitted). Putative Intervenors thus have "no 'personal stake' in defending [Measure B's] enforcement that is distinguishable from the general interest of every citizen" of Los Angeles County. *Id. Hollingsworth* therefore definitively establishes that Putative Intervenors here do not have the "direct stake" required by Article III, *or* any "significantly protectable interest" required by Rule 24, which would allow them to be parties to this action.

Putative Intervenors claim it is "inconceivable" that a federal court would exercise its jurisdiction under *Sagebrush Rebellion* to exclude official ballot

---

to do with ballot initiatives, 713 F.2d 525 (9th Cir. 1983), while *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006) (cited Ans. Br. 19), relied solely on *Sagebrush*, and on the fact that the intervening ballot initiative supporters' significant protectable interest was not subject to challenge but rather was conceded. *Id*. at 955-56.

4

sponsors from defending the constitutionality of their initiative when "no other party is participating in the defense." Ans. Br. 18. But as in *The Princess Bride*, that word may not mean what they think it means. [4] It is not as though there is no defendant or appellee in this case – the County, *et al.*, are proper party-defendants/appellees. That the County has opted not to raise arguments Putative Intervenors wish to see put forward is not sufficient to grant party status to those who lack an interest undifferentiated from any other member of the general public. Indeed, the County filed an answer and issued a letter saying it was authorized to "take appropriate measures to enforce" Measure B. (E.R. 114) If the Court feels it needs additional input, there are mechanisms for obtaining it that do not fly in the face of Article III and Rule 24. *See* Reply to Opp. to Mot. to Dismiss 6-7.

## II. THE SEVERANCE OF MEASURE B BELOW CONSTITUTED IMPERMISSIBLE JUDICIAL LEGISLATION, AND DID NOT LEAVE BEHIND AN ORDINANCE THAT IT CAN BE FAIRLY SAID VOTERS WOULD HAVE ADOPTED

The District Court held that the licensing requirements of Measure B operates as a prior restraint that generally lacks procedural safeguards, is in most respects not narrowly tailored, and gives the County unbridled discretion. (E.R. 14) It upheld certain portions of Measure B only after revising its definitions and sub-stantive reach. This plainly violates the rule that courts cannot "rewrite a … law to

---

[4] *See* THE PRINCESS BRIDE (20th Century Fox 1987) (cited in *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1277 (Ohio 2003) (Pfeifer, J., dissenting))

conform it to constitutional requirements." *United States v. Stevens*, 559 U.S. 460, 481 (2010); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 153 (1969) (lower court cannot salvage an unconstitutional parade permit scheme by performing "plastic surgery upon the face of the ordinance"). *See* Op. Br. 24-31.

It is no answer for Putative Intervenors to assert that portions of the law are "severable." This Court recently recognized that the doctrine of severability is "inapplicable" where "a provision encompasses both valid and invalid restrictions of free speech and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 821 (9th Cir. 2013) (quoting *In re Berry*, 68 Cal. 2d 137 (1968)). This rule applies "despite the existence of a severability clause." *Id*.

In any event, the remnants of Measure B that the District Court preserved do not satisfy the test for severability, which under California law requires the text severed to be "volitionally, grammatically, *and* functionally severable." *Id*. at 817 (citations omitted). Putative Intervenors' unsupported proffer that California voters knew Measure B's "core requirement" was to require condoms in adult films, Ans. Br. 38-39, 45, cannot justify the District Court's blue-lining of the ordinance. Nor can Putative Intervenors' primary reliance on a dissenting opinion to support their argument. Ans. Br. 39 (citing *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 965 (9th Cir. 2011) (Kozinski,

6

C.J., dissenting)).  As the redrafted Measure B fails all of the criteria for sever-ability, it must be invalidated as a whole, *Acosta*, 718 F.3d at 821, and the District Court's partial denial of Appellants' motion for preliminary injunction should be vacated, with the rest of Measure B being preliminary enjoined.

### A.    The Preservation of Certain Measure B Provisions Fails the Test for Volitional Severability

As a threshold matter, "[i]f a statute does not meet any one criteria" for severability, any attempt to preserve part of the law must fail.  *Acosta*, 718 F.3d at 821 (citation omitted).  Though this may be considered a "harsh remedy," it is especially necessary when, as here, the "full protection for *First Amendment* liberties," cannot be reconciled with the "intent of the enacting body."  *Id.* (empha-sis in original).  In this case, the changes to Measure B cannot pass the threshold test for volitional severability.  The question is whether the portion of a law left intact is complete in itself, whether it would have been adopted by voters had they foreseen the partial invalidation that ensued, and whether it is a completely opera-tive expression of voter intent.  *MHC Fin. Ltd. P'ship Two v. City of Santee*, 125 Cal. App. 4th 1372, 1393 (2005).

In this case, there simply is no evidence or analysis in the decision below to suggest that the Los Angeles County electorate's "attention was sufficiently focused" on the use of condoms for vaginal and anal sex, such that the ordinance "would have still been passed in its constitutional form."  *Acosta*, 718 F.3d at 818

7

(citation omitted).  Quite to the contrary, the extent of the law that was invalidated, combined with the extravagant claims made by its sponsors relating to provisions that did not survive, point to a contrary conclusion.  There simply is no basis to be "confident" that Measure B would have been enacted without the parts that were enjoined.  *Id*. at 819.

Putative Intervenors' claim that "County voters would have voted for Measure B even if they had known that the condom licensing requirement would only apply to vaginal and anal sexual intercourse," Ans. Br. 45, is supported by nothing more than their assertions that Measure B was colloquially known and/or was searchable online as a "condom" law, *id*. at 38-39, and their hyped description of the surviving provisions as Measure B's "marquee feature."  *Id*. at 1.  But this Court has rejected attempts to meet the volitional test based on such a "*post hoc* litigating position*,*" and instead has insisted on proof that the law still would be adopted, looking at the measure as a whole.  *Acosta*, 718 F.3d at 817 n.10 & 818.

In this case, it is far from certain voters would have approved Measure B if they knew it could become an unfunded mandate.  Its supporters, including Putative Intervenors, emphasized in Measure B's official "Arguments in Favor," that it would be financially self-supporting – and they explicitly promised in bold, underlined text, that "**<u>100% of all costs</u>**" would be covered by adult filmmakers, not taxpayers.  Similarly the Measure's "Rebuttal to Argument Against" section,

also in bolded, underlined text, touts that "**Measure B makes clear that no public dollars will be spent to enforce condoms in porn.**" [5]   Indeed, Measure B's proponents made the promise of the public *not* funding the new regime one of only two primary arguments in support of Measure B.  *Id.*

This case is unlike *McMahan v. City and County of San Francisco*, 127 Cal. App. 4th 1368 (2005), upon which Putative Intervenors rely on this lack-of-funding point.  Ans. Br. 44-45.  In *McMahan*, the statute at issue, regarding benefits for the indigent, *expressly included a public funding component* when it was enacted, that was later declared unenforceable, and voters thus knew that public funds (*i.e.*, their tax dollars) would be used for the program.  *Id.* at 1371-72.  In addition, unlike Measure B here, the ballot materials distributed to voters made no connection between the purpose of the statute and the funding mandate.  *Id.* at 1375.  Here the opposite is true – Putative Intervenors promised voters in bold face that Measure B would cost them nothing, and that its implementation would not divert resources from more pressing public health concerns.

---

[5]   District Court Dkt. 25, Ex. D at 29, 32.  The California  Secretary of State prepares an official voter information guide to assist voters in "mak[ing] [their] decisions" that includes "arguments in favor of and against ballot measures prepared by proponents and opponents."  *See* http://voterguide.sos.ca.gov/.  The Excerpts of the Record include only the text of Measure B itself, though the voter information portion was before the District Court as well, as indicated above.

Putative Intervenors also offer nothing to suggest that voters would have approved permitting and blood-borne pathogen training requirements, which the District Court preserved, absent not only the corresponding fees, but also the related permit revocation and suspension authority and inspection regime. Indeed, it is highly unlikely voters even focused on, *e.g.*, the training requirements, or if they did, that they would have required adult filmmakers, including on-set directors, to complete such training simply to check a box on a permit application form.

The California Supreme Court has "refused to sever portions of a statute where it was 'doubtful whether the purpose of the original ordinance is served by a truncated version'" and severance would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals." *Acosta*, 718 F.3d at 819 (quoting *Metromedia, Inc. v. City of San Diego*, 32 Cal. 3d 180, 191 (1982)). As Measure B's inspection, enforcement and funding have all been enjoined, it is now very different from what was pitched to voters, it is presumptively less effective in achieving its goals, and it thus differs sufficiently from its original form. There is no basis for asserting voters would have supported it as modified, or concluding that revised Measure B passes the volitional test.

## B. Measure B's Remnants Fail the Test for Grammatical Severability

The District Court's removal of individual words and phrases from Measure B's definition of "adult film" fails the test for grammatical severability. In *Acosta*,

10

this Court noted that "when California courts have concluded that text was grammatically severable, the text was severed from language that was in an entirely different sentence or section of the statute, making it grammatically 'complete and distinct.'" *Id.* at 819. "No California cases hold that one word … [is] grammatically severable." *Id.* at 820 ("grammatical severability does not permit a single word to be excised from the middle of a clause or phrase"). The same is true for excising "grouping[s] of individual words" that are not a "complete grammatical unit," or "full clause[s] or phrase[s]." *Id.* Indeed, the Court held that "to excise single words (or groups of individual words)," would be to impermissibly "'*rewrite [an ordinance]* in order to save it.'" *Id.* (emphasis added) (quoting *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002)).

Excising single words and groups of individual words that were not themselves complete grammatical units is precisely what the District Court did to the definition of "adult film." *Compare* E.R. 19 (original definition) *with* E.R. 22 (modified version, excising from definition: (a) "oral," (b) "including, but not limited to, penetration"; and (c) "finger, or inanimate object; oral contact with the anus or genitals of another performer, and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious

11

materials"). These changes are not "modifications," as Putative Intervenors suggest, Ans. Br. 41, but are the type of rewriting that this Court has condemned. [6]

The District Court's reformulation of Measure B also finds no support in *Borikas v. Alameda Unified School District*, 214 Cal. App. 4th 135 (2013) (cited Ans. Br. 42). In *Borikas* (which predates *Acosta*), the California court removed a discrete subsection of a statute, which comprised a complete grammatical unit, specifically, the statute's description of certain commercial or industrial property subject to a property tax. *Id*. at 166. To be sure, as Putative Intervenors argue, a separate subsection of the law remained unchanged except for removal of a single word, "residential." Ans. Br. 42. But that word was removed only because it was no longer necessary given the deletion of the other subpart. *Borikas*, 214 Cal. App. 4th at 166.

The severance in *Borikas* is thus quite different from the District Court's manipulations of Measure B's definition of "adult film," where selective portions were deleted that were not complete grammatical units. Moreover, the individual word "oral" that was removed was part of a larger list of connected words, and was selectively chosen by the District Court for removal, as opposed to *Borikas* where

---

[6] Even Chief Judge Kozinski's dissent in *Comite de Jornaleros* (cited Ans. Br. 18, 39), notes that "[s]ometimes the offending provision is so intertwined with other parts of the statute that it's impossible to sever only the offending part; at other times, severing just one key part of the statute so distorts the statutory purpose that it's more prudent to strike down the whole." 657 F.3d at 965-66.

the single word removed was consistent with changes to deletion of an entire sub-part.  Similarly, in *City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264 (1993) (cited Ans. Br. 43), the California court struck a statute's reference to "incorporated areas," which was a complete grammatical unit within the text.

### C.    Measure B's Remnants Fail the Test for Functional Severability

The District Court's tinkering with Measure B also fails functional severability, which requires that any removed portions are not necessary to the ordinance's operation and purpose.  *See*, *e.g.*, *Acosta*, 718 F.3d at 820.  Here, for example, the District Court left intact a requirement that adult filmmakers obtain a permit, the sole purpose of which is now to confirm that blood-borne pathogen training has occurred, and to post at production sites. [7]  Given that no inspections of those production sites can occur to identify violations of representations made on the permit, or the requirements underlying it, and that the permit cannot be revoked, modified or suspend even if violations come to light, the permit regime hardly seems "functional."  Also, the District Court's blithe suggestion that

---

[7]  As discussed with respect to the First Amendment, there is nothing in the record or in the decision below establishing that blood-borne pathogen training and/or the obligation to get a permit that cannot be revoked, modified or sus-pended, will serve any legitimate government objective.  *See infra* 21-25; *see also* Op. Br. at 46-47.

Measure B might still be implemented and enforced without any funding (E.R. 33-34) seems unduly optimistic given State budget concerns in California. [8]

Moreover, while the stated (and *only*) purpose of Measure B is to more effectively enforce "preexisting law," *see* Measure B, § 3 (Purpose and Intent), the severed provisions saved from preliminary injunction serve no real purpose in that context. In both the "Findings and Declaration" at §§ 2(g) & (h), and the portion of § 5 codified as L.A. County Code § 22.56.1925.C, Measure B incorporates and seeks to ensure enforcement of Cal-OSHA rules that already regulate workplaces where there is a risk of exposure to blood-borne pathogens. (E.R. 85-87, 103-05) Measure B's proponents added layers of prior restraint permitting applicable to a broad range of sexually explicit filmmaking, an inspection regime, and the ability to modify, suspend or revoke permits – and thus terminate the ability to film – to buttress the Cal-OSHA regime.

But as modified by the District Court, the scope of covered conduct has been diminished, and the "nuclear options" in Measure B licensing have been removed. While some may argue that this makes Measure B less burdensome, *but see infra*

---

[8] *See e.g.*, summary of state budget proposal by Governor Brown, *available at* http://www.ebudget.ca.gov/2013-14/pdf/BudgetSummary/Introduction.pdf (outlining financial challenges faced by California); analysis of 2013-14 California state budget prepared by Legislative Analyst's Office, *available at* http://www.lao.ca.gov/reports/2013/bud/spending-plan/spending-plan-073013.aspx (same).

§ III.A.2-3, it also drains the ordinance of its purpose. Cal-OSHA rules already include the kinds of barrier protection and blood-borne pathogen plan requirements that the severed portions of Measure B now effectively duplicate. CAL. CODE REGS. tit. 8, § 5193; E.R. 7, 224-25. All Measure B does now, therefore, is not increase compliance, but merely creates an overlay of uncertainty that imposes a chilling effect and economic burdens on adult filmmaking. Such an impact hardly adheres to the ordinance's original purpose.

## III.  MEASURE B DOES NOT WITHSTAND ANY LEVEL OF FIRST AMENDMENT SCRUTINY

The District Court agreed that "Measure B, which requires producers to obtain a permit before shooting 'any film, video, multimedia or other represen-tation of sexual intercourse' is a prior restraint." (E.R. 14) Nevertheless, although prior restraints are presumed to be unconstitutional, *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009) (*en banc*), the District Court upheld the modified portions of Measure B under a "secondary effects" theory that Putative Intervenors echo. That theory is inapplicable in this case, but even were it appropriate, the reconstituted Measure B would still fail First Amendment scrutiny.

### A.    Measure B is an Invalid Prior Restraint

Strict scrutiny is the appropriate test for prior restraints. *See* Op. Br. 39-40 (citing cases). Moreover, Measure B imposes licensing requirements on film pro-

duction based on content, which also requires strict First Amendment scrutiny. [9]
*Id*. 40-42. And if that were not sufficient, there is also evidence, unrebutted by
Putative Intervenors, that Measure B's sponsors were motivated by hostility toward
the content of adult films. [10]

The only response to this is that courts should limit their concern to "objec-
tive indicators of intent." Ans. Br. 26 (citing *Gammoh v. City of La Habra*, 395
F.3d 1114, 1124 (9th Cir. 2005)). But "subjective statements … are relevant if
they show objective manifestations of an illicit purpose." *Colacurcio v. City of
Kent*, 163 F.3d 545, 552 (9th Cir. 1998) (cited Ans. Br. 25, 31-32, 35). Moreover,
purely subjective intentions are not so easily dismissed where the First Amendment
is implicated. *E.g.*, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S.

---

[9] A law is content based if either (1) "by its very terms, [it] singles out
particular content for differential treatment," or (2) "the underlying purpose of the
regulation is to suppress particular ideas." *Berger*, 569 F.3d at 1051. In this case,
Measure B manifests both indicia of being content-based. *Id*. ("one can regulate
the manner of speech on the basis of content, taking the regulation outside the
time, place, and manner rubric, even though *some* manner of communication on
the subject is allowed") (emphasis in original). *See City of Cincinnati v. Discovery
Network, Inc*., 507 U.S. 410, 429 (1993).

[10] Op. Br. 7-8. *See also* District Court Dkt. 25, Ex. D at 32 (official ballot
point by Measure B supporters equating performing in adult films with "abuse").
*Cf., R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402, 410 (7th Cir. 2004)
("[E]xplicit hostility toward and disapproval of the speech itself is not" a per-
missible purpose of regulation. "Certainly, … direct acknowledgment from the
official responsible for introducing the Ordinance makes us sensitive to the
possibility that [it] might be a pretextual … means of suppressing expression.").

520, 540-42 (1993); *Sorrell v. IMS Health Inc*., 131 S. Ct. 2653, 2663 (2011) (content-based purpose of a law revealed "by the record and by formal legislative findings").

Even if the issuance of permits by the County "is a ministerial task that is performed promptly and at no cost to the applicant," any law "requiring a permit to engage in speech constitutes a dramatic departure from our national heritage and constitutional tradition." *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 166 (2002). This Court has stressed that the "presumptive invalidity and offensiveness of advance notice and permitting requirements stem from the significant burden they place on free speech." *Berger*, 569 F.3d at 1037. In short, in "relying on an expansive, prophylactic prior restraint," the government burdens "substantially more speech than necessary to further [its] interests." *Id*. at 1045 (citation omitted).

This concern is particularly pertinent in this case, where the stated – and *only* purpose – of Measure B is "to ensure that producers comply with preexisting law." *See* Measure B, § 3 (Purpose and Intent). Putative Intervenors never explain why it is necessary to adopt what the Supreme Court has described as "the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), as merely a backstop for Cal-

17

OSHA regulations. [11]   Indeed, this Court repeatedly has struck down permitting requirements where "the government could simply enforce its existing rules" rather than require speakers "to pre-register with the government as a prerequisite to engaging in communicative activity." *Berger*, 569 F.3d at 1044.  Adoption of a licensing scheme, especially viewed in light of the various onerous provisions of Measure B that the District Court enjoined, strongly reinforces the conclusion that it was advanced primarily as pretext to suppress disfavored speech. *See Discovery Network, Inc.*, 507 U.S. at 429.

For this reason, Putative Intervenors' quest to promote a redundant but far more burdensome regulation in the form of a licensing requirement cannot be explained away as merely an effort to combat "secondary effects." *See* Ans. Br. §§ II.A-B; E.R. 8-11.  And even if this explanation were plausible, the secondary effects doctrine has never been upheld as applying to the production of mass media works like adult films.  Putative Intervenors (and the Court below) could find no

---

[11]   Due to its differences from Measure B as originally enacted, the Cal-OSHA regime is not subject to an obvious First Amendment facial challenge, as it does not target any particular industry or apply to expression in any of its other applications.  However, to the extent the State applies Cal-OSHA law to adult film, an "as applied" challenge might lie against particular enforcement actions.

such cases, and instead cite only decisions that involve adult establishment zoning and conduct regulation. [12]

Putative Intervenors dispute that secondary effects as applied to adult entertainment has thus far been restricted to zoning, by arguing it "applies equally to licensing/permitting laws like Measure B." *Id*. 21 n.2.  But such licensure regulations govern what conduct proprietors may engage in at particular locations in a city or county, akin and often adjunct to zoning, and are nothing like Measure B. The Supreme Court has expressly distinguished and limited the zoning cases as a separate line of authority.  *See*, *e.g.*, *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 815 (2000) (strict scrutiny applied to statute restricting sexually oriented cable TV programming).

Ultimately, however, it makes little difference how Measure B is characterized.  Putative Intervenors do not even attempt to defend the measure as satisfying strict scrutiny, which it clearly would fail. *E.g.*, *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011).  But even if it were to be analyzed under intermediate scrutiny, the surviving portions of Measure B still fall short, because its supporters cannot show that the Ordinance "will in fact alleviate [the asserted] harms in a direct and material way," and that it does not "burden substantially

---

[12]  *See*, *e.g.*, Ans. Br. 21-23 (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000); *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301 (11th Cir. 2003)).

more speech than is necessary to further the government's legitimate interests."
*Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664-65 (1994) ("*Turner I*"); *accord Gammoh*, 395 F.3d at 1125-26.

### B.    Measure B Fails Intermediate First Amendment Scrutiny

### 1.    The Asserted Governmental Interest is Unsupported

Appellants do not dispute that there is a substantial interest in curbing sexually transmitted diseases and infections ("STDs" and "STIs") as a general proposition,[13] but Measure B's stated intent is "minimiz[ing STIs] resulting from the production of adult films," which are alleged to have a "negative impact on public health and quality of life" for all Los Angeles residents.  Measure B § 3.  In finding this first element satisfied, the District Court failed to cite any evidence that allegedly higher incidents of STDs in the adult film industry have <u>any</u> impact on the health of the *general* population of Los Angeles County, and Putative Intervenors cite no such evidence here.[14]

Putative Intervenors' seek to divert attention from the actual government interest asserted for Measure B, claiming instead that it lies in "lowering the rate of

---

[13]    Ans. Br. 27-28; *see also* Op. Br. 6-7, 43.

[14]    Measure B's proponents fail even to identify what percentage of the population of Los Angeles County works as performers in adult films.  Perhaps that is because, even if the DPH Letter undercounted the number of adult film performers in Los Angeles County by several multiples, *see* E.R. 99, they would still make up but a miniscule proportion of the County's nearly 10 million residents.  *See*, *e.g.*, http://quickfacts.census.gov/qfd/states/06/06037.html.

STD infection *among adult film performers*" and "curb[ing] transmission of [STDs] in the adult film industry."  Ans. Br. 32, 33.  But, as shown above, the text of Measure B states a different purpose, one the Answering Brief ignores insofar as it requires showing a connection between adult filmmaking and the health of Los Angeles County's general population.  While Putative Intervenors admit that they may not rely on "shoddy" data to satisfy their burden, Ans. Br. 27, here there is <u>no</u> data at all on the claimed government interest.

Measure B's "findings" are entitled to no deference (on this, or any other point), [15] and Putative Intervenors did not take the opportunity on preliminary injunction briefing or argument to offer independent evidence.  Instead, they throw all their weight behind a September 2009 County Public Health report (the "DPH Letter"), which Putative Intervenors now claim, for the first time on appeal, that Measure B is "based on," despite there being no basis in the record for that position, or any mention of the DPH Letter in Measure B's text or official ballot statements.  *See* District Court Dkt. 25, Ex. D, *supra* note 5.

The fact that a letter exists regarding sexual health in the adult film industry, without any connection to Measure B, is insufficient to demonstrate a real, sub-stantial governmental interest vis-à-vis the general population of Los Angeles

---

[15] *See* Op. Br. 37 (citing *Daggett v. Webster*, 1999 WL 33117158, at *1 (D. Me. May 18, 1999); *California Prolife Council PAC v. Scully*, 989 F. Supp. 1282, 1299 & n.42 (E.D. Cal. 1998)).

County.  This is particularly so in that the DPH Letter contains no findings that allegedly higher incidents of STDs in the adult film industry have any impact on the health of the general population of Los Angeles County.  Op. Br. 42-43. Significantly, recent cases of HIV found by adult film testing, as cited by Putative Intervenors [16] – resulted from transmissions *outside* adult film production, which would not be prevented by Measure B.

These evidentiary failings leave Putative Intervenors pinning all their hopes of satisfying their burden on an "inference" that adult film performers pose greater risks to the general populace than other County residents, Ans. Br. 30, and on asserted "logical necessity."  *Id.* 33.  While the Answering Brief cites the DPH Letter, Putative Intervenors' ultimate conclusions are all *ipse dixits* for which they cite no authority or evidence.  Such assertions cannot satisfy this factor.  *Ibanez v. Florida Dept. of Bus. & Prof. Reg.*, 512 U.S. 136, 143 (1994) (restrictions on commercial speech cannot be based on "unsupported assertions");  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490 (1995) ("anecdotal evidence and educated guesses" cannot support speech restrictions under intermediate scrutiny).  *Cf., R.V.S.*, 361 F.3d at 411 ("While it is true that common experience may be relied

---

[16]  These claims are made through a proffer that was not before the court below.  *See* Intervenor Defendants-Appellees' Request for Judicial Notice ("RJN") 11.  Such materials should not be considered on appeal, even when submitted as part of a request for judicial notice.  *See Yagman v. Republic Ins. Co.*, 987 F.2d 622, 626 n.3 (9th Cir. 1993).

upon to … claim [] a regulation serves a [] governmental interest … such consideration cannot amount to acceptance of an 'if they say so" standard.").

### 2.    Measure B Does Not Alleviate in a Direct and Material Way the Harms that it Targets

The greatest failing of both the decision below and the Answering Brief on narrow tailoring is that Putative Intervenors do not and cannot dispute that the District Court failed to address whether Measure B does "in fact alleviate [] harms in a direct and material way." *Turner I*, 512 U.S. at 664-65.  Failure to address this point is by itself reversible error, and Putative Intervenors offer no suggestion to the contrary.  They cannot avoid that consequence by attempting to reframe the issue by arguing it "is satisfied so long as the government's [] interest would be achieved less effectively absent the regulation."  Ans. Br. 31 (cites and internal quotation omitted).  Even under that formulation, there still must be material advancement, and that cannot be said of Measure B, given Putative Intervenors' suggestion that adult filmmakers can avoid Measure B's burden on speech by just shooting outside Los Angeles County.  *See* Op. Br. 44-45.

Given this concession, which the Answering Brief does not disavow, there is no evidence or likelihood Measure B will serve its objectives based solely on the DPH Letter and paeans to "mathematical calculation[] and [] logical necessity." Ans. Br. 32-34.  That remains true, even were the Court to accept the criticisms

leveled at adult film testing protocols (which Appellants do not concede). [17] Despite the issue being front-and-center in the Opening Brief and below, Op. Br. 44-45; E.R. 86-87, Putative Intervenors still have no answer for the fact that there is no tangible public health benefit from merely forcing adult film production into the next county.

The Answering Brief's only response is that "if *any* productions remain in Los Angeles County (with condoms) or if *any* performers crossing county lines do not return for unprotected sex in Los Angeles, Measure B will have made a difference." Ans. Br. 31 (emphases added). But that "difference" is speculative at best, and stands as a far cry from direct and material advancement of Measure B's stated objective that intermediate scrutiny demands. Indeed, such supposition is inadequate to support even a time, place, or manner requirement. *Watchtower Bible*, 536 U.S. at 165-166 (regulations are invalid where they only marginally advance the government's asserted interests).

Putative Intervenors also do not even attempt to show how Measure B's blood-borne pathogen training, permitting and permit-posting left intact below might directly and materially advance a governmental interest, compounding the

---

[17] That is not to overlook, however, that Putative Intervenors offer no support by citation or reference to any evidence or legal authority, for their contention that "unknown numbers of performers with 'clean' test results are infected and are having unprotected sex[] with unsuspecting partners, further spreading STDs despite screening." Ans. Br. 33-34.

District Court's failure to make any such finding.  Instead, they claim Appellants made "no argument that the remaining portions of Measure B's permitting require-ments are unconstitutional or otherwise unenforceable."  Ans. Br. 38.  Far from "waiving" such arguments, *id*., the Opening Brief stated quite clearly that there was already no legislative or other record showing that the permitting regime, even without pruning, satisfies narrow tailoring, nor any basis for concluding a regime stripped of suspension, revocation, and inspection mechanisms does so. [18]

### 3.    Measure B Burdens Substantially More Speech Than Necessary

Putative Intervenors' argument that Measure B leaves alternative channels for communication, Ans. Br. 35-36, ignores that even under intermediate scrutiny, the targeted speech cannot simply be driven from a jurisdiction.  *E.g., Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 941-42 (9th Cir. 2007).  In particular, a permit requirement for speech cannot be justified in this way because "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  *Schneider v. State of New Jersey*, 308 U.S. 147, 151-152 (1939).

---

[18] Op. Br. 46-47.  Notwithstanding Putative Intervenors' claims, Appellants have not "waived" any other argument, such as the fact that regulating speech via ballot initiative is per se unconstitutional.  *See* Ans. Br. 38.  *Compare also id*. 10 n.1 *with* Op. Br. n.12.

Putative Intervenors' claim that Measure B seeks only to make State regulations in the area of blood-borne pathogen transmission more effective essentially concedes the point that less drastic alternatives to a prior restraint exist. As noted above with respect to functional severability, Measure B incorporates and seeks to ensure the enforcement of Cal-OSHA rules that already govern blood-borne pathogens in the workplace. *See supra* 14 (citing Measure B §§ 2(g) & (h), L.A. County Code § 22.56.1925.C; E.R. 85-87, 103-05)  As explained in the Opening Brief, these rules stand as a less restrictive alternative to Measure B's condom mandate that Appellants offered, and that the District Court ignored. *See* Op. Br. 46 n.17.

It is well-settled both that if there is a separate regulatory mechanism addressed to the same government interest, more speech-invasive rules cannot stand, and that the burden falls on the proponent of the more speech-invasive rule to "prove [] the alternative will be ineffective to achieve its goals." *Playboy Entm't Group*, 529 U.S. at 816; *Berger*, 569 F.3d at 1044 ("The Supreme Court has consistently struck down prior restraints on speech where a state could achieve its purported goal of protecting citizens from wrongful conduct by punishing only

actual wrongdoers, rather than screening potential speakers.").  Putative Intervenors have not even attempted to do so here. [19]

## CONCLUSION

For the foregoing reasons, and those stated in briefing that the Court treated as a Motion to Dismiss, this Court should reverse the District Court and order the entry in full of the preliminary injunction Appellants sought below.

RESPECTFULLY SUBMITTED this 1st day of November, 2013.

DAVIS WRIGHT TREMAINE LLP
ROBERT CORN-REVERE
RONALD G. LONDON
JANET L. GRUMER
MATTHEW D. PETERSON

LIPSITZ GREEN SCIME CAMBRIA LLP
PAUL J. CAMBRIA, JR.

SANTEN & HUGHES LPA

H. LOUIS SIRKIN


By:    /s/ Robert Corn-Revere
          Robert Corn-Revere

Attorneys for Plaintiff and Appellant
VIVID ENTERTAINMENT, LLC;
CALIFA PRODUCTIONS, INC.;
JANE DOE a/k/a Kayden Kross; and
JOHN DOE a/k/a Logan Pierce

---

[19] Putative Intervenors, like the District Court, also "overlook the main point on under-inclusiveness, which was that Measure B does not address STD risks to the overall population of Los Angeles County, which is its only stated objective." Op. Br. at 49.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FRAP 32(a)(7) because it contains 6,621words, excluding those parts exempted by FRAP 32(a)(7)(B)(iii), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

_____/s/ Matthew D. Peterson_____
Matthew D. Peterson

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 1, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


        /s/ Matthew D. Peterson
Matthew D. Peterson